UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:08 CR 404 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| ANTUN LEWIS, | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending in the above-captioned case is Defendant Antun Lewis's ("Defendant" or "Lewis") Motion for Pretrial Determination That the Imposition and Execution of the Death Penalty is Barred Based on Antun Lewis['s] Mental Retardation. (ECF No. 204). For the reasons which follow, the court hereby grants the Motion.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A. Procedural History

Defendant was indicted on one count of arson based on a fire that was set at a house located at 1220 East 87th Street in Cleveland, Ohio.  (Indictment, ECF No. 1.)  The house was rented by Medeia Carter, whose lease was subsidized by the United States Department of Housing and Urban Development.  Nine people, eight of whom were young children or teenagers, died as a result of the fire, and one person was injured.  The Government gave notice that it would seek the death penalty pursuant to the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq*., and that it was authorized to do so by the Attorney General.

Defendant filed the pending Motion on August 23, 2010, requesting that the court make a pretrial determination that he is mentally retarded as defined by the Supreme Court in *Atkins v.*

*Virginia*, 536 U.S. 304 (2002).  Such a finding would preclude the imposition of a sentence of death pursuant to the Eighth Amendment to the U.S. Constitution and 18 U.S.C. § 3596(c).  In an Order dated August 26, 2010, this court determined that Defendant's Motion should be ruled on by the court, not a jury, and that it should be ruled on prior to the beginning of trial.  (ECF No. 218.)  The court held a hearing on the instant Motion on the following dates: October 19, 20, 21, 29, and November 8, 2010.  The case is currently scheduled for trial, with jury selection to begin on January 5, 2011.  *Id.*

### B. Expert and Lay Witness Testimony

During the six days of hearings, Defendant called six lay witnesses and three expert witnesses. The Government called two lay witnesses and two expert witnesses.  The qualifications of the expert witnesses and the relationship of each lay witness to Defendant are summarized below.

### 1. Defendant's Expert and Lay Witnesses

Defendant's first expert witness was Dr. George W. Woods, Jr. Dr. Woods is a licensed physician specializing in neuropsychiatry.  He received his medical degree from the University of Utah Medical Center, completed a medical internship at Alameda County Medical Center, and completed his residency at Pacific Medical Center in San Francisco.  Dr. Woods is a Fellow and member of the American Psychiatric Association, and a member of the American Neuropsychiatric Association.  His medical training is primarily in neuropsychiatric disorders, brain dysfunction, and metabolic disruption.  He has experience in making assessments regarding intellectual disability under *Atkins*.  Dr. Woods stated that he has testified in two federal *Atkins* hearings.  (Transcript (hereinafter "Tr."), p. 27.)  Dr. Woods stated further that he has been trained in "IQ testing but not in administration or interpretation" of the IQ tests. (*Id*.)  He is also a member of the American Association on Intellectual and Developmental Disability Task Force on *Atkins* and the death penalty.  (*Id*. at 25.)  Patients with an intellectual disability make up 15 percent of his private practice.  (*Id*. at 219-20.)  In this case, Dr. Woods was asked by counsel for Defendant to conduct a neuropsychiatric evaluation of Defendant.  (*Id*. at 10.)

Defendant's second expert witness was Dr. John Matthew Fabian. Dr. Fabian was called as a rebuttal witness.  (*Id*. at 36.)  He is a Forensic and Clinical Psychologist and a Clinical

Neuropsychologist.  (*Id*. at 816.)  He received his Psy.D from the Chicago School of Professional Psychology and his ABPP from the Fielding Graduate Institute.  Dr. Fabian is a member of the American Psychological Association.  (*Id*.)  He has experience in intellectual disability assessments and *Atkins* determinations.  He received training in intellectual disability assessments through his service in a number of different positions, including as a forensic psychology intern with the Court Diagnostic and Treatment Center, and as Director of the Court Psychiatric Clinic in the Lake County Court of Common Pleas.  (Tr., p. 824.)  Dr. Fabian has conducted approximately 15 *Atkins*-related evaluations and over 100 other forms of evaluations related to intellectual disability, competency, and mitigation.  (*Id*.)  Of the 15 or so *Atkins* evaluations Dr. Fabian has performed, he has testified as an expert in about half a dozen of these evaluations.  (*Id*. at 827.)  Finally, he has written several articles regarding intellectually disabled defendants facing the death penalty.  (Def. Exp. Rep., ECF No. 227.)

Defendant's third expert witness, also called in rebuttal, was Dr. Stephen Greenspan, a psychologist and preeminent scholar on intellectual disability.  Dr. Greenspan received his Ph.D. in developmental psychology from the University of Rochester.  He did his postdoctoral fellowship on Mental Retardation and Developmental Disabilities at UCLA's Neuropsychiatric Institute.   In addition to having held various academic posts, Dr. Greenspan was head of the University of Connecticut's Pappanikou Center, a mental retardation center.  (Tr., p. 1094.)  Dr. Greenspan is the co-editor of the book entitled, "What is Mental Retardation?", and he is the authority most cited in the Intellectual Disability: Definition, Classification, and Systems of Supports (11th Ed.) (hereinafter "AAIDD"), one of the primary manuals used to make an intellectual disability determination.  Dr. Greenspan's influential work is particularly pertinent to one of the three requirements for making an intellectual disability diagnosis, the adaptive behavior prong, under the AAIDD intellectual disability standard discussed herein.  (Tr., pp. 1099-1101.)  Dr. Greenspan is a Fellow of the American Psychological Association and the American Association for Intellectual and Developmental Disabilities.  (*Id*. at 1095.)  He indicated that he has been certified as an expert and has testified in 14 *Atkins* hearings.  (*Id*. at 1104.)

Defendant's first lay witness was Stephen Ford, a Psychology Assistant II at the Southern Ohio Correctional Facility.  (Tr., pp. 333-34.)  As a Psychology Assistant II, he conducts psychological evaluations under supervision. (*Id*. at 335.)  On April 4, 2008, Mr. Ford administered an IQ test to Defendant.  As discussed further herein, Mr. Ford miscalculated Defendant's IQ score for that test.

Defendant's second lay witness was David Cox, a Psychology Supervisor at the Southern Ohio Correctional Facility.  (*Id*. at 354.)  As a Psychology Supervisor, Mr. Cox reviewed the psychological evaluations administered by Correctional Facility psychology assistants, including Stephen Ford.  (*Id*. at 358.)  Mr. Cox reviewed Mr. Ford's 2008 administration of the IQ test to Defendant.  Mr. Cox agreed that there was a miscalculation on the original 2008 IQ score.

Defendant's third lay witness was Susan Greenawalt, a retired educator formerly employed at Cuyahoga Hills Juvenile Correctional Facility, Department of Youth Services. (*Id*. at 369.)  Ms. Greenawalt was Defendant's special education teacher during his incarceration at the Juvenile Correctional Facility when Defendant was 17 or 18 years old. (*Id*. at 370.)  Ms. Greenawalt wrote several of Defendant's individualized education program reports that described Defendant's behavioral and intellectual limitations.  (*Id*. at 381.)

Defendant's fourth lay witness was Brenda Lewis, Defendant's mother.  Brenda Lewis testified that Defendant had learning and behavioral difficulties in school and at home.  She testified about her pregnancy with Defendant and his birth.  (*Id*. at 399-405.)  Further, Brenda Lewis testified regarding her own intellectual challenges and handicaps.  (*Id*. at 388-97.)

Defendant's fifth lay witness was Mary Spates, Defendant's aunt.  Ms. Spates's testimony was similar to Ms. Lewis's testimony, in that she described Defendant's behavioral and learning challenges during his childhood and adolescence.  Ms. Spates also testified about her own intellectual impairments, as well as that of her children.  (Tr., pp. 424-437.)

Defendant's sixth lay witness was Domaneek Lewis, Defendant's sister.  She testified regarding Defendant's developmental difficulties in school and at home.

## 2. Government's Expert and Lay Witnesses

The Government's first expert witness was Dr. David Ott, a Clinical Psychologist. He received his Ph.D in clinical child psychology from the University of Alabama. He has experience in intellectual disability assessments and *Atkins* determinations. Dr. Ott has performed intellectual disability assessments in several positions, including as Chief Psychologist at the Muscatachuk State Development Center, and as Psychologist at the Montgomery Company Board of Mental Retardation and Developmental Disabilities. (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223-1.) Further, Dr. Ott has conducted approximately 30 to 40 *Atkins*-related evaluations and has testified in four or five *Atkins* hearings. (Tr., pp. 563, 566.) He is also a member of the Florida Developmental Disabilities Council. (*Id*. at 628.)

The Government's second expert witness was Dr. Galit Askenazi, a clinical neuropsychologist and a forensic psychologist. (*Id*. at 679.) Dr. Askenazi received her Ph.D. in clinical psychology from Case Western Reserve University. (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 25.) She is a member of several psychological associations, including the American Psychological Association and the National Academy of Neuropsychology. (Tr., pp. 679-80.) She has experience in intellectual disability assessments as a consulting neuropsychologist for the Cuyahoga County Court of Common Pleas and Summit County Psychodiagnostic Clinic. (*Id*. at 681.) Dr. Askenazi has also performed *Atkins*-related evaluations. (*Id*. at 687.) She admits her role as a court consulting neuropsychologist is typically limited in *Atkins*-related matters to administration of intelligence and neuropsychological testing. (*Id*.) However, in this hearing, Dr. Askenazi was retained by the Government to complete a comprehensive intellectual disability evaluation. (*Id*. at 688.)

The Government's first lay witness was Ms. Charise Williams. She is an adult female, approximately ten years older than Defendant, who allowed Defendant to reside in her home with her children and boyfriend, for a substantial period of time, starting when he was 15 or 16 years old. (*Id*. at 492.) She was a friend of Defendant from the time he was 15 years old until his 2005 incarceration. (*Id*. at 492-93.) Charise Williams testified regarding issues related to Defendant's social behavior, his lack of hygiene, maturity, employment, and other abilities.

The Government's second lay witness was Ms. Joann Arnold, the Manager of Quality Review and Custodian of Records for the Cuyahoga County Board of Developmental Disabilities (*Id.* at 892.) Ms. Arnold testified that the Board never provided, or was requested by the County schools to provide, any developmental disabilities services to Defendant. (*Id.* at 893.)

## II. LEGAL STANDARD

### A. Evidentiary Standard

Defendant bears the burden of proof by a preponderance of the evidence that he is intellectually disabled. *See United States v. Hardy,* No. 94-381, 2010 WL 4909550, at *1 (E.D.La., Nov. 24, 2010).

### B. *Atkins* Determination Standard

#### 1. Introduction

The Federal Death Penalty Act of 1988 prohibits a person who is intellectually disabled from being sentenced to death. *See* 18 U.S.C. §3596(c) ("sentence of **death** shall not be carried out upon a person who is mentally retarded.")(emphasis added). The Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), affirmed this prohibition, and held that the Government's execution of an intellectually disabled person is a cruel and unusual punishment in violation of the U.S. Constitution's Eighth Amendment. *Atkins* created a categorical exclusion from the death penalty for individuals determined to be intellectually disabled. The Court reasoned that because intellectually disabled individuals are impaired in areas of reasoning, judgment, and control of their impulses, their actions are not at a similar "level of moral culpability that characterizes the most serious adult criminal conduct." *Id.* at 306. Further, the Court opined that the impairments associated with intellectual disability "can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Id.* at 306-07. For these reasons, the Supreme Court concluded that intellectually disabled defendants "in the aggregate[,] face a special risk of wrongful execution." *Id.* at 320-21.

Although the *Atkins* Court left to the states "the task of developing appropriate ways" to determine intellectual disability, the court did refer to the "mental retardation" standards of the American Association on Mental Retardation (now called the American Association of Intellectual and Developmental Disabilities) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (hereinafter, "DSM-IV-TR"). *Atkins*, 536 U.S. at 308 n. 3.

<u>2. AAIDD/DSM-IV-TR Standards for Intellectual Disability</u>

The AAIDD and DSM-IV-TR standards for determining intellectual disability are analytically similar in methodology and may be used interchangeably to determine intellectual disability. *See United States v. Davis*, 611 F.Supp. 2d 472, 474-75 (D.Md. 2009) ("Since *Atkins*, other federal courts have applied these same definitions, noting that the two definitions are essentially identical."). The court will apply the AAIDD standard for intellectual disability to this case and refer to the DSM-IV-TR standard and its classifications when pertinent. The court will also apply the guidelines set forth in the AAIDD User Guide. User's Guide Mental Retardation: Definitions, Classification, and Systems of Supports, 10th Edition, Gallery Draft, American Association on Mental Retardation (2006) (hereinafter "Guide").

Under the AAIDD operational standard, a person is intellectually disabled if he or she: (1) possesses significant limitations in intellectual functioning; (2) possesses significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and (3) exhibits both types of limitations before the person reaches the age of 18. This analysis requires the application of five assumptions in making a determination of intellectual disability. These assumptions are: (1) a consideration of the context of community environments typical of the person's age, peers and culture; (2) a consideration of cultural and linguistic diversity, as well as differences in communication, sensory, motor and behavioral factors; (3) the reality that an individual will possess both intellectual limitations and strengths; (4) the purpose of describing limitations is to develop that person's profile of needed supports; and (5) that a person with

intellectual disability generally will improve his or her life functioning with appropriate personalized supports over a sustained period. AAIDD, p. 1.

The DSM-IV-TR standard for intellectual disability is similar.  Under this standard, a person is intellectually disabled if: (1) the person possesses significantly subaverage general functioning; (2) that is accompanied by significant limitation in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (3) the onset must occur before age 18. DSM-IV-TR, p. 41.

In addition to providing a standard for intellectual disability, the AAIDD sets forth core diagnostic practices for an intellectual disability assessment.  The AAIDD considers these "best practices" critical in the administration of an intellectual disability assessment. Two "best practices" are relevant to this *Atkins* determination: (1) the expert's clinical judgment; and (2) the Flynn Effect.

The AAIDD states that the test administrator's clinical judgment is "essential" and that a "higher level of clinical judgment is frequently required in complex diagnostic and classification situations."  AAIDD, p. 29.  The AAIDD defines clinical judgment as "a special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive data." *Id.*  Clinical judgment is critical in situations where "formal assessment is less than optimal and cannot be improved" and "legal restrictions significantly impact opportunities to assess the person consistent with the definition's five operational assumptions."  *Id*. at 8.

The second best practice is relevant to Prong 1 of the intellectual disability standard, which uses IQ scores from standardized tests to measure an individual's intellectual functioning. The Flynn Effect accounts for errors   in IQ scores calculated  with outdated test norms.  *Id*. at 37.  A standardized IQ test is "normed" so that the test's IQ mean (average) reflects the average score of the general population.  To create a standardized norm for a test, the test is administered to a  large group that reflects the demographics of the general population.  The average score of the large

-8-

group's test results becomes the IQ test's standardized mean. Typically, a test's mean is represented by a score of 100. Because the process of norming an IQ test takes place within a given year, the test norm reflects the IQs of the general population in that given year. Thus, a test normed in 2000 would reflect the IQ mean of the given population in 2000. A person who takes this test will receive a score that is compared to the test's 2000 IQ mean. The Flynn Effect recognizes the phenomenon that IQ scores increase over time within a population. *Id*. at 37. The theory that supports this phenomenon is that the population, as a whole, becomes more intelligent over time. As a result of this increase in intelligence, the general population's average IQ score also increases. Thus, using the prior example, the mean of a test normed in 2000 will no longer reflect the increased average IQ of the current population in 2010. A person who takes this test in 2010 will receive a score that does not reflect his actual IQ as compared to the general population's current IQ average. An IQ test's failure to account for this increase in the population's IQ average will inflate a person's IQ score because the person's score is being measured by an older, and thus lower, IQ average than the current population. The person's overall intelligence has not changed, rather, the actual norms by which to judge the person's IQ have increased since the test was last normed. Because a standardized test's norm is fixed in time, and thus does not account for this phenomenon, the Flynn Effect adjusts an IQ score by 0.33 points for each year between the time the test was normed and the time the test was administered. *Id*. For instance, a 2010 IQ score resulting from a test normed in 2000 would need to reflect the increase in the population's IQ between the test's normed date and its administration. Because 10 years has passed between the test's norm date and the test's administration, 3.3 points, 10 multiplied by 0.33, would need to be subtracted from the 2010 IQ score. As a result, the Flynn Effect decreases an IQ score received from an outdated normed test.

### 3. Mild Mental Retardation or Intellectual Disability

The DSM-IV-TR classifies intellectual disability, or as the text labels the disorder, mental retardation, into five categories: mild; moderate; severe; profound; and mental retardation, severity unspecified. DSM-IV-TR, pp. 42-44. The text defines mild mental retardation as individuals who possess an IQ of 50-55 to "approximately 70." *Id*. at 42. The text uses the term "approximately"

because a person possessing an IQ as high as 75 can be diagnosed with mental retardation.  *Id*. at 41-42.  The text describes mild mental retardation as a disability:

> roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR, p. 43.

The DSM-IV-TR recognizes that the characteristics for mild mental retardation are "generally notice[d] later" in an individual's life.  *Id*. at 47.  The Guide cautions that individuals with mild mental retardation may "manifest subtle limitations that are frequently difficult to detect, especially in academic skills, planning, problem solving, and decision making, and social understanding and judgment." *Id*. at p. 16.  The Guide advises strongly that clinicians consider both the similarities and differences in individuals with mild mental retardation and those with other disorders, such as a learning disability.  *Id*.  The Guide states that the difference between the two groups is that those individuals with mild mental retardation have subaverage IQs that are consistent with their low academic achievement.  *Id*. at 16-17.  Conversely, individuals with learning disabilities show a discrepancy between their IQs and poor academic achievement.  *Id*. at 16.

-10-

# III. LAW AND ANALYSIS

## A. Prong 1: Defendant Possesses Significant Limitations in Intellectual Functioning

### 1. Legal Standard

A person's intellectual functioning is determined by individually administered tests that measure a person's IQ.  As discussed above, an individually administered test is normed to have a mean IQ score of 100.  Thus, an IQ score of 100 represents the average score of the test results received during the norming of the test. For an IQ score that is either higher or lower than the mean, the test assigns a fixed number of points that indicate how far an IQ score is away from the mean. This fixed number of points is called the standard deviation. An individually administered test possesses a standard deviation of 15 points.  The test also has a standard error of measurement ("SEM") of approximately 5 points on either side of the IQ score.  The SEM accounts for potential errors in the IQ assessment, including "variations in the test performance, examiner's behavior, cooperation of test taker, and other personal and environmental factors."  AAIDD, p. 36.  The SEM estimates the statistical confidence interval for a particular IQ score. *Id*. at 48.  The AAIDD states that "the use of plus/minus two SEM yields a statistical confidence internal (sic) (around the obtained score) in which the person's true score will fall 95% of the time." *Id*. at 49.

A person who receives an IQ score of 100 is stated to have an average level of intellectual functioning.  *See Atkins*, 536 U.S. at 309 n. 5.  A person with an intellectual disability will score *approximately* two standard deviations below the mean of 100, and thus receive an IQ score of around 70.  However, there is no specific cutoff score required to make a diagnosis of mental retardation or intellectual disability.  AAIDD, p. 40.  Taking into consideration the SEM of 5 points on either side of 70, an IQ score for intellectual disability falls within the range of 65 to 75.  (Tr., p. 42.)  Thus, a person can still be considered intellectually disabled if his IQ score is between 70 and 75.  *See e.g., Atkins*, 536 U.S. at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."); *Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010) ("There is no Alabama case law stating that a single IQ raw score, or even

multiple IQ raw scores, above 70 automatically defeats an *Atkins* claim when the totality of the evidence (scores) indicates that a capital offender suffers subaverage intellectual functioning."); *Davis*, 611 F.Supp.2d at 475 ("[T]he SEM in IQ assessments is approximately 5 points, therefore raising the operational definition of mental retardation to 75.").

In addition to the SEM, Prong 1 takes into account two other sources of error for an IQ score. The first source, called the "Practice Effect," considers the increase in a person's IQ score that takes place when that person is retested on the same test. The AAIDD recommends that a clinician not administer the same test to the same individual within a year because the person's score will be an "overestimate of the [person's] true intelligence." *Id*. at p. 38. The second source, the "Flynn Effect" considers the increase in IQ scores when a test with aging norms is used. As discussed above, the Flynn Effect adjusts an IQ score by 0.33 points for each year after the test was normed.

## 2. Analysis

### i. Evidence

#### a. Defendant's IQ Score Results

Defendant was administered two IQ tests, the Wechsler Adult Intelligence Scale ("WAIS-III") in 2008 and the Stanford Binet 5th Edition ("SB5") in 2010. Defendant was over the age of 18 when he took both tests.

Defendant's WAIS-III test was administered by Mr. Stephen Ford on April 4, 2008. As noted above, Mr. Ford testified that he miscalculated Defendant's full scale score. (Tr., p. 343.) Mr. Ford testified that he originally calculated Defendant's full scale IQ to be 76. *(Id*.) On the day of his testimony, Mr. Ford recalculated the score to produce a full scale IQ score of 72. (*Id*. at 343.) Further, he stated that he incorrectly wrote Defendant's age at the time of the test as 25, when Defendant was actually 24. (*Id*. at 347.) Mr. Ford also testified that he did not apply the Flynn Effect, an adjustment made to IQ scores calculated from tests with outdated norms, to the original score of 76 or the new score of 72. (*Id*. at 339.) Under cross-examination by the Government, Mr. Ford admitted that he did not remember administering Defendant's test. (*Id*. at 351.) Further, Mr. Ford believed that the test was valid and reliable. His belief was based on a note he wrote in

Defendant's IQ test chart, stating that he applied the test using the standardized protocol.  (*Id*. at 352.)  Mr. Cox, Mr. Ford's Psychology Supervisor at the Southern Ohio Correctional Facility, confirmed that the recalculated score of 72 was correct.  (*Id*. at 360.)  Defendant's WAIS-III full scale score, without application of the Flynn effect, was 72.

A SB5 IQ test was administered to Defendant by Dr. Ott, the Government's expert, on September 26, 2010.  (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 41.)  Defendant's SB5 full scale score, without application of the Flynn Effect, was 75.  Applying the Flynn Effect, Defendant's WAIS-III full scale score was reduced to 67.71 and his SB5 full scale score was reduced to 72.03.

### b. Expert Testimony

Dr. Woods determined that Defendant possessed significant limitations in intellectual functioning under Prong 1.  (Tr., pp. 146-155.)  Dr. Woods applied the Flynn Effect to Defendant's WAIS-III and SB5 scores to obtain full scale scores of 67.71 and 72.03, respectively.  (*Id*. at 154.)  Considering the IQ score's SEM, Defendant's IQ range for the WAIS-III score is 62.71 to 72.71 and for the SB5 score is 69.03 to 75.03.  Dr. Woods concluded that both scores' IQ ranges and full scale scores are two standard deviations below the test mean and thus meet Prong 1 for an intellectual disability diagnosis.  (*Id*. at 155.)

Dr. Ott testified that Defendant did not possess significant limitations in intellectual functioning sufficient to meet Prong 1.  He based his determination on Defendant's SB5 index scores (scores in specific subareas of intellectual functioning) instead of Defendant's SB5 full scale score.  (*Id*. at 599.)  Dr. Ott opined that although Defendant's full scale score was 75, all but one of Defendant's index scores was above 75.  Dr. Ott reported Defendant's index scores to be as follows: a fluid region index score of 79; a knowledge standard score of 69; a quantitative reasoning score of 81; a visual spatial processing score of 82; and a working memory of 83.  (*Id*. at 598.)  He did not apply the Flynn Effect to Defendant's full scale IQ score, testifying that the application of the Flynn Effect in individual cases remains problematic.  (*Id*. at 601.)  Dr. Ott cited to "studies in Scandinavian countries" that suggest that the application of the Flynn Effect to individual cases is

problematic because the Flynn Effect's adjustment of 0.33 points per year may be too great.  (*Id*.)
Because Dr. Ott did not apply the Flynn Effect, Defendant's full scale score was 75 with a range of
72 to 80, accounting for the SEM.  He testified that he did not include Defendant's WAIS-III score
in his analysis because of the original calculation errors made by Mr. Ford, and the possibility that
Mr. Ford also made errors in the administration of the WAIS-III test.  (*Id*. at 596.)

       Dr. Askenazi determined that Defendant did not possess significant limitations in intellectual
functioning, as indicated by his IQ test results.  In making this determination, she relied on both the
WAIS-III and SB5 test results.  (Exp. Reps. of Drs. Ott and Askenazi, p. 41.)  Dr. Askenazi did not
apply the Flynn Effect to Defendant's test scores because, according to her, the Flynn Effect is not
considered "a standard practice for psychologists."  (Tr., p. 707.)

       Dr. Greenspan testified, in rebuttal, regarding Drs. Ott and Dr. Askenazi's assessment of
Defendant's IQ scores. Dr. Greenspan noted that both doctors erred in not applying the Flynn Effect
to Defendant's raw full scale IQ scores.  (Decl. of Stephen Greenspan, ECF No. 229, p. 5.)  Dr.
Greenspan challenged Dr. Ott's characterization that Defendant's SB5 full scale score of 75 falls in
the borderline to low average range for IQ, but not intellectual disability. (*Id*.)  Dr. Greenspan stated
that a full scale score of 75 is a "qualifying score" for intellectual disability because it is a ceiling
score that is approximately two standard deviations below the test's mean when the SEM is taken
into account.  (*Id*.)  Finally, Dr. Greenspan criticized Drs. Ott and Dr. Askenazi's focus on
Defendant's SB5 index scores, rather than his full scale IQ scores.

## ii. Findings

       The court acknowledges that Mr. Ford erred in his calculation of Defendant's WAIS-III index
scores and that Dr. Ott chose not to use Defendant's WAIS-III scores because of this error.  Dr. Ott
testified that he did not give any weight to the test score because of the "errors in [the test's]
administrations."  (Tr., p. 596.)  However, the evidence indicates that Mr. Ford's error was not in his
administration of the WAIS-III test, but in his calculation of the full scale score.  (*See* Tr., p. 359-60.)
Mr. Ford, under the supervision of Mr. Cox, corrected his error.  Further, under oath, Mr. Ford
testified that he believed he reliably administered the test due to a notation he made in the test results.
(*Id*. at 352.)  Dr. Ott's testimony confuses errors in scoring with errors in administering the test. (*Id*.

-14-

at 594.)  Dr. Ott did not point to a single error in administering the test, only to Mr. Ford's miscalculations in scoring.  Dr. Greenspan explained that the scoring of an IQ test can in fact be more difficult than administering the test and that scoring errors are common for IQ test administrations.  (*See* Tr., p. 1212.)  In light of this evidence, the court considers Defendant's WAIS-III score as a reliable source under Prong 1.

Additionally, the court disagrees with Drs. Ott and Askenazi's decision to use the index scores, instead of the full scale scores, in their determinations.  Neither doctor could point to an authoritative source that supports an intellectual disability assessment based on individual index scores.  Dr. Greenspan testified that the AAIDD did not support this practice and the AAIDD's text itself  suggests that one global score is used under Prong 1.  For example, the AAIDD advises that "until more robust instruments based upon one or more of the multifactorial theories of intellectual functioning are developed and demonstrated to be psychometrically sound, we will continue to rely on a global (general factor) IQ as a measure of intellectual functioning. *Id*. at 41. *See e.g.,* AAIDD, p. 31("a diagnosis of intellectual disability is *an* IQ score that is approximately two standard deviations below the mean," with the "an" suggesting one global score. *See e.g.,* AAIDD, p. 31; *Id*. at 36 ("Both AAIDD and the American Psychiatric Association (2000) support the best practice of reporting *an* IQ score with an associated confidence interval."); *Id*. at 40 ("*An* IQ score should be reported with confidence intervals rather than *a single score.*") (emphasis added).  The court considers the full scale IQ score as the best indicator of Prong 1 intellectual functioning.

Finally, the court recognizes the Flynn Effect as a best practice for an intellectual disability determination.  The AAIDD mandates the application of the Flynn Effect when a clinician administers a test with outdated norms.  AAIDD, p. 37.  It specifically states that the Flynn Effect is "warranted" in test administrations "where a test with aging norms is used."  AAIDD, p. 37. Further, federal courts across the country have recognized the legitimacy of applying the Flynn Effect to IQ scores.  *See e.g., Holladay v. Allen*, 555 F. 3d 1346, 1350 n. 4, 1358 (11th Cir. 2009) (holding that the district court was not clearly erroneous in crediting the psychologist that concluded the IQ scores needed to be adjusted for the Flynn Effect); *Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005) (remanding for an evidentiary hearing in part because the district court "refused to

-15-

consider relevant evidence, namely the Flynn Effect evidence."); *Hardy*, 2010 WL 4909550 at *12-13 ("[T]here is in fact published, peer-reviewed research supporting the existence of the Flynn Effect for the test Hardy took and the IQ range in which his score fell," and "correcting for the Flynn Effect is a 'best practice' in the field and therefore should be done."); *Wiley v. Epps*, 668 F. Supp.2d 848 (N.D.Miss. 2009) ("The Court finds that regardless of whether the 'Flynn effect' is considered as a precise mathematical formula in this case, it will take into consideration the obsolescence of test norms in weighing the evidence concerning Petitioner's intellectual functioning."); *U.S. v. Davis*, 611 F.Supp.2d 472, 488 (D.Md. 2009) ("[T]he Court finds the defendant's Flynn effect evidence both relevant and persuasive, and will, as it should, consider the Flynn-adjusted scores in its evaluation of the defendant's intellectual functioning."); *Thomas v. Allen*, 614 F.Supp. 2d 1257, 1278 (N.D.Ala. 2009) ("It also is undisputed that Professor Flynn's recommendation - i.e., 'deduct 0.3 IQ points per year [three points per decade] to cover the period between the year the test was normed and the year in which the subject took the test' - is a generally accepted adjustment."); *Green v. Johnson*, 2006 WL 3746138, at *45 (E.D.Va. 2006) ("Considering all of the case law and evidence, this Court concludes that the Flynn Effect should be considered when determining whether Green's scores fall at least two standard deviations below the mean.  There is sufficient evidence in the record to show the Flynn Effect is recognized throughout the profession.").

As recently as last month, a federal court applied the Flynn Effect based on the "significant evidence" that the Effect was well accepted by psychology organizations, respected psychologists like Dr. Stephen Greenspan, reviewed psychology studies, and case law that accepted or affirmed the application of the Flynn Effect from the Fourth, Fifth, and Eleventh Circuits.  *Hardy*, 2010 WL 4909550 at *7-*10 (citing to *Wiley*, 625 F.3d 199 (affirmed lower court's application of the Flynn Effect yet declined to pass on the Effect's validity); *Thomas*, 607 F.3d at 753 (stating that "[a]n evaluator may also consider the 'Flynn Effect,'"); *Walker*, 399 F.3d at 322-23  (remanding the case because the district court "refused to consider relevant evidence, namely the Flynn Effect.")).  The court in *Hardy* found persuasive Dr. Greenspan's conclusion that, "the Flynn Effect is a useful, and valid, method for increasing the likelihood that a psychologist will correctly diagnose MR [mental retardation] in someone deserving of that label."  *Hardy*, 2010 WL 4909550, at *7.

The Government contends that the Flynn Effect should not apply to this case and argues, among other things, that several European studies, in particular studies conducted in Scandinavia, undermine the Flynn Effect's credibility.  (*See* Gov't. *Atkins* Brief, ECF No. 250, pp. 30-31.) However, the court does not find these articles more authoritative than the AAIDD Manual, a source that both parties' experts use in their intellectual disability assessments.  The court notes that the Manual references the Scandinavian studies as acknowledging the Flynn Effect's existence and that the studies only serve as a critique regarding how many points are needed to correct for the Flynn Effect.  AAIDD, p. 37.  Despite this reference, the AAIDD still requires recognition and application of the Flynn Effect if a test possesses outdated norms.  *Id*. at 37.  Further, as Dr. Greenspan noted, these articles address European IQ trends and norms that may not be applicable to the United States. (Tr., p. 1168.)  Additionally, he testified that these studies examined a specific population within Scandinavia, Swedish army recruits, and that declining birth rates and immigration to the country likely affected the population's IQ norms.  (*Id*. at 1168-69.)

In circumstances such as these, where a potentially intellectually disabled individual faces the death penalty, the court finds that the Government has not produced evidence to counter the authoritativeness of the AAIDD, persuasive federal case law in support of Defendant's position, and the testimony of eminent intellectual disability scholars, including Dr. Greenspan.  In light of the AAIDD's mandate, other federal courts' practices, and the evidence presented by both parties, this court will adjust Defendant's IQ scores to correct for the Flynn Effect. As one federal court aptly stated, "where a life-or-death categorization depends on a strict numerical cutoff, failure to adjust individual scores in light of changed norms would be unwise-if not reckless-and certainly would *not* . . . be a 'deliberate effort to distort the record.'" *Davis*, 611 F.Supp. 2d at 488.

Both IQ tests administered to Defendant have outdated norms.  The WAIS-III was normed in 1995 and the SB5 was normed in 2001 and 2003.  Because Defendant was administered the WAIS-III in 2001 and the SB5 in 2010, both tests' norms were obsolete.  The court considers the Flynn Effect as it relates to Defendant's WAIS-III and SB5 full scale IQ results.

As discussed above, the full scale scores, without the Flynn Effect's adjustment, for the WAIS-III and SB5 are 72 and 75, respectively.  Even without the Flynn Effect, Defendant's WAIS-

III score and range meet the upper threshold for Prong , 75. *See* DSM-IV-TR, p. 41-42; AAIDD p. 36. When the Flynn Effect is accounted for, Defendant's WAIS-III and SB5 full scale scores are 67.71 and 72.03, respectively, with a SEM range that produces scores much lower than 70. Both scores qualify as showing that Defendant is significantly limited in intellectual functioning. Both scores are below the upper threshold for intellectual disability.

Defendant has shown, by the preponderance of the evidence, that he meets Prong 1 of the AAIDD standard for intellectual disability. Defendant's IQ scores qualify Defendant as intellectually disabled. Both scores are approximately two standard deviations below the mean when adjusted for the Flynn Effect. Because Defendant has met his burden, the court finds Defendant has significant limitations in intellectual functioning.

## B. Prong 2: Defendant Possesses Significant Limitations in Adaptive Behavior

### 1. Legal Standard

Prong 2 of the intellectual disability standard requires an individual to be significantly limited in one of three adaptive behavior domains. Adaptive behavior is defined as the skills that people learn and use in their everyday lives. AAIDD, p. 43. Prong 2 assesses the individual's ability "to function and maintain himself independently, and the degree to which he meets satisfactorily the culturally-imposed demands of personal and social responsibility." AAIDD, p. 44 (internal quotation marks omitted).

Adaptive behavior consists of three domains: conceptual; social; and practical. Conceptual skills include language; reading and writing; money; time; and number concepts. *Id*. Social skills include interpersonal skills; social responsibility; self-esteem; gullibility; naïveté; ability to follow rules/obey laws; ability to avoid being victimized; and social problem solving. Practical skills include activities of daily living; occupational skills; use of money; safety; health care; travel/transportation; schedules; and use of a telephone. *Id*.

The operational standard under the AAIDD is that an individual must be significantly deficient in one of the three domains. *Id*. These three domains must be assessed in reference to typical and actual functioning in the individual's community and should reflect whether the

individual had an opportunity to learn and use a certain adaptive skill. *Id*. at 46, 52. An assessment under Prong 2 should include a review of "the individual's family history, medical history, school records, employment records, other relevant records or information, as well as clinical interviews" with knowledgeable respondents. *Id*. at 45. Additionally, a clinician should administer standardized instruments that measure the individual's conceptual, social, and practical skills to those respondents. AAIDD, p. 47.

A standardized instrument presents a series of questions regarding the individual's adaptive skills and assigns numerical scores that reflect the individual's performance of those skills. Typically, a standardized instrument is administered to a third-party respondent who knows the individual being assessed for intellectual disability very well. *Id*. at 51. The third-party respondent should have had "the opportunity to observe the [individual] on a daily or weekly basis in a variety of community settings and over an extended period of time." *Id*. Parents, older siblings, other family members, and friends are considered knowledgable respondents. *Id*. at 47. A score is received from the answers of the third-party respondent. The score received from the instrument measures adaptive behavior in either: (1) one of the three domains; or (2) all of the three domains. *Id*.; Guide, p. 13. Similar to an IQ test, the score is compared with the instrument's mean (average of general population's adaptive behavior score). AAIDD, p. 47. The AAIDD states that an individual is significantly limited in adaptive behavior if the score received was two standard deviations below the mean. *Id*. Two standard deviations below the mean is approximately a score of 70.

If the clinician determines that administering a standardized instrument is unwise or unavailable, the AAIDD states that a clinician must conduct a comprehensive review of the individual's records, prior psychological evaluations, and third-party informant interviews. *Id*. at 48. Clinicians may chose not to use a standardized instrument when he or she cannot apply reliably the instrument's administrative procedures, or if the respondents, those answering the questions, are unreliable. *Id*.

There are several other factors which must be considered when assessing an individual's adaptive behavior. First, deficits in adaptive behavior must be distinguished from problem or maladaptive behavior. *Id*. at 46. Maladaptive behavior is not considered a significant limitation of

adaptive functioning, but is a "conceptually different" problem.  *Id*. at  49. Exceptions exist where such behavior may function as  "a response to environmental conditions . . . [or] lack of alternative communication skills."  AAIDD, p.49.  The AAIDD notes that generally these exceptions do not apply to individuals with higher IQ scores.  *Id*.  Second, this analysis  recognizes that an individual possesses both strengths and limitations, and thus  a clinician's focus should be on the individual's limitations, not strengths.  *Id*. at 1, 47.  Third, any self-reporting by the assessed individual should be interpreted with caution because of the individual's bias or masking of his or her impairments.  A clinician must not rely heavily on only information obtained by the assessed individual.  *Id*. at 52.  Prong 2 should be given equal weight to Prong 1 when making an intellectual disability determination. *Id*. at 45.

### 2. Analysis

### i. Evidence

Both expert and non-expert testimony are relevant to Prong 2 of the AAIDD standard, adaptive behavior.  Defendant relied on the testimonies of Dr. Woods, Dr. Fabian, Dr. Greenspan, Susan Greenawalt, Brenda Lewis, Mary Spates, and Domaneek Lewis, to illustrate Defendant's deficits in adaptive behavior.  To rebut Defendant's evidence, the Government relied on the testimonies of Dr. Ott, Dr. Askenazi, and Charise Williams. All five experts reviewed Defendant's school, prison and medical records, interviewed third-party informants, and administered or interpreted Defendant's adaptive functioning test results.  The witness testimony is summarized below in the following order: Defendant's expert witnesses; Government's expert witnesses; Defendant's rebuttal witnesses; and all lay witnesses.

### a. Dr. Woods

Dr. Woods found that Defendant possessed significant limitations in adaptive functioning, and thus met Prong 2 of the intellectual disability standard. (Tr., p. 47.) To make this determination, Dr. Woods reviewed numerous historical and current records and interviewed several witnesses, including Brenda Lewis, Defendant's mother, and Mary Louise Spates, Defendant's aunt, to make his psychosocial evaluation of Defendant. Further, Dr. Woods performed a mental status and

neurological examination of Defendant.  Dr. Woods testified that he analyzed Defendant's self-reporting of his deficits with caution, because self-reporting is "the poorest way to gather information" about Defendant.  (*Id*. at 73.)  As discussed below, Dr. Woods did not administer standardized behavior assessment instruments for his determination. Dr. Woods found that Defendant possessed adaptive deficits in all three domains.  (*Id*. at 43-47.)

Further, Dr. Woods assessed Defendant's August 16, 2010 neuroimaging results from a Magnetic Resonance Imaging ("MRI") and a Positron Emission Tomography ("PET").  (*Id*. at 21.) Dr. Woods concluded that Defendant's MRI showed no significant structural abnormalities in the brain; however, his PET showed decreased functioning in Defendant's temporal lobes.  (*Id*. at 188-89.)  Dr. Woods stated that a decrease in functioning of the temporal lobes negatively affects language, learning, and emotional reactivity functions.  While Dr. Woods acknowledged that these results "may not correlate" with intellectual disability, these results are aligned with Defendant's language and academic deficiencies during childhood.  (*Id*. at 189-90.)

For conceptual skills, Dr. Woods determined that Defendant had significant limitations in language, reading, and writing.  (*Id*. at 101.)  Dr. Woods testified that Defendant had difficulties in receptive language[1] throughout his adolescence. (*Id*. at 173.) Defendant's historical records indicate that he was in speech therapy at least through the fifth grade, and took some speech courses when he was 16.  (*Id*. at 171-72.)  Dr. Woods stated that Defendant had difficulty following instructions, comprehending direction, and understanding verbal, as well as written communication during school. (*Id*. at 136.)  Dr. Woods determined that, although Defendant possessed some strengths in mathematics, it took Defendant four minutes to divide 54 by 3 during an interview with Dr. Woods. (*Id*. at 89.)

Dr. Woods also found Defendant to be deficient in social skills.  (*Id*. at 45.)  Dr. Woods stated that Defendant's interpersonal skills were limited, and that Defendant was unable to understand humor and engage in appropriate conversation.  (*Id*. at 44-45.)  He determined that Defendant's school records showed his difficulty in obeying rules.  (*Id*. at 44, 178.)  Dr. Woods noted that during

---

[1]     Receptive language is the ability to understand language that is communicated to you.

school, Defendant constantly ran out of the classroom and got into arguments.  He attributed this behavior to Defendant's frustration in his "inability to be socially appropriate." (Tr., pp. 178, 181.) Dr. Woods determined that Defendant's cognitive deficits "precluded him from developing more social methods of problem solving."  (Rep. of Dr. Woods, ECF No. 204, Ex. A, p. 45.)

Finally, Dr. Woods found that Defendant was significantly limited in his practical skills. (Tr., p. 176.)  Specifically, Dr. Woods stated that Defendant had only lived alone once, when he was homeless.  Dr. Woods testified that Defendant did not maintain proper health care, evidenced by Defendant's use of marijuana while also having asthma.  (*Id*. at 180.)  Dr. Woods testified that Defendant had "great difficulty in employment," but could handle money well.  (*Id*. at 179.)

On cross-examination, the Government questioned whether Dr. Woods adequately considered Defendant's school absences in his assessment.  The Government presented a 1991 article written by Dr. Stephen Ceci, who argued that there may be a correlation between lower IQ scores and increased school absences. (*Id*. at 245, Govt Ex. 1.)  Dr. Woods responded that the study addressed children who possessed average IQs, and did not apply to children with intellectual disabilities. (*Id*. at 246.)

### b. Dr. Ott

Dr. Ott found that Defendant possessed adaptive limitations related to learning disabilities and behavioral disorders, not intellectual disability.  (Tr., p. 608.)  To make this determination, Dr. Ott reviewed Defendant's historical records, the report written and interviews conducted by Dr. Woods,  and the academic achievement tests administered by Dr. Askenazi.  (Exp. Reps. of Dr. Ott and Dr. Askenazi, ECF No. 223, p. 2.)  Additionally, Dr. Ott interviewed Charise Williams, a witness called by the Government, after submitting his expert report.  (Tr., p. 576.)

Dr. Ott determined that Defendant was deficient in his academic abilities, the ability to follow rules, the ability to obey orders, and occupational skills.  (*Id*. at 609.)  Dr. Ott found that Defendant's conceptual skills were not so significantly limited as to meet the AAIDD standard of intellectual disability.  Dr. Ott stated that Defendant did not exhibit any substantial deficits in money concepts or health and safety.  (*Id*. at 610, 613.)  For example, Dr. Ott pointed to Defendant's statement that

he could use his inhaler properly by age 10, as indicative of proper adaptive behavior.  (*Id*. at 613.) Dr. Ott did address Defendant's difficulties in communication, self-direction, and academics, but attributed these deficits to learning and behavioral disorders.  (*Id*. at 609.)  Dr. Ott stated that Defendant's current communication skills showed no significant difficulties.  (*Id*. at 605.)  Dr. Ott based this conclusion on jailhouse recordings of Defendant's telephone calls, a videotaped police interrogation with Defendant, and his own interactions with Defendant.  (*Id*. at 605.)  Dr. Ott further stated that Defendant's lack of self-direction and poor academic performance are consistent with Defendant's prior diagnoses with ADHD and other learning disorders.  (*Id*. at 609.)

In testifying regarding Defendant's social skills, Dr. Ott stated that available information indicates significant interpersonal difficulties throughout Mr. Lewis's early life, particularly in the school setting.  (*Id*. at 611.)  However, Dr. Ott noted that Defendant related that he had romantic relationships and friendships with older individuals.  (*Id*. at 611-12.)  Dr. Ott determined that Defendant did not show any limitations in the areas of gullibility or naïveté, and that his experience with being victimized appeared minimal, despite the circumstances he grew up in.  (*Id*. at 611-12.)  Further, Dr. Ott determined that Defendant's inability to obey rules or the law was attributed to his behavioral disorders, not any intellectual difficulties.  (*Id*. at 607.)

Finally, Dr. Ott found that Defendant did not exhibit significant deficits in his practical skills.  (*Id*. at 613.)  Dr. Ott stated that the record did not reflect Defendant had problems with fulfilling his daily activities or maintaining personal hygiene.  (*Id*.)  Dr. Ott noted that Defendant's occupational skills were "limited," even though he had held a carnival job for a period of time.  (*Id*. at 614.)  Dr. Ott testified that Defendant's second-grade school records contained a written recommendation that Defendant be placed in a learning disability program.  (*Id*. at 577.)  He noted further that in 1996, the Applewood Center, a clinic for children with behavioral health issues, diagnosed Defendant with both ADHD and Oppositional Defiant Disorder.  (*Id*. at 586; Govt Ex. A-23.)

On cross-examination, Dr. Ott admitted that, in the *Atkins* context, a clinician's "emphasis usually may be on deficits."  (Tr., p. 641.)  Dr. Ott testified that he did not interview any respondent that knew and could speak to Defendant's skills prior to age 15.  (*Id*. at 644.)  Dr. Ott agreed that the AAIDD states that mental health disorders, like ADHD, are more prevalent among intellectually

disabled individuals. (*Id*. at 645.) Dr. Ott testified that he relied on Defendant's own account of his use of an inhaler, use of money, and gullibility. (*Id*.)  Further, Dr. Ott's report relies heavily on Defendant's statements of his abilities, particularly in the areas of health and safety, interpersonal skills, gullibility, self-care, and activities of daily living.  For example, all of Dr. Ott's information regarding Defendant's health and safety came from his interview with Defendant.  Dr. Ott's report reads:

> "During *our interview*, Mr. Lewis demonstrated awareness of the significant asthma from which he suffered as a youth, he *reported* that as a boy he would identify when he was feeling poorly and inform his mother. He *also reported* that by about age 10 he would use his rescue inhaler of his own accord. He *was able to describe* in detail the assembly and operation of the nebulizer he would use for a breathing treatment . . . ."

(Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 20 (emphasis added).)  On cross-examination, Dr. Ott agreed that the AAIDD advises cautious use of an individual's self-report of his adaptive abilities, but that he used Defendant's accounts along with corroborating sources.  (Tr., p. 650.)

Finally, Defendant's expert, Dr. Woods, questioned Dr. Ott's use of Defendant's verbal behavior or communications, captured in jailhouse telephone recordings, video interrogation, and the doctor's own conversation with Defendant, to determine that Defendant's current speech is not impaired.  Dr. Woods pointed to the Guide that warns clinicians not to use an individual's verbal behavior as evidence of the individual's adaptive behavior.  (Tr., p. 157; Guide, p. 22 ("Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having MR/ID.").)

### c. Dr. Askenazi

Dr. Askenazi testified that, in her opinion, Defendant was not intellectually disabled.  She determined that Defendant suffered from ADHD, Borderline Intellectual Functioning, and Antisocial Personality Disorder.  (Tr., p.737.)  Dr. Askenazi was retained by the Government to perform neuropsychological and psychological testing for Defendant's *Atkins* determination.  Dr. Askenazi admitted that she did not complete a comprehensive adaptive functioning assessment of Defendant, but instead addressed any issues regarding adaptive skills that relates to her specialization as a forensic and Neuropsychologist.

-24-

Dr. Askenazi administered 13 neurophysiological tests to determine Defendant's "current cognitive functioning." (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 17; *see also* Tr., pp. 717-18.)  From these tests results, Dr. Askenazi determined that Defendant was deficient in attention, sequencing, and spontaneously retrieving and producing some verbal material. (Tr., p. 725.) Dr. Askenazi found that Defendant's "[a]cademic skills do not evidence a specific learning disability." (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 17.) Dr. Askenazi noted that Defendant's language skills are "within normal limits," but that there exists "a notable discrepancy between ability to generate verbal information of varying structure, with lower performance than would be expected on less structured material." (*Id.* at 19.)  On one of Defendant's performance neurophysiological test, the Woodcock-Johnson - Third Edition, Dr. Askenazi found that Defendant's broad reading abilities were at a fourth to fifth grade reading level (4.5); his spelling and word attack abilities were both at a second grade level (2.8, 2.3); and his comprehension of written passages was at a fifth grade level. (Tr., pp. 766-67; Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p.18.) Dr. Fabian contested Dr. Askenazi's interpretation of Defendant's test results. Specifically, Dr. Fabian stated that his Woodcock-Johnson test results indicated language deficits. (Tr., pp. 932-33.)

During her testimony, Dr. Askenazi assessed Defendant under the three domains for adaptive behavior.  She found that Defendant did not have a significant deficit in any of the three domains. For conceptual skills, Dr. Askenazi recognized Defendant's deficits in communication and learning, but attributed Defendant's academic troubles to ADHD, not intellectual disability. (Tr.,  p. 724.) For social skills, Dr. Askenazi stated that there was no evidence that Defendant felt he had been taken advantage of as a child. She noted, however, a history of some teasing and fighting between groups.   She stated that his social skills seemed consistent and probably necessary, given Defendant's environment. Finally, for practical skills, Dr. Askenazi asserted that Defendant was able to care for his own finances, got his own cell phone, was able to transport himself from place to place. (*Id.* at 727.) Dr. Askenazi ruled out a diagnosis that Defendant possesses a learning disorder stating, "[a]cademic skills do not evidence a specific learning disability." (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 44.) She reasoned that Defendant's "capacity to continually learn new information suggests if [his problems] were effectively treated in childhood, [Defendant] would

-25-

have been able to make better gains academically and intellectually." (*Id*. at 47.) Dr. Askenazi opined further that because of Defendant's "limited education, [his] intellectual functioning is in the borderline range." *Id*.

### d. Dr. Fabian

Dr. Fabian found that Defendant possessed significant limitations in adaptive functioning. (Tr., p. 939.) As Defendant's rebuttal witness for Prong 2, Dr. Fabian contested the Government's arguments that Defendant suffered from a learning disability, and not intellectual disability. He performed both a comprehensive assessment of Defendant's historical records and administered a standardized adaptive behavior instrument. Indeed, Dr. Fabian was the only expert retained who administered a standardized instrument for Prong 2.

Dr. Fabian administered the Scales of Independent Behavior-Revised (SIB-R), a standardized adaptive behavior instrument, to both Defendant's mother and aunt as informants. (Exp. Rep. of Dr. Fabian, ECF No. 227, p. 19.) The SIB-R measures an individual's adaptive skills by asking third-party informants a series of questions about the individual's conceptual, social, and practical behavior. (SIB-R, p. 912.) The SIB-R gives a broad independent score that measures adaptive functioning and also classifies adaptive behavior by eighteen subscales. The SIB-R's broad independent score measures the average score of an individual's motor skills, social interaction and communication skills, personal living skills, and community living skills. (*Id*.) The SIB-R's eighteen subscales for adaptive behavior are: motor skills; gross motor; fine motor; social/communication; social interactions; language comprehension; language expression; personal living; eating; toileting; dressing; self-care; domestic skills; community living; time and punctuality; money and value; work skills; and home-community. The SIB-R classifies the results for each subscale and the broad independent score by skill level (i.e., very limited; limited; and age appropriate) and by age equivalent (i.e., 10 years old; 12 years old).

For both administrations, Defendant's broad independent score on the SIB-R was 59. (Tr., p. 915.) This score places Defendant's adaptive skills within the "limited" classification. (Exp. Rep. of Dr. Fabian, ECF No. 227, Ex. B, p. 15.) Dr. Fabian stated that this score placed Defendant's adaptive skills in the range of an average 11-year and 10-month old. (*Id*. at 14-15.) A majority of Defendant's results in the SIB-R's eighteen subscales were classified as "limited to

very limited." (*Id.* at 15.) The only subscales that Defendant had an "age appropriate" skill level was for toileting (Brenda Lewis as respondent) and gross motor skills (Brenda Lewis and Mary Spates as respondents). (*Id.* at 14-15.) Dr. Fabian testified that the consistency between both test results shows that Defendant's behavior is functionally impaired. (Tr., p. 916) Further, he testified that this consistency negates the contention that Defendant's mother's and aunt's biases made them improper third-party informants. (*Id.* at 921.) This score falls two standard deviations below the instrument's mean and thus qualifies Defendant as intellectually disabled (*Id.* at 915.) Dr. Fabian took issue with the Government's experts not including standardized instruments as part of their assessment, asserting that the use of these instruments is in the AAIDD definition of an assessment. (Tr., p. 910.)

Additionally, Dr. Fabian conducted several academic achievement tests to assess Defendant's current academic abilities, including the Woodcock-Johnson 3rd Edition, Tests of Achievement and the Wide Range Achievement Test ("WRAT-4"). (*Id.* at 924-25.) Dr. Fabian limited his administration of the Woodcock-Johnson test because Dr. Askenazi had administered the test to Defendant several days before Dr. Fabian's examination. (*Id.* at 924.) Thus, Dr. Fabian's Woodcock-Johnson results reflect only those portions of the test that Defendant did not remember taking with Dr. Askenazi. (*Id.*) Dr. Fabian found that both achievement test results showed Defendant was deficient in spelling, word reading, story recall, and quantitative concepts. (*Id.*) Specifically, Defendant's spelling was equivalent to second to third grade level; reading was equivalent to fourth grade level; quantitative concepts was equivalent to a third to fourth grade level; and story recall, the lowest, was at a kindergarten level. (*Id.* at 924-26.)

Similar to Dr. Woods, Dr. Fabian's comprehensive assessment used Defendant's historical records, prior evaluations, and additionally, Drs. Woods, Askenazi, and Ott's expert reports. Dr. Fabian indicated that his assessment showed that Defendant was deficient in conceptual and social skills. (Tr., p. 875.) He also found that Defendant was deficient in "receptive language, interpreting, and understanding," that Defendant's academic history illustrated his low conceptual abilities, and his severe behavioral handicap program records show Defendant's limitations in interpersonal skills and social responsibility. (*Id.* at 873, 905.)

During his testimony, Dr. Fabian disagreed with the Government's claim that Defendant's deficits illustrated a learning disability and behavioral impairments, rather than an intellectual disability.  Dr. Fabian asserted that Defendant's historical records show global impairments in academic achievements.  (*Id*. at 865, 902.)  Dr. Fabian stated that typically an individual with a learning disability possesses limitations in only a few academic areas and that there would be a discrepancy between a learning disabled person's IQ and academic achievement functioning.  (*Id*. at 877.)  Defendant's school individualized educational program reports indicate that he was placed in special education programs for reading, spelling, English, writing, math, social studies, science, health, listening comprehension, oral expression, and written expression.  (*Id*. at 868.)  Dr. Fabian disagreed with Dr. Ott that Defendant's placement in severe behavioral handicapped classes implied a behavioral and not intellectual disorder.  (*Id*. at 904.)  Dr. Fabian stated that a school's severe handicap placement looks at the student's behavior and not necessarily the underlying causes of the behavior.  *Id*.  Further, Dr. Fabian disagreed with Dr. Askenazi's diagnosis of ADHD because ADHD could not account solely for Defendant's global cognitive and adaptive impairments.  (*Id*. at 936.)  Dr. Fabian determined that Defendant's deficits in numerous academic areas coupled with Defendant's low IQ showed that Defendant possessed  low functioning intelligence, not just a learning disability.  (*Id*. at 1089.)

### e. Dr. Greenspan

Dr. Greenspan testified as a rebuttal witness, confirming Drs. Woods and Fabian's conclusions that there was sufficient evidence to support a diagnosis of intellectual disability.  Dr. Greenspan did not administer any standardized instruments or conduct interviews of third-party respondents.  Dr. Greenspan's charge was to review all expert reports, certain records, and other historical sources submitted into evidence. (Tr., p. 1197.)  Dr. Greenspan determined that both Drs. Woods and Fabian's approaches to the adaptive behavior assessment were appropriate.  (*Id*. at 1136, 1138.)  Dr. Greenspan criticized Dr. Ott's reliance on Defendant's self-report of his adaptive behavior as an invalid approach for discovering Defendant's adaptive deficits.  (*Id*. at p.1141.)  Dr. Greenspan explained that an individual who reports his or her abilities will attempt to appear more competent than he or she is.  (*Id*. at. 1142.)  Dr. Greenspan stated that both Drs. Ott and  Askenazi's reports "heavily emphasized" Defendant's self-reporting.  (*Id*.)  Dr. Greenspan opined further that

-28-

Dr. Ott's reliance on jailhouse recordings of Defendant's communications to show that Defendant was not deficient in language is based on an inappropriate stereotype - that the intellectually disabled cannot have a conversation.  (*Id*. at 1155.)  Dr. Greenspan took issue with Dr. Ott's uncritical reliance on Defendant's placement in learning disability classes as evidence that Defendant is not intellectually disabled.  (*Id*. at 1157.)  Dr. Greenspan explained that Dr. Ott has no knowledge of the school's process for classifying Defendant, and, in his experience, "there's an extreme reluctance [in urban settings] to label kids" intellectually disabled because of the pejorative stereotypes regarding urban minority intelligence.  (*Id*. at 1157-58.)

In reviewing Defendant's school records, Dr. Greenspan found that "there was no question that LD [learning disability] was an inappropriate diagnosis for Mr. Lewis."  (*Id*. at 1159.)  Dr. Greenspan supported Dr. Wood's criticisms of the Government-proffered Ceci study that theorized a correlation between school attendance and IQ.  (*Id*. at 1162.)  Dr. Greenspan stated that the Ceci study relies on data from "middle class kids" and "is not specific to mental retardation at all." (*Id*. at 1163.)  Furthermore, Dr. Greenspan was very critical of Dr. Ott's analysis that used the fact that Defendant once held a temporary job at a carnival as evidence against a finding of deficits in the practical domain.  Dr. Greenspan stated that most individuals with intellectual disability have jobs and that Defendant's statement that he worked at a carnival does not show what type and level of skills Defendant used at that job.  (*Id*. at 1177.)

On cross-examination, the Government questioned Dr. Greenspan regarding Defendant's SIB-R score and Defendant's experts' retroactive assessment of his adaptive functioning.  The Government asked Dr. Greenspan if Defendant's SIB-R score would be invalid if Defendant's mother and aunt denied some of his known adaptive deficits.  (*Id*. at 1260.)  Dr. Greenspan explained that this denial would not invalidate Defendant's scores, and "[i]f anything, it underestimates the person's actual incompetence."  (*Id*. at 1260.)  Dr. Greenspan further noted that the timing of Defendant's intellectual disability assessment has an advantage, in terms of performing a retrospective analysis, because Defendant is not very old and thus not far removed from Prong 3's age cutoff. (*Id*. at 1242.)

<u>f. Susan Greenawalt</u>

Susan Greenawalt, Defendant's teacher at the ODYS, testified that Defendant did not possess a "real severe behavior problem" but that Defendant "had difficulty understanding assignments a lot of times." (*Id.* at 372.) Susan Greenawalt described Defendant as a "slow" learner. (*Id.* at 373.) Notably, she distinguished Defendant's learning capabilities from her students diagnosed with ADD and ADHD. (*Id.* at 384.) She testified that her ADD and ADHD students "would not focus" but that Defendant "could focus, but he just did not comprehend what you were showing him or telling him." (*Id.*)

### g. Brenda Lewis, Mary Spates, and Domaneek Lewis

The court acknowledges Dr. Ott's reservation in using Defendant's mother, Brenda Lewis, as a third-party informant due to her apparent intellectual deficiencies. (Tr., p. 664.) However, the court considers Brenda Lewis's testimony consistent with the testimony of Mary Spates, Domaneek Lewis, and to a certain extent, Government witness Charise Williams. Further, the AAIDD recommends the use of parents as knowledgeable respondents because parents typically observe the individual's developmental milestones, maturation, and achievement of adaptive behavior skills. AAIDD, p. 47 (quotation marks omitted). Thus, the court will consider Brenda Lewis's testimony in this analysis.

The three witnesses for Defendant testified to his difficulties in school and language. Brenda Lewis testified that, as a child, Defendant's speech was significantly delayed and that she could not comprehend him until he was about three or four years old. (Tr., p. 403). Brenda Lewis stated that she withheld Defendant from kindergarten because of his speech difficulties. (*Id.*) Both Mary Spates and Domaneek Lewis testified that Defendant could not speak properly as a child. (*Id.* at 443, 453.)

Further, the three witnesses for Defendant testified to his interpersonal skills. Brenda Lewis testified that Defendant was teased as a child and would fight those who teased him. (*Id.* at 409.) Mary Spates also testified about how Defendant would be teased by other children. (*Id.* at 445.) Domaneek Lewis indicated that Defendant could be gullible and had been taken advantage of by his friends. (*Id.* at 457.) Specifically, she noted that people Defendant trusted and believed were his friends would take advantage him. (*Id.*)

Relevant to Defendant's practical skills, Mary Spates testified that, as an adolescent, Defendant did not have good hygiene (*Id.* at 447.) Domaneek Lewis testified that Defendant "never

really cared about taking a bath." (*Id*. at 459.) Domaneek Lewis testified that Defendant owned and used cell phones. (*Id*. at 480-81.)

### h. Charise Williams

Charise Williams, who was approximately 10 years older than Defendant, testified to Defendant's social and practical skills. She also testified that she allowed Defendant to live with her, her children and boyfriend from the time Defendant was 15 until his 2005 incarceration. Charise Williams's testimony is limited to Defendant's skills after the age of 15, the age she first met him. She stated that Defendant had friends with whom he was in contact every day. (Tr., p. 498.) Further, Charise Williams stated that when she first met Defendant at age 15, he was easily manipulated but that as he grew older, he matured. (*Id*. at 513-14.) She testified that Defendant was a follower at first, but as he got older he was sometimes a leader. (*Id*. at 503.) She stated that Defendant was "normal." (*Id*. at 506.)

Additionally, Charise Williams testified that Defendant had a hygiene problem. (*Id*. at 498.) She testified that she had to show Defendant how to clean and bandage his gunshot wound. (*Id*. at 541.) Charise Williams testified that Defendant was a regular customer at an urban clothing store and that he would receive regular customer discounts on clothing. (*Id*. at 518-19.) She related that Defendant was considered a "sharp dresser" and that "everything matched." (*Id*. at 499, 521.)

### ii. Findings

### a. Preliminary Findings

### 1.Clinical Judgment is Critical For Prong 2 Assessment

First, a clinician's clinical judgment is critical in order to produce a reliable adaptive behavior assessment. The AAIDD advises use of clinical judgment "to guide the evaluation of the reliability of information provided by respondents as well as possible sources of bias" when assessing adaptive behavior information. AAIDD, p. 48. Drs. Greenspan, Fabian, and Ott have extensive experience in conducting or assessing adaptive behavior determinations. Specifically, Dr. Greenspan is a leading scholar on adaptive behavior in intellectual disability assessments. Most notably, he is the creator of the three domain analysis that the court applies in this case and is the most cited expert in the AAIDD Manual for his groundbreaking work on adaptive behavior. As a result of his expertise, Dr. Greenspan's clinical judgment for Defendant's Prong 2 assessment carries

considerable weight.

<u>2. The Use of Self-Reporting as Prong 2 Evidence is Discouraged</u>

Second, the use of Defendant as an informant to his own adaptive behavioral capabilities, known as "self-reporting," without any corroborating sources, is disfavored by the AAIDD, Defendant's experts, including Dr. Greenspan, and acknowledged as problematic by the Government's experts.  AAIDD, p. 51; Tr., p. 1136 (Dr. Greenspan stated that, "it's particularly critical to look at different things with regard to prong two and to not just rely on gut impression and certainly not rely on self-reports by the individual."; *Id*. at 73 (Dr. Woods stated that, "self-report by people that are mentally retarded is the poorest way to gather information about it."); *Id*. at 909 (Dr. Fabian stated that the AAIDD requires caution when using information from self-report); *Id*. at 651 (Dr. Ott stated that, "individuals with mental retardation may overexaggerate, some individuals may. And that's why it's important to look for consistencies of the individual's report with the collateral information and other informants."); *Id*. at 740, 749-51 (Dr. Askenazi acknowledged that adaptive behavior assessment should typically have third-party respondents, rather than a self-report and agreed that portions of her written report of Defendant's adaptive behavior are based on self-report.).

In particular, self-reporting by individuals with mild intellectual disability should not be used because these individuals may exaggerate their adaptive abilities to appear more competent.  (*See* Tr., p. 1140.)  The court notes that the adaptive behavior portion of  Dr. Ott's report relies heavily on Defendant's self-report of his abilities.  Further, in making his report, Dr. Ott had only interviewed Defendant.  Only after completion of his report did Dr. Ott interview Charise Williams as a third-party respondent.  Crucially, during cross-examination, Dr. Ott has only limited information from one witness, Charise Williams, who could confirm Defendant's statements.  (*See* Tr p. 655.)  As stated above, Charise Williams's knowledge of Defendant, as a child, is limited.  Unlike Defendant's mother, Brenda Lewis, sister, Domaneek Lewis, and aunt, Mary Spates, who are familiar with Defendant's behavior since birth, Charise Williams has only  known Defendant since he was 15.  Dr. Askenazi's description of Defendant's adaptive skills also relied heavily on Defendant's self-report. As noted above, Dr. Askenazi's adaptive behavior  assessment was largely based on Dr. Ott's report.  (Tr., p. 723).

### 3. Defendant's Adaptive Behavioral Instrument Results Are Relevant

Third, an adaptive behavior assessment should use standardized instruments to measure limitations in the three domains of conceptual, social, and practical.  Only Dr. Fabian administered an adaptive behavioral instrument to third-party respondents - the SIB-R.  Drs. Woods, Ott, and Askenazi did not use any instrument to assess Defendant's adaptive skills. Drs. Ott and Askenazi did not administer a standardized instrument because neither doctor  interviewed any third-party respondents for their expert reports.  Further, Dr. Ott did not administer an instrument to the only third-party respondent he did interview after the completion of his report.  (Tr., p. 640.)  While Dr. Woods did not administer an instrument, he did interview several witnesses, including Defendant's mother and aunt. Dr. Woods reasoned that Defendant's family members' own impairments would make administering an instrument very difficult.  (Tr., p. 95.)

During his testimony, Dr. Greenspan stated that Dr. Woods's clinical decision not to administer an instrument, but instead to interview Defendant's family members, was appropriate. (*Id.* at 1136.)  Dr. Greenspan opined that, as a psychiatrist, Dr. Woods is not qualified to administer formal psychological tests.  (*Id.*)  Dr. Greenspan stated that despite Dr. Wood's lack of experience with adaptive behavioral instruments, he considers Dr. Woods "an eminently qualified psychiatrist when it comes to mental retardation."  (*Id.* at 1137.)  Despite not using an instrument, Dr. Woods's assessment of Defendant's adaptive behavior is more consistent with the AAIDD's Prong 2 procedures than Drs. Ott and Askenazi's assessments. The AAIDD advises that when a standardized instrument cannot be used, a clinician should use multiple sources, including "interviews with individuals who know the person and have had an opportunity to observe the person in the community but may not be able to provide a comprehensive report regarding the individual's adaptive behavior." AAIDD, p. 48.  As stated above, neither Dr. Ott nor Dr. Askenazi interviewed third-party respondents for their expert reports.  Dr. Woods did conduct several comprehensive interviews with Defendant's family members who, despite their impairments, could provide some insight into Defendant's behavior during his adolescence.

Like Dr. Woods, Dr. Fabian acknowledged that both third-party respondents possessed impairments.  (Tr., p. 1031; Rep. of Dr. Fabian, ECF No. 227, p. 13.)  To account for both respondents' impairments, Dr. Fabian stated that he read the SIB-R questions to the respondents,

clarified any questions the respondents had about the questions, and made certain that the respondents understood the rating procedures for each item. (Tr., p. 922.) Dr. Fabian noted that the consistency between Brenda Lewis and Mary Spates's broad independent score of 59, illustrates Defendant's adaptive impairments. (*Id.* at 916.)

The Government questions the validity of Dr. Fabian's SIB-R test results and argues that Dr. Fabian did not properly consider or record the time frame by which the third-party respondents were to consider Defendant's adaptive skills. (Tr., p.1031.) The Government bases this critique on Dr. Greenspan's testimony about how he would conduct an assessment using other standardized instruments, such as the ABAS or Vineland. (*Id.* at 1249.) Dr. Greenspan testified that when he performed a retrospective assessment of intellectual disability, the ABAS and Vineland required giving the respondents a time frame with which to think about the individual as that individual functioned within that time frame. (*Id.* at 1250.) Although Dr. Greenspan does have experience with administering the ABAS and Vineland instruments, he admitted that he had never administered the SIB-R. (*Id.* at 1249.)

Further, the Government contends that Dr. Fabian did not determine whether the respondents were guessing on the questions, whether the questions reflected situations Defendant was likely to encounter (i.e., whether a question regarding sewing capabilities is relevant to the assessment if Defendant never had to sew), and whether Dr. Fabian considered potential bias from respondents. (Tr., p. 1053.) The AAIDD does advise clinicians to use an answer that the respondent guessed on with caution. AAIDD, at 53; *see also* Tr., p. 1043. Yet the SIB-R Administration Procedures requires a respondent to guess on a question if the respondent does not know the specific answer to the question. (Government Ex. 12, p. 31; Tr., p. 1043.) The SIB-R states that "[i]f estimates are made on a large number of items, it may be necessary to consult another person who had an opportunity to make observations." (*Id.*) On cross-examination, the Government noted the potential inconsistency between the AAIDD and the SIB-R Manual. (Tr., p. 1045.) Dr. Fabian admitted that he did not ask the respondents whether they guessed or not on a particular question but stated that a retrospective assessment of intellectual disability requires a clinician to analyze all the available data, including adaptive behavior instruments. (*Id.* at 1045-46.) He further admitted that for several questions that reflected situations that Defendant was unlikely to encounter, he did not ask the

respondents whether they had an opportunity to observe Defendant in this encounter. (*Id*. at 1050-51.)

Finally, the Government asserts that Dr. Fabian's test results were not properly scored because Dr. Fabian used the wrong SIB-R norms when calculating Defendant's scores. (Tr., pp. 1064-65.) The SIB-R, as with other standardized instruments, have set norms that correspond with a particular age group. As Dr. Greenspan testified, these different norms correspond with age because "there are certain things you would expect a 25-year-old to be able to do that you would not necessarily expect of a 16-year-old." (*Id*. at 1252.) Dr. Fabian testified that he assessed the SIB-R scores with norms of a 26-year-old. (*Id*. at 176.) Dr. Fabian admitted that he should have assessed Defendant's scores with the norms of a 21-year-old, the age at which the respondents assessed Defendant's adaptive skills. (*Id*.) Dr. Fabian testified that he did not know how the norms would have differed between the age groups of 21 and 26, but that it was possible that Defendant's actual broad independent score is higher. (*Id*. at 178.) Dr. Greenspan testified that while an SIB-R result may vary depending on the age group used, the "difference [in adaptive abilities] between an 18-year-old and a 25-year-old is not as great as you might think." (*Id*. at 1253.)

Despite Dr. Fabian's miscalculation in scoring Defendant's SIB-R results, these results are consistent with and further support the substantial evidence that shows Defendant possesses significant limitations in adaptive functioning. As one federal court noted, "nearly *all* methods of assessing an individual's adaptive functioning - particularly in a retroactive analysis - are imperfect." *Davis*, 611 F. Supp. 2d at 493. As Dr. Greenspan explained, the advantage of a standardized instrument is that the information received from the questions is "much more meaningful and concretized than the kind of general stuff you get in interviews, or reports, or testimony." (Tr., p.1257.) While the court will not consider Defendant's scores of 59 definitive evidence of Defendant's significant limitations in adaptive behavior, the score does illustrate that Defendant possesses deficits in his adaptive skills. Notably, both Defendant's SIB-R scores from different respondents are consistent and both scores are approximately 11 points lower than the score needed to show significant adaptive limitations. Because the AAIDD advises clinicians to use adaptive behavioral instruments to measure adaptive skills, and no other expert, other than Dr. Fabian, followed this practice, the court will take into account Defendant's SIB-R scores.

### 4. Adaptive Behavior And Mild Intellectual Disability

Finally, an assessment of Defendant's adaptive behavior must consider that Defendant's IQ range places him in the category of Mild Mental Retardation or Intellectual Disability. Individuals with a mild intellectual disability will exhibit both strengths and weaknesses in adaptive functioning. As noted above, the DSM-IV-TR states:

> As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support . . .

DSM-IV-TR at 43.  Thus, the focus of an assessment must be on Defendant's deficits in Prong 2's three domains, and not on his strengths.

### b. Findings Under The Three Adaptive Behavior Domains

### 1. Conceptual Domain

The AAIDD defines conceptual skills as an individual's ability in language; reading and writing; money; time; and number concepts.  AAIDD, p. 44.  Defendant possesses significant limitations in his conceptual skills. Defendant proffered extensive evidence that he had delayed and impaired speech; substantial difficulties in reading and writing; and low comprehension.  The court finds Defendant is significantly limited in this domain.  All experts agree that Defendant was deficient in his speech and communication as a child.  Defendant's school records indicate that Defendant was in speech therapy at least through the fifth grade and that in his teenage years, Defendant took some speech classes.  Brenda Lewis, Defendant's mother, testified that Defendant had delayed communication as a baby, and that she could not understand Defendant's communication until he was about four years old.  Defendant's aunt and sister, Mary Spates and Domaneek Lewis, confirmed Brenda Lewis's account of Defendant's delayed speech.  Defendant's speech was so impaired as a child that Brenda Lewis withheld him from kindergarten, fearing that if Defendant was hurt at school, "he could not tell me if anything happened to him."  (Tr., p. 403.) Defendant's elementary and middle school records indicate Defendant's inability to comprehend. Defendant's sixth grade report notes that Defendant "does not always comprehend what is being said and often misinterprets directions."  (Def. Ex., A-3.)  Dr. Woods opined that Defendant had

deficits in his articulation of words and understanding other's communication.  (Tr., pp. 172-73.) Dr. Fabian noted that Defendant's school records showed that Defendant was limited in his "receptive language" and comprehension.

Drs. Ott and Askenazi recognized Defendant's substantial difficulties in language as a child, but chose to focus on Defendant's current speech patterns which they both indicated had no significant deficits.  Dr. Ott made this determination based on Defendant's verbal behavior in jailhouse telephone recordings, a videotaped interrogation, and communications between Defendant and himself.  The Guide explicitly cautions against use of verbal behavior in an intellectual disability assessment.  The Guide further notes that individuals with mild mental retardation possess "subtle limitations that are frequently difficult to detect."  AAIDD, p. 16. Further, the court agrees with the court in *Davis,* 611 F.Supp. 2d at 495, that determined recordings of speech are largely "irrelevant" because these recordings may not reflect Defendant's actual abilities.  Finally, these recordings do not undermine or refute the explicit historical record that shows Defendant's difficulties in communicating.  Dr. Greenspan testified that most individuals with mild mental retardation "can carry on a conversation that's grammatically or syntactically correct, but are limited in " their ability to understand complex social and linguistic situations."  (Tr., p. 1144.)  Dr. Askenazi's own neuropsychological test undermine her conclusion that Defendant does not have a deficit in language.  Defendant's scores for both spelling and phoneme[2] pronunciation fell below a third-grade level.

Further, all experts agree that Defendant exhibited deficits in his reading, writing, and academic subjects generally.  Defendant's poor performance in these areas was constant throughout his schooling.  Defendant was placed in special education classes for reading, spelling, English, writing, math, social studies, health, listening comprehension, oral expression, and written expression.  For example, in the subject of reading, Defendant received three F's and a D in second grade, three D's and one F in third grade, one F, two D's, and one C in fourth grade, and two C's, one B, and one A in fifth grade. Although Defendant received higher marks in the fifth grade, his fifth grade teacher wrote within his report that Defendant needed to improve in his vocabulary,

---

[2]     A phoneme is the smallest unit of speech that affects the meaning of a word.  For example, the c in cat and the m in mat are phonemes.

comprehension, "word attack", and study skills. (Def. Ex., A-3.)  In the sixth grade, Defendant's school records indicated that he was "performing 2 years below grade level," and as a result, should be exempt from taking the school's competency test.  (*Id*.)  Defendant's sixth grade school records indicate further that Defendant has "weak word recognition and word attack skills" that are at a second to third grade level.  (*Id*.)  Defendant's current performance on tests measuring cognitive functioning illustrate Defendant's deficits.  Dr. Askenazi's results indicate that Defendant possesses a fourth to fifth grade level in reading and has spelling and phoneme pronunciation capabilities of a second to third grader.  (*See* Tr., p. 766-67; Exp. Reps. of Dr. Ott and Dr. Askenazi,  ECF No. 223, p. 18.)  Dr. Fabian's results on several academic achievement tests showed Defendant's significant limitations in spelling and word reading, story recall, and quantitative concepts and that he functioned below a sixth grade level on all four subjects.  (*See* Tr., 924-26; Exp. Rep. of Dr. Fabian, ECF No. 225, pp. 12-13.)  The DSM-IV-TR states that individuals with mild intellectual disability can "acquire academic skills up to approximately the sixth-grade level."  DSM-IV-TR,  43. Testimony by Susan Greenawalt, Defendant's teacher when he was in ODYS, confirms Defendant's limitations in academics in general and in his comprehension.  Ms. Greenawalt testified that Defendant was a "slow learner."  (Tr., p. 384.)  Critically, Ms. Greenawalt distinguished Defendant's limitations from students with ADHD, stating that Defendant could focus on her instructions, but could not comprehend what he was being told.  (*Id*.)  Defendant's limitations in comprehension were also noticed by the ODYS when Defendant was in the juvenile corrections system.  Defendant's ODYS records express concern regarding whether Defendant could obtain meaningful employment because Defendant is "extremely, low functioning and, cannot catch on very well."  (Def. Ex., A-1.)

Although the evidence regarding Defendant's skills in money concepts show Defendant's limitations, these limitations were not so significant as to be classified as a deficit under the applicable standard.  Dr. Ott testified that as a child, Defendant was aware of money and that Defendant would go to the store for his mother and would purchase food for a neighbor boy.  (Tr., p. 610.)  Further, Dr. Ott testified that "when I asked [Defendant] how he knew he got correct change, he indicated I counted it."  (*Id*.)  The court notes that Defendant's assertion regarding his ability to count change is a self-report, and, as the AAIDD advises, and even Dr. Ott admits, should

be corroborated by other evidence.  Although Dr. Ott's account of Defendant's ability to make purchases from the store is corroborated by the testimony of Mary Spates, Defendant's aunt, her testimony illustrates some of Defendant's limitations.  (*Id*. at 447.)  She testified that when Defendant would go to the store he "would forget some of the things we would tell him to bring," and that Defendant knew where the store was located, but needed help getting the items.  (*Id*.) Finally, Dr. Greenspan explained that individuals with mild intellectual disability who have the mental capabilities of a nine or ten-year-old will be able to count change. He stated, "a ten-year-old knows the difference between a nickel and a quarter.  In fact, I would say most five-year-olds do. That has nothing to do with their money concept or skills." (*Id*. at 1143.)  The court finds that the evidence discussed herein does not conclusively demonstrate that Defendant's limitations are in regard to money concepts.

The court, however, does find that Defendant has shown, by the preponderance of the evidence, that he is significantly limited in his conceptual skills.  The evidence illustrates Defendant's significant limitations in language, reading and writing.  In showing his significant limitations in the conceptual domain, Defendant has satisfied Prong 2 of the intellectual disability standard.

### 2. Social Domain

The AAIDD defines social skills as an individual's ability in interpersonal skills; social responsibility; self-esteem; gullibility; naïveté; following rules/obeying laws; avoiding being victimized; and social problem solving.  AAIDD, p. 44.  The evidence shows that Defendant was impaired in his social skills.  The court finds Defendant is significantly limited in this domain.

Overwhelming evidence shows that Defendant is impaired in his interpersonal skills, social problem-solving, and in his ability to follow rules and obey laws.  Defendant's school records indicate Defendant was an aggressive, impulsive, and frustrated child.  In school, Defendant was placed in a severe behavior handicapped program.  Defendant's sixth grade individualized education program report describes Defendant as "very aggressive towards peers" and "unable to ignore inappropriate behavior." (Def. Ex., A-3.)  The same report states that Defendant "gets into a lot of fights" and that he often left the classroom when "frustrated." (*Id*.)  Defendant's second through

fifth grade report cards indicate his lack of interpersonal skills with other children.  Defendant received mostly an "unsatisfactory" or "needs improvement" in the areas of self-control, respect, obeying school rules in all four grade levels.  (*Id*.)  Both Drs. Woods and Fabian determined that Defendant's behavioral problems illustrate limitations in social adaptive skills.  Dr. Woods testified that Defendant's behavior in school was due to his disappointment in not being capable of appropriate social conduct.  (Tr., p. 181.)  Dr. Fabian determined that Defendant's placement in the severe behavioral handicap program shows his deficits in interpersonal skills and social responsibility.  (*Id*. at 867, 902.)

Dr. Ott did not find Defendant significantly limited in his social skills, but did find that he had significant interpersonal difficulties throughout his childhood.  (*Id*. at 611.)  Dr. Ott determined that Defendant had developed "sufficient interpersonal skills to engage in a relationship with a [woman]" and that his skills were "capable with those about whom he cared."  (Exp. Reps. of Dr. Ott and Dr. Askenazi, ECF No. 223, p. 8; *see also* Tr., pp. 611-12.)  However, this evidence does not contradict a diagnosis of intellectual disability.  The DSM-IV-TR states that individuals with "mild mental retardation" can "usually achieve social and vocational skills adequate for minimum self-support."  DSM-IV-TR, p. 43.

Further, the evidence shows that Defendant was victimized repeatedly.  Brenda Lewis, Defendant's mother, testified that Defendant got "teased a lot" for his speech as a child.  (Tr., p. 409.)  Defendant's aunt, Mary Spates, confirmed Brenda Lewis's account of Defendant's victimization.  Mary Spates testified that Defendant would be teased by others "all the time".  (*Id*. at 445.)  Dr. Askenazi determined that Defendant had a history "of some teasing and fighting between groups."  (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 49.)  Dr. Ott stated within his report that there appeared to be "minimal experience with being victimized."  (*Id*. at 8.)  However, Dr. Ott bases his conclusion not on third-party respondents, but on Defendant's self-report of his teasing.  (*Id*. ("During our interview, [Defendant] reported that the frequency with which others would tease him decreased as he got older.").)

The parties disagreed on the meaning of one particular incident and whether it illustrated Defendant's capacity for interpersonal skills. Expert witnesses Drs. Woods,  Fabian, Ott, and

Greenspan testified regarding an incident when Defendant was a child, where he and a younger boy would "rap" lyrics for money at a car wash. According to Defendant's mother, the younger boy's parent would take all the money he earned from rapping. In response, Defendant would take the boy to get food so that the boy could benefit from the money he earned. (Tr., p. 607.) The Government asserts that this incident shows Defendant's self-motivation and determination and discredits arguments of Defendant's gullibility. (*Id*. at 607, 1263-64.) Dr. Ott, the Government's expert, testified that Defendant's conduct does not show him as "other directiveness"[3], an attribute often present in the intellectually disabled. (*Id*. at 607.) However, Dr. Greenspan explained that this incident shows Defendant's compassion for others, and that his compassion is "totally independent of his own gullibility in relation to other[s]." (*Id*. at 1263-64.) The court finds Dr. Greenspan's assessment of this incident more persuasive. Defendant's ability to help a friend being victimized does not mean that Defendant is, himself, less susceptible to being a victim.

The court finds that Defendant has shown, by the preponderance of the evidence, that he is significantly limited in his social skills.

### 3. Practical Domain

The AAIDD defines practical skills as the individual's ability in daily living; personal care; occupation; use of money; safety; health care; travel/transportation; schedule/routines; and use of the telephone. AAIDD, p. 44. The court notes that significant deficits under the third domain does not mean a complete inability to perform daily living activities. As the DSM-IV-TR states, an individual with mild intellectual disability can "usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance." DSM-IV-TR, p.43.

In terms of Defendant's skills to help in his daily living, Defendant has never lived on his own, except for a brief period of time when he was homeless. (Tr., pp. 173-80.) Defendant's mother, Brenda Lewis, related that if he ever lived on his own, he would need assistance. (*Id*. at 193.)

Defendant has substantial limitations in his personal care and health care. In particular, the

---

[3]      Directed or guided chiefly by external standards as opposed to one's own standards or values.

evidence indicates Defendant had poor hygiene. Domaneek Lewis, Defendant's sister, indicated that Defendant had bad hygiene because he did not bathe or use deodorant. (*Id.* at 459.) Defendant's personal care difficulties were present during his teenage years. Charise Williams, who first met Defendant when he was 15, noted that she had to tell him to use deodorant and that "[e]very now and then you would have to remind him." (*Id.* at 499.) This testimony directly contradicts Dr. Ott's conclusion that Defendant did not have a personal care problem. The evidence also shows that Defendant has needed assistance in maintaining his health. Charise Williams testified that she had to tell and show Defendant how to bandage and clean his shotgun wound. (*Id.* at 541.) Domaneek Lewis testified that she had to help her brother take his asthma treatments even when he became old enough to administer the treatments himself. (*Id.* at 458-59.) Dr. Woods stated that Defendant did not respond appropriately to his health care. Dr. Woods noted that Defendant, who suffers from asthma, has smoked marijuana since he was 12, and that, against medical advice, he left the hospital on several occasions. (*Id.* at 291-92.)

All experts noted Defendant's limited work experience. Dr. Woods testified to Defendant's difficulty in getting employment. (*Id.* at 179.) Dr. Ott testified that Defendant did have summer employment at a carnival, but outside of this job, his experience was limited. Dr. Greenspan explained that Defendant's ability to get a carnival job does not infer a strength in occupational abilities. (*Id.* at 1177.) Further, Defendant's ODYS records express a concern in Defendant finding employment because of his "low functioning." (Def. Ex. A-1.)

Defendant does possess some capabilities that relate to the practical domain. The evidence indicates that Defendant could count money, owned several cell phones, and drove cars for transportation. But a determination of intellectual disability must focus on Defendant's deficits, not his abilities. The AAIDD specifically states that individuals with intellectual disability will typically "demonstrate both strengths and limitations in adaptive behavior. Thus, in the process of diagnosing [intellectual disability], significant limitations in [the three domains] is not outweighed by the potential strengths in some adaptive skills." AAIDD, p. 47. This focus on limitations, and not strengths, was recognized by the federal court in *Davis*, 611 F.Supp.2d at 503. The court found defendant to be intellectually disabled and to possess significant impairments in adaptive behavior. *Id.* There, the court based its decision on substantial evidence that was not outweighed by

defendant's ability to manage his personal finances, use money orders and debit card, live outside the home and hold more than one romantic relationship at a time. *Id*. Similar to the court in *Davis*, this court acknowledges that Defendant's strengths in particular adaptive skills do not negate his significant limitations in other skills.

Defendant has shown, by the preponderance of the evidence, that he has met Prong 2 because he is significantly limited in his conceptual, social, and practical skills. Defendant must now show that his limitations originated before the age of 18.

### C. Prong 3: Defendant Exhibits Both Types of Limitations Before Age 18

#### 1. Legal Standard

Finally, this assessment must find that the individual's disability originated before 18 years of age. AAIDD, p. 1. Because intellectual disability is a developmental disorder, Prong 3 helps distinguish intellectual disability from disorders that manifest during adulthood. *Id*. at 27. Prong 3 requires a retrospective diagnosis of intellectual disability in cases where an individual is over the age of 18 and has not been previously diagnosed with the disability. *Id*. at 96. Although an optimal intellectual disability determination will take place before age 18, this type of determination will never take place in the *Atkins* context. As one court noted, because "those under the age of 18 are already constitutionally ineligible for the death penalty . . . . no clinician evaluating a person for purposes of an *Atkins* hearing will ever be evaluating the person prior to age 18." *Hardy*, 2010 WL 4909550 at \*26. A clinician conducting a retrospective diagnosis must assess a "thorough history" of the individual and base the diagnosis on the individual's personal history and if possible, testing data. AAIDD, p. 96.

#### 2. Analysis

#### i. Evidence

The evidence for Prong 3 has been described in the evidence and findings sections of the prior prongs. Indeed, most of the evidence used in Prong 2, significant limitations in adaptive behavior, is or is based on Defendant's records before he turned 18. These records include Defendant's Cleveland Public School records, which include his individualized education program, and severe behavioral handicap reports, certain hospital records, and his ODYS records. Additionally, the testimonies of Brenda Lewis, Domaneek Lewis, Mary Spates, Charise Williams, and Susan

Greenawalt, recounted Defendant's adaptive skills during his adolescence.

Defendant presented additional evidence that illustrates his limitations before 18 years of age. Dr. Woods conducted a developmental assessment of Defendant that reviewed certain etiological factors of intellectual disability and how these factors can be present in several generations of one family. These risk factors are divided into four categories (biomedical, social, behavioral, and educational), and include premature birth, brain injury, poverty, maternal malnutrition, parental smoking while pregnant, and impaired parenting. AAIDD, p. 60. The AAIDD states that these risk factors can be intergenerational so that the presence of risk factors in one generation can effect the next generation. *Id.* at 61.

### ii. Findings

Based on his assessment, Dr. Woods determined that Defendant's prenatal, perinatal, and postnatal development exhibited risk factors for intellectual disability. These risk factors are: prenatal exposure to cigarette smoke and toxins, prematurity at birth, numerous infections as an infant, aggressive behavior as a toddler, delayed speech and significant language problems, and his mother's own lack of preparation for parenthood. (Tr., pp. 86, 133, 142.) Brenda Lewis's testimony confirmed that Defendant experienced these factors during his development. Brenda Lewis testified that while she was pregnant with Defendant, she smoked half a pack of cigarettes a day. (*Id.* at 399.) Brenda Lewis further stated that Defendant was born prematurely. (*Id.*) She admitted that she fed the one-month-old Defendant regular solid food, such as corn bread and mustard greens, to increase the infant's weight. (*Id.* at 399-400.) Because she fed Defendant solid food, he weighed twenty-three pounds at three months old. (*Id.* at 400.)

Dr. Woods determined further that these risk factors for intellectual disability are intergenerational within Defendant's family. ( *Id.* at 108.) Dr. Woods found that Defendant's mother, Brenda Lewis, aunt, Mary Spates, and his cousins, the children of Mary Spates, all have deficits in their intellectual functioning. (*Id.* at 243.) Both Ms. Lewis and Ms. Spates testified that they have intellectual difficulties. Brenda Lewis testified that, as a child, she was enrolled in special education classes and received D's and F's in most of her classes. (*Id.* at 391-92.) Mary Spates testified that she was placed in special education classes for English and math, and that her son was diagnosed as "educationally mentally retarded." (*Id.* at 424, 429.) She indicated that her son was

placed in special education classes in elementary, middle, and high school. (*Id*. at 428.) Dr. Woods contends that these intellectual limitations across generations made Defendant predisposed to the disability. (*Id*. at 108.)

The court therefore finds that Defendant has shown, by the preponderance of the evidence, that his significant limitations in intellectual and adaptive functioning originated before he turned 18 years old. Evidence documenting Defendant's functioning throughout his childhood establishes Defendant's substantial deficits since he was a toddler. Further, evidence shows that Defendant experienced risk factors for intellectual disability during the prenatal, perinatal, and postnatal periods and that Defendant's family members are impaired in their intellectual abilities. Defendant has met all three prongs of the intellectual disability standard.

### D. The Issue of Comorbidity

The court will address below a number of issues which were raised during the course of the hearing. The purpose of this analysis is to clarify the court's reasoning of why it concluded that Defendant is intellectually disabled. The Government argues that Defendant suffers from a learning disability and other behavioral disabilities that are distinct from intellectual disability. (Gov't. *Atkins* Brief, ECF No. 250, p. 40.) Dr. Ott found Defendant possessed limitations related to learning disabilities and behavioral disorders. (Exp. Reps. of Drs. Ott and Askenazi, ECF No. 223, p. 24.) Dr. Askenazi determined that Defendant suffered from ADHD, Antisocial Personality Disorder, and possessed Borderline Intellectual Functioning. (*Id*. at 47.) Defendant contends that any other potential disorder that he has does not preclude a finding that he has an intellectual disability. Defendant states that to the extent he might have other disorders, these disorders would be comorbid (coexist) with Defendant's intellectual disability.

The DSM-IV-TR indicates that, "[t]he diagnostic criteria for Mental Retardation does not include an exclusion criterion." DSM-IV-TR, p. 47. Thus, an individual should be diagnosed with intellectual disability if the individual meets the three prongs for an intellectual disability determination. *Id*. Indeed, individuals with intellectual disability are three to four times more likely to have comorbid mental disorders than the general population. *Id*. at 45. The most common comorbid disorders with intellectual disability include ADHD and mood disorders. *Id*.

-45-

### 1. Learning Disability

A learning disability can be distinguished from an intellectual disability in two ways.  First, a learning disability is a subject specific disorder and can be distinguished from an intellectual disability that exhibits "general impairment in intellectual functioning."  DSM-IV-TR, p. 51.  The DSM-IV-TR divides learning disability into three sub-disorders: reading, mathematics, and written expression.  *Id*. at 51-56.  Second, a learning disability is distinguished from intellectual disability because a learning disabled individual will have a discrepancy between his or her IQ and academic performance. Guide, p. 16.  Conversely, an intellectually disabled individual will have a subaverage IQ that is consistent with his or her academic performance.  *Id*.  However, the line between the two cannot always be drawn so brightly.  There are limited circumstances.  For example, if an intellectually disabled individual's achievement in reading, math, and written expression is significantly below expected levels given the person's schooling and severity of mental retardation, an additional diagnosis of a learning disability may be appropriate.  DSM-IV-TR, p. 51 (quotation marks omitted).

The evidence establishes that Defendant's impairments are more universal than a subject specific disorder.  Defendant's second grade report card is illustrative of this universal impairment in academic achievement.  First, Defendant's second grade records indicate a recommendation for Defendant's placement in learning disability classes, particularly for reading and mathematics. (Def. Ex. A-3.)  Defendant did poorly in both subjects, scoring three F's and one D in Reading, and two D's, one C, and one B in mathematics.  *Id*.  When looking at Defendant's complete report card, Defendant performed poorly on all subjects, including English and science. Defendant received all D's in English and science.  *Id*.  This global failure in academic achievement suggests significant impairments broader than a subject specific learning disability.  (*See* Tr., p. 123.)  The Government argues that the teacher who completed Defendant's second grade report card had an opportunity, but choose not to recommend Defendant be placed in a program for the developmentally handicapped under Board of Education regulations 3301-51-04.[4]  The Government asserts that subsequently, Defendant was placed in the severe behavior handicapped program. (Tr., p. 583.) The Government

---

[4]     The Ohio Board of Education Rules for the Education of Handicapped Children used the term "developmentally handicapped" instead of "mentally retarded."

contends that state regulations do not permit a developmentally handicapped child to be labeled also as having either a learning disability or a severe behavior handicap.  (*Id*. at 583-84; *see also* Gov't. Ex. 3.)  The court finds this argument unconvincing in light of the evidence presented.  First, as Dr. Greenspan indicated, there is no evidence how Defendant was assessed by Cleveland Public Schools, and further, schools in urban settings tend to underclassify minority students as intellectually disabled.  (Tr., pp. 1157-58.)  Second, Defendant's school records themselves cannot be ignored. Defendant's poor academic performance was not only consistent from year to year, but also universal as to academic subjects.  Thus, the evidence weighs in favor of a diagnosis of intellectual disability, not a learning disability.  This finding accords with other federal *Atkins* determinations.  In *Davis*, 611 F. Supp.2d at 482, the court denied the government's argument that defendant's impairments in academic performance were a result of a learning disability.  The court reasoned that "an individual with [mild intellectual disability] will have generalized deficits, whereas a person with [a learning disability] will exhibit underachievement limited to specific areas."  *Id*.  Additionally, Defendant's poor academic performance is consistent with his significantly low IQ. Intellectually disabled individuals, not individuals with specific learning disorders, exhibit this uniformity in low intellectual functioning.

## 2. ADHD

The Government contributes some of Defendant's impairments to ADHD.  As noted above, the DSM-IV-TR states that the most common comorbid disorder with intellectual disability includes ADHD.  DSM-IV-TR, p. 45.  Thus, there exists a significant comorbidity between ADHD and mental retardation.  *See e.g.,* ( Tr., pp. 94-95). *See also* E. Rose, et. al., *Neuropsychological Characteristics of Adults with Comorbid ADHD and Borderline/Mild Intellectual Disability*, 30 RES. IN DEV. DISABIL.496-502 (2009);  B. Oeseburg, et al., *Prevalence of Chronic Diseases in Adolescents with Intellectual Disability*, 31 RES. IN DEV. DISABIL 698-704 (2010); K. ,Xenitidis, et al., *ADHD Symptom Presentation and Trajectory in Adults with Borderline and Mild Intellectual Disability*, 54 J. INTELL. DISABIL. RES. 668-77 (2010); Bruce Baker, et al., *Mental Disorders in Five-Year-Old Children With or Without Developmental Dely: Focus On ADHD*, 39(4) J. CLINICAL CHILD & ADOLESCENT PSYCHOL. 492-505 (2010); Kevin M. Antshel, et al., *Is ADHD a Valid Disorder in*

*Children With Intellectual Delays?,* 26 CLINICAL PSYCHOL. REV. 555-572 (2006); Santo F. Nuovo, et al., 41 *Psychiatric Syndromes Comorbid With Mental Retardation: Differences in Cognitive and Adaptive Skills*, J. PSYCHIATRIC RES. 795-800 (2007). The DSM-IV-TR further states that "symptoms of inattention are common among children with low IQs who are placed in academic settings that are inappropriate to their intellectual ability." DSM-IV-TR, p. 91. Defendant was diagnosed with ADHD and placed on Ritalin to treat the disorder. (Tr., p. 300.) Thus, in theory, Defendant's intellectual disability is comorbid with ADHD. While Defendant may have ADHD, this disorder alone cannot account for Defendant's low IQ functioning and his significant impairments in all three adaptive domains. As Defendant's special education teacher, Ms. Greenawalt testified, Defendant's impairments were not in his ability to focus, but to comprehend. (*Id*. at 384.)

### 3. Oppositional Defiant Disorder

Finally, it should be noted that Defendant was also diagnosed with Oppositional Defiant Disorder during his stay at the Applewood Center. (Tr., p. 883; Gov't. Ex., A-23). This disorder is defined as "recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least 6 months." DSM-IV-TR, p. 100. Yet, as Dr. Greenspan explained, individuals with mild intellectual disability face a diagnosis of Oppositional Defiant Disorder because their impairments make school a "very upsetting setting for them." (Tr., p. 1159.) Furthermore, like ADHD, this disorder only addresses Defendant's antisocial behavior and not his limitations in conceptual, practical, and intellectual functioning.

### IV. CONCLUSION

For the aforementioned reasons, the court grants Defendant's Motion for Pretrial Determination that the Imposition and Execution of the Death Penalty is Barred Based on Antun Lewis['s] Mental Retardation. (ECF No. 204.) Defendant has shown, through the testimony of expert witnesses, lay witnesses, and exhibits that he is intellectually disabled or mentally retarded. In order to be diagnosed as intellectually disabled or mentally retarded, Defendant must be shown to possess: (1) significant limitations in intellectual functioning; (2) significant limitations in one of the three adaptive behavior domains of conceptual, social, and practical adaptive skills; and (3) that

both of the above-mentioned limitations occurred before Defendant attained the age of 18. This court finds, as required by the standards of the Intellectual Disability: Definition, Classification, and Systems of Supports and the American Psychiatric Association Diagnostic and Statistical Disorders, that Defendant has an IQ of approximately 70 or less, and thus falls within the range of mild mental retardation.  The court also finds, pursuant to the relevant criteria in the above-mentioned authoritative sources, that Defendant is substantially impaired in his conceptual, social, and practical skills. The court further finds, as required for a mental disability diagnosis, that Defendant possessed the above-mentioned IQ and limitations in his adaptive behavior before attaining the age of 18.

While the Government has presented evidence to the contrary, the court finds that Defendant has proven, by a preponderance of the evidence, that he is intellectually disabled or mentally retarded.  Thus, a sentence of death may not be imposed on Defendant pursuant to the Eighth Amendment to the U.S. Constitution and 18 U.S.C. §3596(c).

IT IS SO ORDERED.


/s/*SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT


December 23, 2010