UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:08 CR 404 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| ANTUN LEWIS, | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant | ) | AND ORDER |

On May 21, 2005, eight children and one adult died in a fire that consumed a house at 1220 East 87th Street ("1220 House") in the City of Cleveland.  One individual was severely burned, but survived.  Another resident escaped unscathed.  On February 14, 2011, a jury found Antun Lewis ("Lewis" or "Defendant") guilty of maliciously damaging and destroying by fire the 1220 House in violation of 18 U.S.C. § 844(i).   On March 31, 2011, Lewis filed a  Motion for a New Trial Pursuant to Fed. R. Crim. P. 33 (ECF No. 324), contending that this court should grant Lewis a new trial in the interest of justice because the verdict is against the manifest weight of the evidence.  On June 10, 2011, Lewis filed a second Rule 33 Motion, this one based on newly discovered evidence suggesting that key Government witnesses colluded in fabricating testimony.  (ECF No. 332.)  The court held a hearing on the latter Motion on August 30, 2011 and September 2, 2011.  For the following reasons, which are summarized at pages 87-95, the court grants Lewis's Motion based on the weight of the evidence.  (ECF No. 324.)  Because the Motion is granted, Lewis's Motion based on newly discovered evidence of perjury is dismissed as moot.

## I. FACTUAL AND PROCEDURAL HISTORY

On October 1, 2008, a grand jury indicted Lewis for one count of arson in violation of 18 U.S.C. § 844(i).  This statute provides that "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building . . . or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be" guilty of a violation of the laws of the United States.  18 U.S.C. § 844(i).[1]

At trial, the Government had the burden to prove the following elements beyond a reasonable doubt: (1) Lewis set a fire to damage or to destroy, or in an attempt to damage or destroy, the 1220 House; (2) that the 1220 House was used in interstate commerce or was used in an activity affecting interstate commerce; and  (3) that Lewis acted maliciously.  (*See* Jury Instructions, p. 19, ECF No. 297.)  The jury trial commenced on January 24, 2011.  (*See* Transcript of Jury Trial Proceedings, Vols. 1–13, pp. 1–3100.)   The jury was instructed that proof of motive was not a necessary element to establish Lewis's guilt or innocence, and therefore, the Government did not have to prove beyond a reasonable doubt why Lewis committed the arson.  (Jury Instructions, p. 25.)  The jury, however, was instructed that "the presence or absence of motive is a circumstance which you may consider as bearing on the intent of the Defendant."  (*Id.*)

For its case-in-chief, the Government called 38 witnesses, including:

- Jennings Dawson, owner of 1220 House (Tr. 154),  and Roberta Witt,

---

[1]     No objections were raised, either at trial, or in the Motions currently before the court, concerning this court's jurisdiction.  *See Russell v. United States*, 471 U.S. 858, 862 (1985) (noting "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties" and holding "property was therefore being used in an activity affecting commerce within the meaning of § 844(i)").

a Housing Authority officer (Tr. 168), who testified that Medeia Carter, the renter of the house, received Department of Housing and Urban Development ("HUD") Section 8 funding to pay her rent.

- Various family members and friends of the victims of the fire who testified about the lives of the victims. (*See, e.g.*, Evelyn Martin's testimony, Medeia Carter's mother (Tr. 174); Moses Marshall's testimony, Medeia Carter's boyfriend (Tr. 539).) The night of the fire, the eight child-victims were having a sleepover at Carter's home.

- The firefighters who responded to the fire. (*See* Patrick Mangan's testimony (Tr. 215); Terry Piazza's testimony (Tr. 236); Angel Marrero's testimony (Tr. 244).)

- Surviving victim of the fire and resident of the 1220 House, Capritta Nicole Bell. (Tr. 460.)

- Carmella Smith (Tr. 697) and Charise Frazier (Tr. 736), two cousins who bought marijuana from Lewis and spoke with him about the fire a week after it occurred.

- George H. Hightower III (Tr. 786), a friend of Lewis's, who allowed Lewis to stay with him the week leading up to the fire. Lewis went to Hightower's house shortly after the fire occurred.

- Special Agent Don Illig, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent, who assisted in the investigation of the fire at the 1220 House. (Tr. 933.)

- Sharese Williams, mother of one of the child-victims in the fire, a close friend of victim Medeia Carter, and an acquaintance/friend of Lewis's. (Tr. 1125.) Her daughter Shauntavia, considered by Lewis to be a sister, was at the sleepover.

- Sharay Williams, daughter of Sharese Williams, who allegedly spoke with Lewis the morning after the fire. (Tr. 1211.)

- Stephanie Charlene Mitchell, Moses Marshall's mother. (Tr. 1250.)

- Douglas Smith, a Revol Wireless Radio Frequency Engineer, who testified regarding Lewis's cell phone records from the night of the fire. (Tr. 1283.)

- Paul McKeever, a jailhouse informant who worked closely with the ATF during the investigation.  (Tr. 1405.)

- Jailhouse informants who testified that they heard Lewis state he committed the arson.  (*See* Daniel Id'Deen's testimony (Tr. 1695); Richard Wheeland's testimony (Tr. 1804); Anthony Collier's testimony (Tr. 1904); Cyle Watson's testimony (Tr. 1974); Christopher Myers's testimony (2022).)

- Samantha Collins-Taylor, a prostitute and drug user from the west side of Cleveland, who allegedly allowed Lewis to use her house for drugs and sexual purposes several months leading up to the fire.  (Tr. 2195.)

- Marion Jackson, Lewis's alleged lookout and accomplice for the arson.  (Tr. 2258.)  He is an acquaintance of informant McKeever and prostitute Collins.

For his case-in-chief, Lewis called 7 witnesses, including:

- Teon Marcel Smith, a former resident of 1220 House, who escaped the fire unscathed.  (Tr. 2552.)

- Bruce Shannon Thomas, who was present on 87th Street at the time of fire and witnessed the fire.  (Tr. 2583.)

- Ricky Chapman, Manager of Security Quality for the Greater Cleveland Regional Transit Authority ("RTA").  (Tr. 2652.)

On February 14, 2011, the jury returned a guilty verdict.  Lewis now moves for an order vacating the jury verdict and granting a new trial pursuant to Federal Rule of Criminal Procedure 33.  In its Opposition, the Government contends that the following evidence at trial conclusively shows that it met its burden of proof:

Medeia Carter received HUD Section 8 funding to pay her rent for the 1220 House.  According to the lease agreement, Medeia Carter owed $741 per month, all of which was subsidized by HUD. (Tr. 156.)  The lease agreement was still in effect at the time of the fire.  (Tr. 158.)

Evidence of irregular burn patterns in the house and arson expert testimony indicate that the fire was intentionally set with gasoline.  (Tr. 309–14,

328–29.)

Testimony of Douglas Smith, a Revol Wireless engineer, that Lewis's cell phone records show Lewis was in the same cell phone sector[2] as the 1220 House at the time of the fire.  (Tr. 1283.)

Samantha Collins-Taylor's testimony that Lewis planned to "burn out" the residents of a house, possibly due to a drug debt owed to Lewis by one or more of the residents.  (Tr. 2204–05.)

Marion Jackson's testimony that Lewis asked him to be a "lookout" for the arson, and that he accompanied Lewis the night of the arson to obtain gas. Jackson further testified that he believed Lewis wanted to burn the house due to a drug debt owed to him. (*See* Tr. 2244, 2272–87.)

Testimony of Carmella Smith and Charise Fraizer that Lewis told them details about the deaths of the victims a week after the arson.  (*See* Tr. 701–19.)

Lewis's May 21, 2005 statements to investigators that he was in a dispute with one of the child-victim's mother, Sharese Williams, and that he bought $5.00 worth of gas either the day before or the day of the arson. (Agent Illig's testimony, Tr. 943, 949.)

The testimonies of six inmates who heard Lewis make incriminating statements about his involvement in the fire. (Paul McKeever's testimony, Tr. 1444–46,1459–60; Rick Wheeland's testimony, Tr. 1837–40; Daniel Id'Deen's testimony, Tr. 1720, 1724; Anthony Collier's testimony, Tr. 1920–21; Chris Myers's testimony, Tr. 2031, 34, 75; Cyle Watson's testimony, Tr. 1983, 85–86.)

On August 30 and September 2, 2011, the court held a hearing regarding Lewis's Motion based on newly discovered evidence.  Lewis called as witnesses:

- Sergeant Russell Jaenke, (ECF No. 354, Tr. 11), who testified that inmate Michael

---

[2]      Doug Smith testified that a call from a cell phone is recorded by towers located in cell sites or sectors.  (Tr. 1303–04.)  There are 210 cell sites or sectors in the Greater Cleveland area.  (Tr. 1291.) Within and across each sector, the towers transmit calls between cell phones, and the towers record this transmission. (1293–96.)  Thus, a cell phone record can show the path of a call made by a person driving from one sector to another sector.

Miller was in the Protective Custody pod of the Cuhayoga County Jail from February 16th until April 2, 2010, (Tr. 15), and that Miller's stay in this pod coincided with jailhouse informant Paul McKeever's detention in this pod between February 8, 2010 and April 1, 2010.  (Tr. 16.)

• Sergeant Phillip Christopher, (Tr. 20), who testified regarding Miller's commissary purchases, specifically phone card purchases.  (Tr. 22.)  Further, he testified regarding calls made from Miller's phone cards. (Tr. 24–28.)

• Inmate Michael Miller, who testified regarding the contents of his Declaration, (*See* Decl. of Michael D. Miller, ECF No. 332-1), the "newly discovered evidence," in which he averred, among other things, that McKeever worked with Lewis's alleged accomplice Marion Jackson, prostitute Sam Collins, and several jailhouse informants in fabricating testimony.  (*See* Testimony of Michael D. Miller, ECF No. 353.)

• Miller's defense attorney, Jeffrey S. Richardson, (ECF No. 354, Tr. 31), who testified regarding his discussions with Miller concerning Miller's belief that McKeever had colluded with others to fabricate testimony in the Lewis trial.

• Phillip Reed, (Tr. 48), who shared a residence with Paul McKeever during 2009, and who testified regarding a prior statement he made to defense investigators in which he claimed that a woman by the name of "Sam" visited Paul McKeever.  (Tr. 53.)  Reed had previously identified a photograph of prostitute Samantha Collins as the relevant "Sam," but on the stand he testified that it was a "50-50 decision."  (Tr. 56.)

• Herman Ramos, investigator for the Federal Defenders, (Tr. 93), who testified concerning  the defense's investigation into Phillip Reed and methods for photo and photo array identifications.

The Government called one witness:

• Melissa Cantoni (Tr. 115), institutional investigator at the Lorain Correctional Institute, who testified that she did not receive any requests for a meeting from Michael Miller despite Miller's claim that he reached out to a facility investigator regarding his information about possible perjury in the Lewis trial.

Both sides filed post-hearing briefs on September 12, 2011.  (ECF Nos. 356, 357.)

## II. STANDARD OF REVIEW

Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Though the rule does not define

- 6 -

"interest of justice," a "paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006)).[3]  Under the "manifest weight of the evidence" standard, the court has broad discretion to consider both the credibility of the witnesses and the weight of the evidence to ensure that there was no miscarriage of justice.  *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).  In exercising this discretion, the court sits as a "thirteenth juror" to weigh the evidence and consider the credibility of the witnesses.  *Id.* at 266. Unlike the stricter test for reviewing a motion for acquittal, in deciding a Rule 33 motion based on the weight of the evidence, "the court need not view the evidence in the light most favorable to the verdict." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).  However, a jury verdict should be vacated "only in the extraordinary circumstance[] where the evidence preponderates heavily against the verdict." *Ashworth*, 836 F.2d at 266 (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)); *see also United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990) ("If the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial."); *United States v. Arroyo*, 301 F. Supp. 2d 217, 225 (D. Conn. 2004) (grant of new trial should be reserved for instances where there is real concern that an innocent person may have been convicted).

Under Rule 33, a defendant may also move for a new trial based on newly discovered

---

[3]      In *Munoz*, the Sixth Circuit also noted that the "interest of justice" standard "allows the grant of a new trial where substantial legal error has occurred."  605 F.3d at 373 (citing *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)).  In his Motion, Lewis has not raised any substantial legal errors meriting the grant of a new trial, limiting the Motion to the weight and competency of the evidence.

evidence. In general, "[m]otions for a new trial based on newly discovered evidence are disfavored." *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986). Thus, before a new trial will be granted, the defendant must establish that the new evidence: "(1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried." *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982).

### III. ANALYSIS

In his Motion, based on the manifest weight of the evidence, Lewis argues that the following issues warrant the granting of a new trial: (1) the dubious credibility of the Government's key witnesses and inconsistencies in their testimony; (2) the Government's presentation of contradictory motives for the crime; (3) the nature of the Government's investigation of the crime; and (4) "other issues," namely evidence that the court ruled was either inadmissible or admissible for a specific purpose only. The court will address each of these four issues, beginning with a discussion of the fourth point–the significance of evidence not presented at trial, which Lewis argues bears on the issue of innocence. Second, the court will turn its discussion to the Government's presentation of possible motives. Although the Government did not have to prove a motive in this case, the Government's attempts to establish a motive provide crucial context. Third, the court will assess the credibility of the Government's main witnesses. Fourth, the court will address Lewis's argument concerning the nature of the investigation of the arson and the remaining evidence in the case. Finally, the court will conclude its analysis with a discussion of whether Lewis has met his heavy burden under Rule 33.

## A. Evidence Not Presented at Trial

In his Motion, Lewis argues that there are four pieces of evidence not presented to the jury that the court should nevertheless consider in its resolution of his Rule 33 Motion.  Specifically, Lewis argues that the court should consider the following evidence:

### 1.  The December 27, 2005 recorded conversation between Jackson and Lewis

On December 27, 2005, alleged accomplice Marion Jackson visited Lewis, who was detained in county jail on unrelated charges, to discuss the fire.  Jackson, who had been cooperating with the ATF, wore a recording device.  At issue are the statements made by both Lewis and Jackson during the recorded conversation.  Lewis argues that the court should consider the December 27th conversation because the conversation is "exculpatory in nature," "possesses impeachment value," goes towards Lewis's innocence, and contradicts Jackson's testimony that Lewis solicited Jackson to set the fire and act as a lookout for the fire.  (Mem. in Supp. of Mot., pp. 83–84, ECF No. 324.)  Prior to his trial, Lewis moved to admit this evidence in its entirety. (ECF Nos. 174, 195.)  On February 1, 2011, this court denied Lewis's Motion.  (ECF No. 279.)   The court determined that Lewis could use a portion of the December 27th conversation for the limited purpose of impeaching a witness on cross-examination, but that Lewis could not admit the entire conversation into evidence due to hearsay considerations.  (*Id.*)

### 2. The August 24, 2006 recorded conversation between Orlando Stanley and Lewis

On August 24, 2006, the ATF secured a recording device on Orlando Stanley, one of Lewis's fellow inmates at Belmont Correctional Institution.  Lewis contends that Stanley spent 75 minutes attempting to elicit incriminating statements from Lewis. (Mem., p. 85.)  Lewis claims that he made no incriminating statements during their conversation.  (*Id.*)  Lewis argues that the August

24th conversation should be considered by this court because it is further proof of Lewis's innocence, and it undermines the credibility of the Government's six jailhouse informants, all of whom testified that Lewis confessed to them, but were not secured with recording devices during Lewis's alleged confessions.  (Mem., p. 85.)  During trial, the court was asked to address the admissibility of the August 24th conversation twice at sidebar.  The first time was during the cross-examination of Agent Illig.  The court ruled that, based on hearsay considerations, it was not appropriate to admit into evidence the August 24 conversation to show Agent Illig did not obtain any incriminating statements.  (Tr. 1044.)  The second time was during the redirect examination of jailhouse informant Paul McKeever.  McKeever testified that the ATF did not place a recording device on him for his conversations with Lewis.  (Tr. 1652.)  McKeever stated that an inmate wearing a recording device would need "six to 12" law enforcement officers to oversee the wired inmate in prison and that no inmate would talk to another inmate with law enforcement around.  (Tr. 1652.)  Defense counsel motioned for a mistrial in light of the court's prior exclusion of the Orlando Stanley recording, and argued that McKeever's testimony that he could not be wired is contradicted by the ATF's  actions of  placing recording devices on other inmates, specifically Orlando Stanley.  (Tr. 1660–61.)  The court questioned defense counsel regarding the relevancy of the August 24th conversation for McKeever's examination.  (Tr. 1661.)  Defense counsel admitted that McKeever did not know Orlando Stanley, and reserved its right to address the Motion regarding the August 24th conversation at a later date.  (Tr. 1663.)  Thus, on the second sidebar, the court did not determine whether the August 24th conversation was inadmissible in its entirety.  At the conclusion of trial for that day, the court denied defense counsel's motion for a mistrial and requested that both parties work to see if they could come to an agreement regarding the extent to

which the August 24th conversation might be admissible.  (Tr. 1680.)  The parties did not proffer to the court any agreement on the issue.

### 3. The ATF polygraph examinations

On May 31, 2005, ten days after the fire, Lewis voluntarily took an ATF polygraph examination.    Lewis argues that this court should consider the results of the polygraph examinations because it shows the "uncertainties, inconsistencies, and contradiction" in the Government's case.  (Mem., p. 87.)  Before trial, Lewis moved for an Order allowing him to reference the polygraph examination, not for the truth of the matter asserted within the results, but for the effect of the results upon law enforcement's conduct.  (ECF No. 52.)  The Government argued that the results from Lewis's polygraph examination are contested and would mislead the jury.  (ECF No. 91.)  On July 12, 2010, the court denied Lewis's motion because the results of Lewis's polygraph were in dispute and thus, were likely to confuse the jurors who might place undue weight on the results.  (ECF No. 160.)  Four days later, on July 16, Lewis filed a Motion to reconsider this court's previous denial of the motion.  (ECF No. 165.)  On January 31, 2011, the court denied Lewis's Motion to Reconsider and concluded that, pursuant to Federal Rule of Evidence 403, the probative value of admitting the polygraph examination is relatively low in comparison with the unfair prejudice that may result.  (ECF No. 273.)

### 4. The October 23, 2007 three and one half hour recorded interrogation of Lewis

On October 23, 2007[4], Cleveland homicide detectives interrogated Lewis for three and one-

---

[4]    In defense counsel's Brief for its Rule 33 motion, it states that the three and a half hour interrogation took place on October 27, 2007.  (ECF No. 324.)  However, in prior motions to the court regarding this interrogation, both parties stipulate that the interrogation took place on October 23, 2007.  (*See* ECF Nos. 22 and 30.  *See also*, Court order, non-document, February 11, 2010.)

half hours regarding the fire.  The officers video recorded the interrogation.  Lewis asserts that his

answers to the officers' questions are further evidence of his innocence.  (Mem., p. 88.)  Before trial,

on May 15, 2009, defense counsel filed a motion to suppress Lewis's statements within the recorded

interrogation because the interrogating officers violated Lewis's constitutional rights.  (ECF No.

22.)  In its opposition to the motion, the Government agreed that it would not introduce the recorded

interrogation in its case-in-chief, but reserved its right to use the evidence for impeachment purposes

if Lewis testified.  (ECF No. 30.)  On February 11, 2010, this court granted Lewis's motion to

suppress statements made on October 23, 2007, agreeing that they could not be used as evidence

by the Government in its case-in-chief.  (Court Order, non-document, February 11, 2010.)  In fact,

the statements were not introduced at trial.

5. Analysis

In his Brief, Lewis acknowledges that prior to or during  trial, the court determined that the

above-referenced evidence was either inadmissible or admissible for a limited purpose only.  Lewis

does not challenge the legality of this court's determinations to exclude such evidence[5], but asserts

that this court should consider this evidence as further support of the "uncertainties, inconsistencies,

and contradictions" in the Government's case.  (Mem., p. 87.)  To support his contention, Lewis

---

[5]      It is within the court's discretion on a Rule 33 motion to examine "errors which
may have been committed during the course of the trial."  *United States v. Simms*,
508 F. Supp. 1188, 1203 (D. La. 1980).  Once the defendant has shown that a
prejudicial error was committed, the court must determine whether it "can
conclude with a fair assurance, after carefully examining all of the facts of the
case, that the verdict was substantially swayed by the error."  *Id.* (citing *Kotteakos
v. United States*, 328 U.S. 750 (1946)).

cites to several cases that set forth the district judge's obligations when deciding a Rule 33 motion.

Although courts have emphasized that a grant of a new trial should be reserved for cases where there is a "real concern that an innocent person may have been convicted," *Ferguson*, 246 F.3d at 134 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)), Lewis has not pointed to, and none of his cited cases state, that a court can consider facts that were not presented at trial in its Rule 33 determination. Indeed, one of the cited cases, *United States v. Parelius,* suggests the court cannot do so. 83 F. Supp. 617 (D. Haw. 1949). In *Parelius,* the court granted the defendant's Rule 33 motion for a new trial because it believed that the evidence did not support a verdict for first degree murder. *Id.* In making its determination, the district court "disregarded all grounds advanced other than the weight and sufficiency of the evidence as a whole." *Id.* at 618. Specifically, the district court declined to consider the affidavits of two jurors that showed the jurors would have never joined in the verdict if they knew the verdict called for life imprisonment. *Id.* Instead, the district court considered evidence presented at trial—the testimony of witnesses, both lay and expert, testimony of the defendant, the indictment, and other "uncontradicted evidence." *Id.* at 618–22. The Government contends that the court cannot consider Lewis's additional issues because the court is limited to the evidence produced at trial. (Mem. in Opp'n, p. 6, ECF No. 327 (quoting *Ashworth*, 836 F.2d at 266 (holding appellate court "limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not 'preponderate heavily against the verdict' is a clear and manifest abuse of discretion").) This court agrees. Rule 33 affords trial judges broad discretion to determine whether or not a new trial is warranted in the "interest of justice," yet such discretion is not untethered. The court must make its determination and weigh the evidence as if it is a "thirteenth juror." *See Ashworth*, 836 F.2d at 266; *United States v. Hughes*, 505

F.3d 578, 592 (6th Cir. 2007).  The court would be exceeding its role by considering evidence not presented to the twelve jurors.  For the reasons stated above, the court will not consider these additional issues and will only consider the evidence presented at trial.

## B. The Government's Presentation of Possible Motives

Lewis argues that the Government presented two contradictory and incoherent motives for the crime: (1) that Lewis was owed money for a drug debt; and (2) that Lewis was upset at Sharese Williams for taking his clothes in retaliation for his failure to comply with the conditions of bonds she posted on his behalf in separate criminal proceedings.  As noted above, 18 U.S.C. § 844(i) requires the Government to show Lewis acted with malice, but does not require the Government to prove Lewis's motive in committing the crime.  The court recognizes that the Government had no obligation to put forward proof of motive.  However, given the absence of physical evidence connecting Lewis to the crime, the Government did present testimony bearing on his motive, and the question of why Lewis  would commit the crime therefore became a pervasive theme throughout trial.  Further, the court did instruct the jury that motive could be considered "as bearing on the intent of the Defendant."  (*See* Jury Instruction No. 19.)  Consequently, Lewis's arguments concerning the Government's presentation of possible motives warrants some discussion by the court.

### 1. The bond dispute with Sharese Williams

The first possible motive proffered by the Government was that Lewis was angry with Sharese Williams for confiscating his clothing in retaliation for his having failed to appear at a court hearing while he was out on bond, for which she was a signatory.  Sharese Williams is a nursing assistant who lost her daughter Shauntavia Mitchell in the fire at the 1220 House.  (Tr. 1061–1063.) Her daughter Shauntavia had been staying with Medeia Carter at the 1220 House since she moved

- 14 -

out of Medeia's neighborhood on or about Mother's Day of 2005. (Tr. 1063.) She had been a good friend of Medeia Carter's for many years—they grew up together—and often spent time with her children at Medeia's house. (Tr. 1063–1064.) The night of the fire, her daughter Shauntavia was over at Medeia's house for a sleepover; Lewis was supposed to drive her other children over to Medeia's house but did not do so. (Tr. 1105–06.)

Sharese testified that she met Lewis when he was 15 years old–she had seen him hanging out on the street with other guys. (Tr. 1065.) Her boyfriend at the time knew Lewis, felt sorry for him, and convinced Sharese to let Lewis stay in her home with her family. (Tr. 1130.) On cross, she testified that over time, the family "loved him. My kids called him their brother, and that was my son. Nothing sexually. . . . We were a family." (Tr. 1130.) She testified that she is still on friendly terms with Lewis. (Tr. 1084.)

In April of 2005, a month before the fire, Sharese signed off on two bonds for Lewis to ensure his appearance in criminal court proceedings. (1074–75) On the first, she made a payment of $785 to the bond company, and on the second she made a payment of $150. (Tr. 1075.) A couple of days after her move to her new house, Sharese took Lewis to scheduled court proceedings, dropping him off at the courthouse. (Tr. 1084–85.) Later in the day, she saw Lewis again, who told her that his sentencing had been continued; she subsequently discovered that this was a lie and that he had not shown up at court. (Tr. 1088, 1090–91.) Sharese was very upset "because he skipped bond on my name. When you skip bond, that mean the bounty hunters is coming to your house. . . . My kids was going to be terrified." (Tr. 1091–92.) She contacted him and told him how upset she was and that he needed to turn himself in. (Tr. 1092–1093.) She then testified that Lewis told her that he would turn himself in, and that she should come and pick him up near E. 84th Street. (Tr. 1093, 1094.)

- 15 -

When she arrived, she saw him, called out to him, and told him to get in the car, but he ran away instead.  (Tr. 1093.)  Sharese testified this incident, which took place perhaps one or two days before the fire, made her more upset.  (Tr. 1094.)  She called Lewis repeatedly, but he would not answer, or he would place the call on hold and play music.  (Tr. 1095–1097.)

When asked whether Lewis was angry with her, she answered, "I don't know. Why would he be angry with me?"  (Tr. 1099.)  She added: "if you made an agreement – I mean, if you made an agreement, you had me come down there on 84th to get you, why would you be mad at me and you made this agreement to go to jail?"  (Tr. 1099.)  She then testified that in an effort to get in touch with him she went to Lewis's mother's house and "retained his clothes."  (Tr. 1100.)  Her objective was to get Lewis to come to her home to change his clothes, at which point she or her kids would call 911 to have Lewis arrested.  (Tr. 1101–02.)  Regarding her having taken his clothing, she admitted that Lewis never called her to threaten her or to express anger.  (Tr. 1140.)  She testified that she saw Medeia the Wednesday before the fire and told her about her plans.  (Tr. 1103.)

About half an hour after the fire had been reported, Sharese's daughter Sharay called Sharese at work to let her know that Medeia Carter's house was on fire.  (Tr. 1109.)  When she later learned that someone had died in the fire, she left work to go to the scene of the fire; on her way there, she got a phone call in which she learned that three other children could not be found, including her daughter Shauntavia.  (Tr. 1111.)  When she arrived at the scene, she was stopped by her brother, who told her that her daughter was dead.  (Tr. 1111.)  At some point in the early morning after the fire, Lewis came over to her house on 106th Street, where family members and friends of the victims had convened.  (Tr. 1114, 1129.)

At trial, only George Hightower testified in support of the theory that Lewis might have

- 16 -

committed the arson because he was upset over the fact that Sharese had obtained Lewis's clothing from Lewis's mother's house. (Tr. 804–05.)[6] A week before the fire, Lewis lived with Hightower at Hightower's residence. (Tr. 793.) Hightower overheard a phone conversation Lewis had with his mother regarding Sharese Williams taking his clothes. (Tr. 797.) Hightower described Lewis as upset by the incident. (Tr. 796.) Hightower suggested to Lewis that "if I was you, I'd burn the house down." (Tr. 806.)

Lewis contends that this motive makes no sense in light of the fact that Sharese Williams did not even reside at the 1220 House. Lewis had lived with Sharese prior to staying with Hightower, and he also assisted Sharese with her May 2005 move to a new house a few weeks before the fire. (Tr. 1079, 1083.) The Government responds that there is a reasonable connection between Sharese Williams and the 1220 House— Sharese's daughter would usually stay with Medeia Carter at the 1220 House, while Sharese was at work. (Mem. in Opp'n, p. 52.) The testimony, however, revealed that Lewis considered Sharese's children to be his siblings. Sharese's daughter, Sharay Williams, 15 years old at the time of trial, testified that she cares for Lewis as a brother. (Tr. 1213.) The night of the fire, she was at her mother's new home on 106th Street and Union Ave., but was hoping to join her sister Shauntavia at the 1220 House. (Tr. 1219.) After receiving a call at around 3:24 a.m. notifying her of the fire at Medeia Carter's house, Sharay called her mother to let her know. (Tr.

---

[6]    The court acknowledges that, at side bar, the Government asserted that they had a witness who could testify about the bond issue. (Tr. 1278-80.) Yet this court determined that the testimony would be hearsay because the witness would be testifying about statements made by Hightower about Lewis. (*Id.*) Because this testimony is not part of the evidence presented at trial,  the court will not consider the argument that a second person could have corroborated George Hightower's testimony regarding the bond money.

1225.)  She testified that Lewis cried when she subsequently informed him that Shauntavia, whom he considered a little sister, had died in the fire.  (Tr. 1234.)  Based on the phone records, she had a 24-minute conversation with Lewis at 6:04 a.m., three hours after the fire, and that is when she believes she told him about Shauntavia's death.  (Tr. 1236.)  She was not aware of any threats Lewis made to her mother as a result of her mother having confiscated his clothing.  (Tr. 1237.)  She admitted on cross that Lewis used to walk Shauntavia to the bus, look out after her and all of the kids.  (Tr. 1239.)

2. The drug debt motive

While only Hightower testified that the possible motive for the arson was the bond money, a number of the Government's witnesses testified that a drug debt owed to Lewis was the motive for the crime.  These witnesses were: the alleged accomplice Marion Jackson; the jailhouse informants Paul McKeever, Anthony Collier, Daniel Id'Deen, Richard Wheeland, Cyle Watson, and Christopher Myers; and former drug addict and prostitute Samantha Collins-Taylor.  Lewis argues that these witnesses colluded to fabricate the drug-debt motive, and that the evidence ties all of these witnesses to jailhouse informant Paul McKeever, who had a reputation of working with law enforcement on cases pending against fellow prisoners.  The court discusses the credibility of these witnesses later in its Opinion, but notes now that their testimony regarding a possible drug debt was greatly undermined by the testimony of the witnesses actually connected to the 1220 House and the victims of the fire.  (*See* Evelyn Martin's testimony, Tr. 202–03 (testifying that her daughter, Medeia Carter, did not use drugs); Capritta Nicole Bell's testimony, Tr. 497–98 (testifying that neither she nor Medeia Carter used drugs); Sharese Williams's testimony, Tr. 1133–34 (testifying that she never heard Lewis state that Medeia Carter or Capritta Nicole Bell owed him money for drugs, and further,

- 18 -

that neither used drugs); Moses Marshall's testimony, Tr. 594 (testifying that Medeia Carter did not

use drugs).)

The testimony of Caprita Nicole Bell ("Bell" or "Nicole") was particularly important in light

of the fact that alleged accomplice Marion Jackson and several of the jailhouse informants testified

that the fire was specifically meant for Nicole, and that Lewis made statements concerning a "bitch

Nicole." (*See* Marion Jackson's testimony, Tr. 2284 (Lewis answered call shortly before setting fire

with, "is the bitch Nicole in the house?"); Paul McKeever's testimony, Tr. 1450 (Lewis "mentioned

a girl named Nicole."); Daniel Id'Deen's testimony, Tr. 1716 (heard Lewis state fire was "meant for

the bitch Nicole"); Richard Wheeland's testimony, Tr. 1839 (Lewis stated "it wasn't intended for the

kids, it was meant for Nicole"); Anthony Collier's testimony, Tr. 1919–20 (heard Lewis "talk about

this girl named Nicole" and that Nicole "got burned but she still looked good").)

Nicole is a nursing student who was living at the 1220 House at the time of the fire, which

she survived despite incurring severe burns.  (Tr. 461, 487.)  At the time of the fire, she had known

Lewis for a couple years—she knew him through Sharese and Sharay Williams, and generally from

the neighborhood. (Tr. 468–469.)  Medeia Carter had taken Nicole into her home after Nicole had

conflicts with her mother; Nicole considered Medeia to be an aunt. (Tr. 496.)  She testified that

Lewis once tried to make a "move" on her by kissing her, but she "told him no, and that was it."  (Tr.

470.)  She admitted that he was always nice to her in her presence, and that he never threatened her

because she would not kiss him. (Tr. 499.)  She testified that Lewis treated the children that were in

the 1220 House as his cousins, and considered victim Shauntavia "Tay-Tay" Mitchell to be his little

sister.  (Tr. 503.)

Asleep when the fire started, she was awakened by the smell of smoke. Bell thought that

- 19 -

Medeia Carter might have accidentally left the stove on.  (Tr. 482–83.)  She testified that she got out

of bed, walked downstairs towards the kitchen to try to turn the stove off, but the smoke was too

heavy, and ended up escaping the house through the basement, where she saw  Teon Smith, who

escaped the fire uninjured.  (Tr. 484, 487–89.)  Like Bell, Smith was a family friend whom Medeia

had allowed to stay in the 1220 House because she "didn't like the conditions [Smith] was living

under."  (Tr. 2555.)  Once out, and before fire trucks and rescue units appeared on the scene, Bell

observed people from the neighborhood trying to get into the house in order to help.  (Tr. 492.)

When rescue units arrived, she was taken to a hospital, where she was treated for second degree

burns to her feet, face, neck, and left arm, and third degree burns on her right arm.  (Tr. 492–93.)

On cross, she testified that she is not a drug user, and was not a drug user at the time of the

events of this case.  (Tr. 497.)  She also testified that she never saw Medeia Carter engage in any

drug-related activity.  (Tr. 498.)  She described Medeia as a generous woman who would take care

of people in the neighborhood, including an elderly neighbor.  (Tr. 497–98.)  Medeia Carter kept an

immaculate household.  (Tr. 505.)

Bell testified that around October 5th, 2007, she had a meeting with ATF Special Agent John

Gregg and Special Agent Illig, which made her extremely upset.  (Tr. 512.)  She testified that the

Agents thought she was involved in the arson, and that she owed Antun money for drugs.  (Tr.

527–528.)  She denied both accusations.  (Tr. 528.)

### 3. Discussion

While the court is mindful of the fact that the Government did not have to prove a motive in

this case, the foregoing reflects that over the course of the trial, the Government's key witnesses

presented two starkly different narratives. The first narrative was that of the witnesses who were

connected to the victims of the fire, through friend or family relationships, experienced the fire themselves, knew the neighborhood, and knew the Defendant. Those connected to the fire related that no one at the 1220 House used drugs, let alone purchased drugs from Lewis. They further related that Lewis had no conflict with anyone in that home; indeed, several of the victims were like family to him. While he may have been in the middle of a dispute with Sharese Williams at the time of the fire, Sharese did not even reside at the 1220 House, and in fact, Lewis knew where she lived. The second narrative was that presented by the alleged accomplice in the arson, Marion Jackson, and Sam Collins, a former crack–addict and prostitute from the west side of Cleveland–with the corroboration of a group of jailhouse informants–who claimed to know Lewis through his drug-related activity. This group of witnesses related that Lewis planned to set the 1220 House on fire because of a drug debt.

However, as is explained more fully below, serious concerns were raised regarding the credibility of all of the witnesses who testified regarding this drug debt motive. These witnesses also happened to be the Government's key witnesses, as they either placed Lewis at the scene of the crime or testified that Lewis made incriminating statements concerning the fire. No other evidence was presented to tie Lewis to the arson. In light of the fact that it was the Government's key witnesses who testified to a possible drug debt motive, the court finds it difficult to fully divorce the question of Lewis's motive from the necessary elements of the Government's case-in-chief. With this in mind, the court turns to the credibility of the Government's main witnesses.

### C. The Credibility of the Government's Witnesses

#### 1. Marion Jackson

The Government's case-in-chief centered around the testimony of Marion Jackson

("Jackson"). As Lewis's alleged accomplice in the arson and the only person claiming to have seen him at the scene of the crime, he was the Government's key witness. Lewis contends that Jackson's testimony is "patently incredible, consisting of material contradictions, facts that defy physical realities, and facts that just do not make any sense." (Mem. in Supp., p. 46, ECF No. 324.) Lewis points to eight specific contradictions or inconsistencies that he argues, renders the guilty verdict a "manifest injustice." (*Id*. p. 47). The court will first summarize Jackson's testimony. Second, the court will address each contradiction or inconsistency argued by Lewis. Third and finally, the court will assess the credibility of Jackson's testimony.

a. Jackson's testimony

i. Marion Jackson

At the time of the May 21, 2005 fire, Jackson was approximately 55 years old, and had an extensive thirty-year criminal record that includes multiple theft-related offenses (Tr. 2330–34); for half of his life, he had been "in some sort of a facility environment." (Tr. 2262, 2264, 2379.) During the events of this case, Jackson suffered from various health conditions, including heart problems, diabetes, breathing problems, post-traumatic stress disorder, and bipolar disorder, for which he took medications. (Tr. 2337.) After having come forward to law enforcement concerning his role in the fire, Jackson stated that the Government helped him change his name, and that he chose the name "Michael Alexander Knight" after the fictional crime fighter, the "Knight Rider," from the television series of the same name. (Tr. 2429.) Later at trial, it was revealed that he changed his name with the help of his court-appointed defender, Jaime Serrat. Regarding Jackson's choice of name, Serrat testified that "Marion sometimes acts like a child . . . and sometimes things he says, things he does, it would remind me of a child. I mean, somebody with a low-level

intelligence and – that's – that's the best I can describe."  (Tr. 2509–10.)

ii. Jackson's connection to Lewis

Jackson testified that he met Lewis through a prostitute named "Sam," who was allegedly an acquaintance of Lewis. (Tr. 2268.)[7] Specifically, Jackson testified that he met Lewis after accompanying Sam on a walk to the corner of West 25th and Lorain on the west side of Cleveland, where she "had to go see somebody," namely Lewis.  (*Id.*)[8]  On direct, he could not remember a date or time for this first encounter with Lewis; on cross, when presented with his initial statement to law enforcement, he admitted that it was somewhere around August of 2004. (Tr. 2375.)  Jackson failed to recall where he and Sam were prior to walking to that street corner to meet Lewis.  (Tr. 2341.)

During that first meeting, Jackson claimed that Lewis was under the impression that Jackson was "turning a trick" with Sam, meaning he was having sex with her, and Lewis told Jackson that he could charge him money for time spent with Sam.  (Tr. 2269.)  Jackson testified that Lewis then wanted to know more about Jackson; Jackson disclosed some personal information to Lewis, including the fact that he had a criminal background and had "done time."  (Tr. 2270.)  However, Jackson would not tell Lewis the crimes for which he had been incarcerated.  (Tr. 2380.)  Based on that first meeting, Jackson concluded that Lewis was Sam's pimp on the west side.  (Tr. 2341.) Despite testifying that he met Lewis through Sam, Jackson testified on direct that he had no idea who

---

[7]     On cross, Jackson admitted that the first time he identified Sam to law enforcement was in July of 2006, approximately ten months after he gave his initial statement to ATF agents confessing his involvement in the fire.  (Tr. 2405.)

[8]     A recurring theme throughout trial was the divide between the east and west side of Cleveland.  The only evidence that Defendant spent time on the west side of Cleveland was the testimony of alleged accomplice Marion Jackson, and the prostitute Sam Collins. The fire took place on the east side of Cleveland.

Sam was, knew only her first name and that she "hung around" on the west side, where he assumed that she was a crack addict and a prostitute. (Tr. 2298.)  On cross, despite maintaining that he did not have a close relationship with Sam, he admitted to previously telling law enforcement that he would occasionally "stop and have . . . a soda or a pop" with her and that Sam wanted him to be her "security blanket."  (Tr. 2340.)

Jackson testified that he had several conversations with Lewis after their first meeting, but could not recall specific dates or times. (Tr. 2271.)  Jackson did, however, recall a specific incident where Lewis wanted him "to pick up an envelope and bring it to him." (Tr. 2271.)  Jackson "took it as a test," delivered the envelope to Lewis and told him not to "test" him any more. (Tr. 2271.)  Again, Jackson could not recall a date, time or location in relation to this incident, claiming that he could "only remember various things . . . and that's about all I can say." (Tr. 2381.)

According to Jackson, in the months before the fire, Lewis came to trust him and "thought more highly of [him] than he did the average guys on the street." (Tr. 2379.)  Jackson noted that, during the time he knew Lewis, Lewis owned at least two cell phones – one cell phone to sell drugs and the other cell phone for girls. (Tr. 2203.)  On cross-examination, Jackson admitted that, prior to his testimony, he had not revealed to law enforcement that he knew Lewis owned two cell phones. (Tr. 2381.)  Further, he admitted that he did not provide ATF Agent Gregg with his own cell phone number when he took his statement in September of 2005, because "I didn't remember my cell number because I lost my phone and I don't – I'm not good with numbers." (Tr. 2346.)  Thus, his accounts of cell phone communications between himself and Lewis went uncorroborated.

Although at various points in his testimony, Jackson could not recall times, dates, numbers, and locations, he recalled that "two days before" the fire, Antun came to see him to "say that he had

- 24 -

a job that he wanted done." (Tr. 2272.) Specifically, he "wanted a house set fire . . . because somebody owed him some money." (Tr. 2272.) Jackson believed that it was "either for drugs or something." (Tr. 2272.) Lewis offered Jackson $1,500 to set the fire, but Jackson declined the offer. (Tr. 2273.) Lewis told Jackson that if he did not do it, Lewis would tell the police that Jackson did it, because he knew Jackson had a criminal history. (Tr. 2273.)

iii. Jackson's alleged involvement in the arson

According to Jackson, Lewis called Jackson on the night of May 20, 2005, and told him to meet him on the east side because he wanted to see him; he instructed Jackson to wear dark clothing. (Tr. 2275.) Jackson did not think that Lewis's invitation had anything to do with the fire. (Tr. 2275.) Jackson took two buses out to the east side, and got off on Superior Avenue near East 85th Street at around 9:30 p.m., but testified that he could be wrong about his arrival time because he did not have his watch and it was dark outside. (Tr. 2274-75.) Once he arrived at Superior, he met Lewis on that avenue, and the two shared a beer for a few minutes. (Tr. 2278-79.) Notably, Jackson did not recall seeing Lewis in a van or any other vehicle that night; Jackson testified that he "didn't even know [Lewis] had a vehicle." (Tr. 2449.)[9]

The two then walked down East 87th Street toward Kosciuszko Avenue. Jackson recalled that, as he and Lewis stood on 87th Street near the 1220 House, he smelled food and saw about 20 people at a party on an open lot on East 87th Street. (Tr. 2285.) When they arrived at the 1220 House, Lewis pointed at the house and indicated it was the house he wanted set on fire. (Tr. 2280.)

---

[9]     Government witness George Hightower testified that Lewis pulled his van into Hightower's driveway shortly after 3:00 a.m., or after the fire. Thus, assuming the veracity of Jackson's and Hightower's accounts, at some point after the fire was set by Lewis, and Jackson fled the scene, Lewis went to some unknown location to pick up his van.

- 25 -

Jackson testified that he refused to set the fire, but that he agreed to be the "lookout" because he feared that he would be blamed for the fire or killed. (Tr. 2280.)

Jackson and Lewis then walked back toward Superior where Lewis went to pick up two cans—one made of plastic and the other of metal—near a building that was under construction. (Tr. 2281.)[10] Both men then walked to a gas station, "Citgo," on Superior, where, according to Jackson, Lewis paid $5.00 for gas and filled both gas cans. (Tr. 2283.) Jackson claimed that he was standing on the sidewalk when the cans were being filled by Lewis. (Tr. 2282.) He knew that Lewis purchased $5.00 worth of gasoline because he "saw him with a $5 bill in his hand." (Tr. 2283.) On cross-examination, Jackson admitted that, in September of 2005, he told Special Agent Gregg that Lewis obtained gas at a station located on East 79th Street and St. Clair, not East 76th and Superior, which is about a mile away. (Tr. 2388.) He did not correct this account when he testified before the Grand Jury in October 2008, raising the gas station on East 76th and Superior for the first time at trial. He admitted that, prior to trial, ATF agents took him to 79th and St. Clair, where he learned that there was no gas station at that location. (Tr. 2390.) Jackson testified that his "calculations was wrong" with respect to his prior statements concerning the location of the gas station. (Tr. 2457.)

Once Lewis filled both gas cans, Jackson stated that he and Lewis walked back up Superior and turned on East 86th Street, walking towards Kosciuzszko Avenue, where they turned the corner and walked to East 87th Street. (Tr. 2283.) Once on East 87th, Lewis's cell phone rang, at which

---

[10]    No cans were recovered from the scene of the crime.

point he put the cans down and answered: "Is the bitch Nicole in the house?"[11]  (Tr. 2284.)

According to Jackson, Lewis did not make any other statement to the person on the phone.  (Tr.

2284.)  Lewis then picked up the cans and quickened his pace, heading toward the 1220 House. (Tr.

2284.)  Jackson stated that, as they arrived at the house, he crossed to the other side of the street and

walked one or two houses down, where he stood still and observed the scene because "Antwan would

have said that I set the fire or else I would have been dead."  (Tr. 2285-86.)[12]  As Jackson stood as

a lookout, Lewis disappeared between the 1220 House and a neighboring house. (Tr. 2285.)  Jackson

then saw flames coming out of a window and from underneath the front door of the home.  (Tr.

2287.)  As the flames were coming out, Jackson walked back down East 87th Street toward Superior.

As he walked away from the fire, Jackson stated that he turned around one last time to have a look

at the scene, and he saw "Antwan . . . standing right there."  (Tr. 2287, 2393–94.)  Regarding the

alleged party down the street, Jackson stated that the party was "going on for quite a while" and that

once the house caught on fire, attendants from the party reacted and ran over to the house.  (Tr.

2391–92.)  Jackson testified that on Superior, he immediately got on a bus heading back to the west

side.  (Tr. 2288.)  On cross-examination, Jackson testified that he vomited on the bus but that the bus

driver did not stop the bus after he did so.  (Tr. 2398–99.)

Jackson saw Lewis on the west side of Cleveland one time after the fire. (Tr.  2289.)  Lewis

---

[11]     This testimony would tend to suggest that Lewis was communicating with someone inside the 1220 House.  Yet, the phone records produced at trial show only a call from Lewis's then-girlfriend, Janine Chisholm, at 2:53 a.m.  Chisholm did not reside at the 1220 House nor was she charged as an accomplice in this case.

[12]     Prior to trial and throughout his trial testimony, Jackson referred to Defendant Antun Lewis as "Antwan."

asked Jackson if he had said anything regarding the fire and Jackson denied having done so; Jackson

suggested that Lewis "not bother" him anymore.  (Tr. 2289–90.)  Shortly after the fire, Jackson

learned that children had died in the fire, but he did not go to law enforcement because he had had

"run-ins with law enforcement before" and didn't have "too much faith in them."  (Tr.  2991.)

iv. Jackson's subsequent incarceration on unrelated charges and connection to Paul McKeever

On August 3, 2005, just a couple of months after the tragic fire at the 1220 House, Jackson

was arrested and ultimately charged with kidnapping, aggravated burglary, and attempted felonious

assault.  (Tr. 2348, 2360, 2361.)  Based on the seriousness of the charged offenses and his extensive

criminal record, bond was set at $100,000, which Jackson could not afford to post. (Tr. 2361–62.)

The day before his arrest, Jackson had moved out of his old apartment building, which he said was

in an area frequented by prostitutes, and into a new apartment building that was close to a hospital.

(Tr. 2348.)  Jackson admitted that his arrest the very next day was devastating.  (Tr. 2348.)

Jackson testified that Lewis was also imprisoned in the same county jail on charges unrelated

to the fire. (Tr. 2394.)  During his cross-examination, Jackson admitted that he told law enforcement

that Lewis told other inmates at the county jail that "he had beaten the girl before he set the fire," and

that Lewis in turn told Jackson that he claimed to have "beaten the girl" in order to throw off

investigators.  (Tr. 2394.)  Yet, Jackson also admitted having told law enforcement that he did not

have any conversations with Lewis for the period that they were both detained at the county jail. (Tr.

2395.)  When asked whether he agreed that his statements are contradictory, Jackson replied: "My

calculations was wrong."  (Tr. 2395.)

Jackson further testified that, for a period of six weeks during his detention, he shared a "jail

pod" with Paul McKeever, an inmate whom Jackson knew from two prior imprisonments and

- 28 -

described as an "acquaintance." (Tr. 2363.) Jackson was in the same pod with McKeever on a daily basis from August 11, 2005 to September 30, 2005.  (Tr. 2363.)

In jail, Jackson watched a TV news story concerning the children that passed away in the fire. (Tr. 2291, 2368–69.)  He claimed that the story "immediately" bothered him and that he "couldn't bear it anymore;" he "started crying and [] was really upset behind it and [] went to lay down."  (Tr. 2291–92.)  McKeever came to him and asked him what was wrong; Jackson disclosed that he "knew of the fire" and that he met "Antwan . . . through a prostitute." (Tr. 2293.)  McKeever told him that he knew somebody he could talk to and that he would call on Jackson's behalf.  (Tr. 2293.) McKeever connected Jackson to Fire Marshal Ray McCarthy and ATF Special Agent John Gregg. (Tr. 2293.)  On September 30, 2005, during a three-to-four-hour meeting, Jackson told  McCarthy and Gregg about the fire. (Tr. 2293, 2374.)[13]  Initially, Jackson discussed the details of the fire as if he had overheard these details from other inmates; however, after breaking down in tears because he "needed to get this off [his] conscience" he confessed that he was involved with the fire.  (Tr. 2294–95.)  Jackson gave McCarthy and Gregg a statement of the events that occurred on May 20 to 21, 2005, written by Gregg and signed by Jackson, a drawing of the cans allegedly used by Lewis on that date, and a drawing of the 87th Street location with an "X" marking the position where Jackson stood during the incident.  (Tr. 2296–97).

Jackson claimed that he received no promises from Agent Gregg for his confession on that day.  (Tr. 2295.)  Later on in the investigation, Jackson did receive immunity for his testimony, but stated he understood that he could still be prosecuted for his involvement in the arson.  (Tr. 2300,

---

[13]      Lewis was indicted three years after Jackson gave his statement to law enforcement implicating Lewis in the crime.

2401.)  He further testified that he received money from the ATF.  (Tr. 2301–03.)  On direct examination, Jackson admitted that the ATF gave him $5,800 from August 15, 2006 to January 12, 2011. (Tr. 2301.)  He further agreed that he received housing funds of $14,000 to move him to a new location for his safety, $236 for storage of his belongings, $62.90 for a U-Haul rental, and $72.94 for electrical services and lodging expenses.  (Tr. 2302–03.)

On cross-examination, Jackson agreed that his case for kidnapping, aggravated burglary, and attempted felonious assault was dismissed for want of prosecution because no prosecutor or witnesses came to his November 29, 2005 trial .  (Tr. 2402.)  Jackson was released from jail.  (Tr. 2404.)  In December of 2005, ATF agents wired Jackson and sent him to visit Lewis in jail in an attempt to elicit incriminating statements; Jackson met with Lewis at a visiting booth where they were separated by a glass window and could communicate through phones only.  (Tr. 2406–12.) Jackson asked Lewis if he had any idea who committed the arson, why they did it, and whether Lewis was there when it happened.  (Tr. 2410–11.)  Lewis was not charged for the arson after this failed attempt to elicit statements.  (Tr. 2421.)  In March of 2006, however, Jackson was recharged for the offenses that had previously been dismissed.  (Tr. 2421.)  At this point in time, Jackson was out on personal bond.  (Tr. 2422.)  At a bench trial, he was found guilty of misdemeanor assault.  (Tr. 2421–22.)  At his July 26th, 2006, sentencing, he was placed on intense supervised probation for the crime.  (Tr. 2422.)  On cross-examination, Jackson admitted that just two days later, he violated his probation by assaulting another woman.  (Tr. 2424.)  Jackson pled guilty to assaulting this woman. (Tr. 2424.)  He further testified that Agent Gregg was present at his probation violation hearing and that he was placed back on probation, but warned by the sentencing judge that he would he be sent to jail if he got into trouble again, regardless of whom he brought from the ATF on his behalf.  (Tr.

- 30 -

2423–25.)

b. Analysis

Under a Rule 33 Motion inquiry, this court has discretion to consider the credibility of a witness. *Ashworth*, 836 F.2d at 266. Jackson is the only witness who testified to firsthand knowledge of how Lewis committed the arson on 1220 East 87th Street. Thus, Jackson's testimony is critical evidence regarding the issue of whether Lewis maliciously set the fire. The court does not overlook the fact that Jackson, in addition to being the only witness to the crime, was also Lewis's alleged accomplice. While uncorroborated accomplice testimony alone can support a conviction, *United States v. King*, 288 F. App'x 253, 256 (6th Cir. 2008), the Sixth Circuit warns that this type of testimony should be given more caution than other testimony when weighing its credibility. *See* 6th Cir. Pattern Jury Instruction 7.08.

The court finds several aspects of Jackson's testimony deeply troubling. Jackson often failed to recall critical information and admitted to a number of "miscalculations" concerning key facts. Certain aspects of his testimony were in conflict with other competent evidence presented by the Government or were uncorroborated. Certain portions of his testimony even raised questions about whether he knew Lewis and was at the scene of the crime. It is clear that Jackson's testimony presented a salient credibility question for the jury.

In his Motion, Lewis points to eight specific contradictions or inconsistencies in Jackson's testimony that, collectively, warrant a new trial: (i) other evidence and Jackson's own statements contradict Jackson's testimony that Lewis had a conversation with him in county jail after the May 20, 2005 fire; (ii) there is no evidence other than Jackson's testimony to show that Jackson vomited on the RTA bus after his involvement with the fire; (iii) there is no evidence other than Jackson's

- 31 -

Case: 1:08-cr-00404-SO  Doc #: 359  Filed: 02/08/12  31 of 95.  PageID #: 9771

testimony to show that a party occurred in an open lot on the same street as the 1220 House; (iv) the testimony of Bruce Thomas, a neighborhood resident that was standing outside on 87th Street right before the fire, contradicted Jackson's testimony; (v) there is no evidence to corroborate Jackson's testimony that Lewis wanted to set the house on fire because a resident of the house owed him money for drugs; (vi) Lewis's cell phone records contradict Jackson's testimony; (vii) Jackson's testimony regarding the trip to the gas station is inconsistent with other evidence and Jackson's own prior statements; and (viii) Jackson's testimony regarding the sequence of events the night of the fire was contradictory and not supported by the evidence.  Some of the alleged contradictions or inconsistencies referenced above are more damaging to Jackson's credibility than others.  The court finds that collectively, however, these inconsistencies and contradictions render Jackson's credibility dubious.  Further, Lewis points to the timing of Jackson's cooperation with law enforcement and benefits received thereafter, and argues that Jackson had a motivation to lie.

i. Contradictory statements concerning conversations with Lewis in Cuyahoga County Jail after the fire

Lewis argues that Jackson offered contradictory statements to law enforcement officers concerning his interactions with Lewis in Cuyahoga County Jail ("county jail") a few months after the fire. (Mem., pp. 29–30.) On cross, he admitted telling ATF Agent Gregg on September 30, 2005, that when Lewis arrived at the county jail, Lewis told other inmates that he had beaten "the girl" before he set the fire, and that he told Jackson that the only reason he was claiming to have beaten the girl was to throw off investigators.  (Tr. 2394.)  In the same statement to ATF Agent Gregg, however, Jackson also stated that he did not have any conversation with Lewis when he was brought to the county jail.  (Tr. 2395.)  Lewis further notes that during the period in which both Jackson and

Lewis were detained at the county jail, they were housed on completely separate floors of the jail. (Mem. in Supp., p. 29.)  When he was confronted with his contradictory statements, Jackson responded that his "calculations was wrong."  (Tr. 2395.)

The Government contends that Jackson's prior inconsistent statements to law enforcement do not relate to "evidence" in the case because they were not part of his trial testimony.  (Mem. in Opp'n p. 30.)  However, as the Government concedes, Lewis elicited the inconsistency in Jackson's statements on cross-examination.  Clearly, such statements can be considered for the purpose of determining credibility.  The Government argues that this court should look, not at Jackson's inconsistent statements, but at the consistency between the substance of Jackson's statements and that of two Government witnesses: Carmella Smith ("Smith") and Charise Frazier ("Frazier").  (*Id.* at p. 31.)  Both witnesses testified that they knew Lewis from the neighborhood.  (Tr. 699, 700, 754.)  On October 6, 2008, three years after the fire, both witnesses gave investigators a statement regarding a get-together with Lewis a week after the fire. Smith testified that during this get-together, she and her cousin Frazier purchased marijuana from Lewis and smoked the marijuana with Lewis in Lewis's van.  (Tr. 706–08.)  Smith testified that while in the van, they discussed the arson. (Tr. 712.)  Smith testified that Lewis stated he was "fucked up about the fire" (Tr. 716), that "the girl was already dead on the side of the bed" and that "the news was lying about the girl being burned."  (Tr. 717.)  Smith further testified that Lewis said a girl was burned from the waist up, not the waist down; the car was moved and put back, and they wouldn't find the keys because the keys were not in the car or the house.  (Tr. 718.)  Smith testified that when she asked Lewis how he knew these details, he gave her a "strange look" like she was the "police."  (Tr. 718–19.)  On cross-examination, however, Smith admitted that it seemed like Lewis was relaying information as if he had gotten it

from someone else, and further admitted that there were rumors circulating in the neighborhood concerning the fire. (Tr. 730.)[14]  Frazier's testimony was consistent with that of her cousin Smith's testimony.  Frazier testified that Lewis never stated he started the fire.  (Tr. 774.)

The Government's argument regarding the alleged consistency of Lewis's statements to Jackson with Lewis's statements to other witnesses (which the court does not see), misses the point. The issue here is Jackson's credibility, not the substance of Lewis's statements.  Regardless of what Lewis allegedly told others about the fire, the fact remains that Jackson admitted to having provided law enforcement with contradictory accounts concerning the extent of his interactions with Lewis in the county jail.  While this may have been a "miscalculation" as Jackson testified, the recurring nature of Jackson's "miscalculations" raises serious issues concerning his testimony.

### ii. Jackson's vomiting on the RTA bus

Lewis contends that the lack of any evidence corroborating Jackson's claim that he vomited on the RTA bus after fleeing the scene, further calls into question whether Jackson was even at the scene of the crime and on the east side of Cleveland.  (Mem., pp. 30–31.)  As stated above, Jackson, on cross-examination,  stated that he vomited on the return bus, but that the bus driver did not stop the bus after he did so.  (Tr. 2398.)  To impeach this testimony, defense counsel called witness Ricky Chapman ("Chapman"), who, at the time of his testimony, served as manager of service quality for

---

[14]    The court also notes that, on cross, Smith wavered when asked whether she was intimidated in any way by ATF Agents when she gave her October 2008 statement.  When asked whether the agent said any intimidating things to her, Smith answered "[t]hey could have."  (Tr. 727.)  Further, Smith testified that they [the agents] told her "they knew whether or not I had children."  (Tr. 727.) Elsewhere in its Opinion, the court discusses the conduct of ATF Agent Gregg in relation to other trial witnesses, but notes now that this testimony somewhat undermines the value that the Government places upon Smith's statement.

the RTA.  (Tr. 2652.)  Chapman testified that under RTA procedure, a RTA bus driver is required to make a "service call" to the RTA headquarters when a customer becomes ill on the bus because RTA prohibits "bodily fluid around on the coach."  (Tr. 2658.)  Chapman stated that the RTA headquarters documents service calls, that he reviewed all service calls for the night of the fire, and that there was no record of a service call made by a bus driver on the line Jackson allegedly took that night.  (Tr. 2656–57.)  Further, no report was issued in the early morning hours of May 21st, 2005.  (Tr. 2665.)  On cross-examination, Chapman stated that he could not definitively say that every bus driver makes a service call when someone gets sick.  (Tr. 2660.)  He further stated that the bus Jackson allegedly took that night was on its last run and headed back to the garage for the night to be cleaned.  (Tr. 2660–61.)  When asked whether this fact would render the issuance of a report or service call moot, Chapman answered that "[i]t still might happen because a person throwing up on a bus is a little different, because you need to call ahead and let them know it needs an interior wash.  Every time you clean every night, it's not an interior wash. We clean them at night, it's just basically they're being swept out or blown out and all the papers are cleaned up."  (Tr. 2661.)  Further, he testified that it is possible that a driver may get into trouble for not reporting such an incident.  (Tr. 2662.)  From this evidence, Lewis argues that a "rational view of the facts can only lead one to conclude Marion Jackson did not vomit on the bus and was never on that bus or on the east side that night."  (Mem.,p. 31.)

The Government contends that Chapman's testimony does not refute Jackson's testimony that he vomited that night on the RTA bus.  This is true in light of the fact that Chapman did not rule out the possibility that a driver might neglect to report the incident if it occurred during the last run, and thus the court does not find that this issue is particularly damaging to Jackson's credibility.

However, in the absence of an incident report, the court must rely on Jackson's word only.

### iii. The alleged party and Jackson's location as a look-out

Lewis challenges two aspects of Jackson's testimony that call into question whether Jackson was even at the scene of the crime.  First, Lewis argues that Jackson's testimony about the 87th Street party attended by at least 20 people was uncorroborated and contradicted by the testimony of Bruce Thomas ("Thomas"), a resident of Superior and 86th Street who was an eyewitness to the fire and who testified as part of Lewis's case-in-chief.  (Tr. 2583–84; Mem., pp. 31–32.)  Second, Lewis challenges Jackson's account of where he stood as a lookout in light of Thomas's testimony that he was standing in the same spot at around the time of the fire.  (*Id.* at 32–33.)

Thomas testified that just prior to the fire, he was with friends at a bar located on 79th and St. Clair.  (Tr. 2586.)  Thomas had a couple of cocktails but denied that he was intoxicated.  (Tr. 2587.)  He and his friends left the bar right after "last call," or around 2:15 a.m.  (Tr. 2587.)  They then walked over to 87th Street and Superior, which he described as their "usual hangout"—his friend's grandmother resides "across the street from where the incident [the fire] happened at."  (Tr. 2587.)  Thomas stated that they arrived at his friend's grandmother's house at about 2:25 a.m., where they stood outside.  (Tr. 2588.)  According to Thomas, he and his friends noticed the fire about five to ten minutes later.  (Tr. 2588.)  He testified that they were "across the street, like diagonal from the house. The house was like two spots over and we was like in the field. We wasn't in the field, we was in the middle of the street, like diagonal from the house, like it was two houses over though."  (Tr. 2588–2589.)

Thomas stated that he did not see any party on 87th Street that night or anyone else on the street aside from his friends, other than a woman who was "dropped off to her truck and she got in

it and left." (Tr. 2591–92, 2632.)  He testified that when he and his friends noticed the fire at the 1220 House, they were the first responders, and they immediately went up to the 1220 House and started to break the windows in order to the get to the kids.  (Tr. 2594–2595.)  He testified to having seen Teon Smith coming out of the house, as well as a woman whose "skin was boiling off."  (Tr. 2596.)  Thomas provided a statement to law enforcement on June 4th, 2005, a few days after the fire. (Tr. 2599.)  On cross-examination, Thomas was adamant that he was in the middle of 87th Street (Tr. 2616) and denied that he told a fire investigator that he and his friends were standing, not on the street, but in a vacant lot at the time of the fire.  (Tr. 2638.)  Further, Thomas stated that he and his friends would have observed whether a person came down 87th Street or walked in or out of the front of the 1220 House.  (Tr. 2618–19.)  Specifically, he stated: "ain't nobody just going to walk up in the house and walk back out and we ain't seeing them walk past. It's impossible." (Tr. 2618–2619.)

The Government contends that Thomas's testimony is not credible. The Government attacks Thomas's recollection noting that he could not remember which victim of the fire came out of the house first (Tr. 2653), and that he admitted he had been drinking that night.  (Tr. 2586–87.)  The Government further asserts that Lewis did not call any of the individuals who were with Thomas on 87th Street during the night of the fire as witnesses, in order to corroborate Thomas's testimony. Further, it argues that Thomas offered contradictory answers regarding his position on 87th Street that night.  As stated above, Thomas initially testified that he and his friends were "out by the field" on 87th Street talking when they saw the fire.  (Tr. 2588. )  When asked directly where he and his friends were located on 87th Street, Thomas testified that they were standing outside on 87th Street, diagonally from the 1220 House, when he saw the house on  fire.  (Tr. 2588–89.)

While the Government attacks Thomas's recollection of that night, the Government has not

presented convincing evidence to indicate Thomas is a less credible witness than Jackson, the alleged accomplice to the arson. If anything, the fact that Thomas is familiar with the neighborhood, was one of the first responders to the fire, and provided a statement to law enforcement just a few days after the fire, lends credibility to his testimony. Further, the Government did not present as a witness any of the alleged twenty party attendants to corroborate Jackson's testimony. While it is entirely possible that Lewis and Jackson might have evaded Thomas's sight, it is improbable that Thomas would not have seen a party of 20 people react to the fire. Thomas's testimony is an additional factor that raises significant questions concerning Jackson's account of the events preceding the fire.

### iv. Jackson's testimony that people in the house owed Lewis money

Lewis argues that the facts do not support Jackson's claim that Lewis set fire to the 1220 House because "somebody owed him some money" for drugs "or something." (Tr. 2267, 2272.) To render Jackson's statement true, Lewis contends that one would have to believe that one of the occupants of the 1220 House owed Lewis money for drugs. (Mem., p. 35.) Lewis asserts that testimony by close family members and friends of the victims refute Jackson's statement regarding Lewis's motive. (*See* Evelyn Martin's Testimony, Tr. 202–03, (testifying that her daughter, Medeia Carter, was not a drug user and would not have allowed drugs in and around her house); Capritta Nicole Bell's Testimony, Tr. 498 (testifying that neither she nor Medeia Carter were drug users or engaged in drug-related activity); Teon Smith's Testimony, Tr. 2556, 2582 (testifying that he had known Medeia Carter since he was 12 or 13 years old and did not know her to be a drug user, and that he was not aware of any conflicts between Lewis and any member of the 1220 House).) Lewis notes that the only Government witnesses discussing a drug debt were Jackson, the jailhouse informants, and Sam Collins. All of these witnesses were connected to each other in some way,

- 38 -

though the extent of the connections was in dispute throughout trial.

The Government contends that Jackson's statement about the debt money was not contradicted by "physical facts or unimpeached and corroborated defense witness testimony." (Mem. in Opp'n, p. 35.) Further, the Government notes that it did not have to prove motive. (*Id.* p. 34.)

Lewis's argument concerning Jackson's testimony that Lewis committed the arson because of a drug debt, is part of a larger recurring critique made by Lewis against several Government witnesses alleging Lewis had this particular motive. Jackson's testimony regarding a drug debt is both corroborated and contradicted by a number of Government witnesses. Those witnesses contradicting Jackson's testimony were family members and friends of the victims of the fire, all of whom were adamant that no one in the house used drugs or had any conflict with Lewis. Conversely, the witnesses supporting Jackson's testimony were jailhouse informants and prostitute Sam Collins, who claimed Lewis stated he burned the house for a drug debt. It is undisputed that these witnesses had no connection to the 1220 House and did not know any of the residents. While there is testimony to support Jackson's account regarding a drug-debt motive, this testimony was thoroughly contradicted by the testimonies of the victims' family members and their friends, witnesses who were not impeached.

### v. The lack of cell phone records connecting Lewis to Jackson

Lewis contends that his phone records further undermine Jackson's credibility because the records do not corroborate Jackson's testimony. (Mem., p. 37.) Jackson testified that Lewis called him on May 20, 2005, the day of the fire, (Tr. 2274–75); he also confirmed that he told Agent Gregg, in a prior conversation, that Lewis called his cell phone on May 21, 2005, the morning after the fire, around 11:30 a.m. (Tr. 2346.) Lewis argues that these statements are not aligned with Lewis's

phone records or the testimony of cell phone expert Douglas Smith. During his cross-examination, Smith was asked to examine Lewis's phone records for May 2005; Smith testified that he did not see any record of Lewis calling Jackson during that month. (Tr. 1336.) Further, none of the records produced at trial placed Lewis on the west side of Cleveland. Lewis asserts that the inconsistency between Lewis's phone records and Jackson's testimony presents extraordinary circumstances requiring a new trial. (Mem., p. 38.) Lewis raises a related issue regarding Jackson's credibility, namely Jackson's testimony about the number of cell phones that Lewis had in his possession. (*Id*. p. 37.) Jackson testified that Lewis owned two cell phones at the time of the fire (Tr. 2274), though he did not previously tell law enforcement this fact. Further, he could not remember Lewis's cell phone numbers or even his own cell phone number during that time. (Tr. 2306.) Lewis contends that Jackson's "selective memory is baffling to a reasonable person," and should be taken into consideration for the court's analysis. (Mem., p. 38.)

The Government responds that Jackson's inability to remember Lewis's cell phone number is consistent with his inability to remember his own number. (Mem. in Opp'n, p. 35.) It further argues that Jackson's testimony about Lewis owning two cell phones at the time of the fire is consistent with other witness testimony that Lewis possessed multiple cell phones at that time. (*Id*. p. 36 (citing to Sharese Williams's testimony, Tr. 1068 (testifying that Lewis carried "one or two" cell phones at the time of the fire); Joan Davis's testimony, Tr. 2692 (testifying that she also knew of Lewis to carry two cell phones with him at the time of the fire.)).) Finally, the Government contends that Lewis's ownership of two cell phones possibly explains why Jackson's phone number did not show up on the record for Lewis's recovered cell phone. (*Id*.) The Government asserts that these phone records show that Lewis may have used the cell phone recovered by law enforcement

for his family and friends, not for "drug buyers or suppliers." (*Id.*)

While the court agrees with the Government that Jackson's trial statement that Lewis carried one or two cell phones was corroborated by other witnesses, the court also notes that the lack of cell phone records connecting Lewis to Jackson makes the issue of Jackson's credibility even more salient. The only evidence produced at trial establishing some sort of relationship between Jackson and Lewis was Jackson's own testimony, and he presented a very ambiguous picture of his connection to Lewis. Indeed, Jackson admitted that when he went to visit Lewis in the county jail on December 27, 2005 wearing a wire in an attempt to record incriminating statements from Lewis, Jackson asked Lewis, "do you have any idea who did it and why they did it," and "were you there when it happened?" (Tr. 2411.) Jackson admitted asking such questions despite having come forward as the alleged accomplice in the case and testifying that Lewis trusted him more than he did the average guys on the street. (Tr. 2410.) The court finds these admissions raise questions about whether Jackson had a relationship of trust with Lewis as he claimed on the stand. Later on in its Opinion, the court also addresses the significance of Lewis's cell phone records and his hypothetical second phone to the Government's case-in-chief.

vi. Jackson's testimony about the location of the gas station

Lewis argues that Jackson's inconsistent statements about the gas station he and Lewis visited prior to the fire further illustrate that the jury's verdict was a "miscarriage of justice." (Mem., p. 41.) At trial, Jackson testified that, on the night of May 20, 2005, Lewis and he went to "Citgo," a gas station on Superior Avenue, to fill two gas cans allegedly used to start the house fire. (Tr. 2282.) On cross-examination, Jackson agreed that he had made a prior statement to Special Agent Gregg in 2005, and the grand jury in 2008, that the gas station was on the corner of 79th Street and St. Clair

Ave. (Tr. 2389.)  Lewis asserts that at the time of the fire, a gas station did not exist on this corner, and that Jackson, realizing this fact, changed his prior statements from 2005 and 2008 at trial to reflect this reality.  (Mem., p. 40.)  Lewis argues that Jackson's change in the location of the gas station is not a mere "miscalculation" because, in his prior statements, Jackson gave specific directions of what streets they traveled to get to the alleged 79th Street and St. Clair Ave. gas station. (*Id.* citing Ex. 37B, p. 11 (describing directions to the gas station as "we walked west on Superior to East 79th where we walked north to St. Clair to a gas station at the [northeast] corner of E 79th and St. Clair.").)

The very specific directions Jackson previously gave to law enforcement do call into question whether Jackson's previous statement was a mere "miscalculation" as he stated at trial.  (Tr. 2389-90, 2457.)  Jackson's testimony recounted a much simpler path: Jackson and Lewis allegedly stayed on Superior Avenue as they picked up cans, proceeded to the gas station where Lewis filled the cans with gasoline, and then walked back to the 1220 House, staying on Superior Avenue. (Mem., p. 40.) By contrast, Jackson's prior statement detailed a much more circular route from the 1220 House, to the gas station, and back to the 1220 House.  (*Id.*)  These inconsistent statements, at the very least, raise additional concerns about Jackson's recollection of that night, and moreover, his credibility in general.  As noted above, his numerous "miscalculations" concerned critical aspects of the Government's case-in-chief.

In its Opposition, the Government contends that, despite this inconsistency in Jackson's statements concerning the location of the gas station, Jackson's statement that Lewis purchased $5 worth of gas the night before the fire, was consistent with Lewis's own statement to Agent Illig that on May 20, 2005, he paid $5 for gas. (*See* Tr. 949.)  This consistency does lend some credibility to

Jackson's testimony, and the record reflects that Jackson was not impeached on this particular point, but the "miscalculation" concerning the location of the gas station does impact the credibility assessment.[15]

### vii. Jackson's alterations of his original time line

Of the several aspects of Jackson's testimony challenged by Lewis, the one that raises the most concern is Jackson's testimony regarding the timing of the events occurring on May 20–21, 2005.  Lewis points to a September 30, 2005 statement Jackson gave to ATF officers regarding the events that took place that night ("2005 timeline") as a reference point for challenging Jackson's credibility.  (Tr. 2244.)

At all times prior to trial, Jackson maintained that the series of events began sometime around 7:15 p.m. to 7:30 p.m, when he received the call from Lewis instructing him to meet him on the east side of Cleveland, and ended around 3:30 a.m. to 4:00 a.m., when he finally got home after taking a bus back to the west side.  (Tr. 2449–52.)  At trial, Jackson initially testified that he was with Lewis the night of May 20 starting around 9:30 p.m., but that he could have "been wrong about my time because it was dark outside and I didn't have my watch."  (Tr. 2274.) Regardless of the timing, he maintained that he was with Lewis continuously until the fire.  (Tr. 2384.)

On cross-examination, however, Jackson was confronted with Lewis's cell phone records, which  indicated that Lewis received two cell phone calls at 1:38 a.m., and 1:39 a.m. placing him in

---

[15]     In its closing, the Defense suggested that the ATF agents who took Jackson's statement may have suggested the $5 amount as well as the Citgo gas station. The court discusses the Defendant's allegations concerning the nature of the investigation of the arson later in this Opinion, but notes now, that although there was testimony in the case concerning ATF Agent Gregg's conduct, there was no testimony to suggest that Agents provided Jackson with facts.

the area of East 106th street and Union Avenue, *four miles away from the fire*.  (Tr. 2385–86.)  In his case-in-chief, Lewis also presented the testimony of Janine Chisholm, a former girlfriend of his, who testified that she was with Lewis around 11:00 p.m. or midnight, the night of the fire.  (Tr. 2767.)  Chisholm stated that she and Lewis were in her car and that she took Lewis to the area of 102nd and Union Avenue, at a family member's home.  (Tr. 2767.)  Chisholm denied seeing Lewis with a middle-aged man fitting Jackson's description.  (Tr. 2767–68.)  The Government notes that although Chisholm testified that she was with Lewis that night, on cross-examination, she admitted that, in 2005, she did not tell police officers that she was with Lewis the night of the fire.  (Tr. 2786–87.)  However, Lewis's cell phone records corroborate her testimony that Lewis was in the Union Avenue area some time before the fire.

When confronted with the records and asked whether he was with Lewis near Union Avenue, Jackson replied that he and Lewis were not near that avenue and further stated: "I don't even know where Union Avenue is." (Tr. 2384, 2385.)  Further, the records show that Lewis made numerous phone calls from 9:15 p.m. to 1:40 a.m. –when Jackson claimed to have been with Lewis–but Jackson did not recall any phone calls aside from the one shortly before the fire in which Lewis asked the caller whether the "bitch Nicole" was in the 1220 House.  (Tr. 2386–87.)[16]

Faced with Lewis's phone records, on redirect, Jackson dramatically altered his previous accounts of the events preceding the fire.  Specifically, he denied that he was with Lewis for hours. (Tr. 2439.)  He testified that he and Lewis walked continuously, with no stopping.  (Tr. 2437.)  He estimated that the entire walk took him "about 15, 20 minutes." (Tr. 2439.)  When asked whether

---

[16]     Again, Lewis's phone records also show a call with Chisolm at 2:53 a.m., around the time of the fire.

"the walk you took was the extent of time you were with the defendant on the 20th or 21st of May 2005," Jackson responded in the affirmative. (Tr. 2439.) On re-cross, Jackson stated that "I'm not good at times . . . I'm not even good with numbers even." (Tr. 2448.) On recross-examination Jackson agreed that he related his original time line of the events to the ATF officers. (Tr. 2449.) Lewis argues this September 2005 time line contradicts Jackson's shortened time line he testified to during his redirect examination.

In its Opposition to Lewis's Motion, the Government acknowledges that Jackson's sequence of events the night of the fire was "off." (Mem. in Opp'n p. 37.) Further, the Government notes that Jackson's inaccuracies were "fully disclosed to the jury and understandable. Jackson was not the only witness with time problems." (*Id.*)

While it would be not be surprising that there might be some slight variation between the previous time line Jackson reported to the law enforcement and the time line presented at trial, Jackson changed his initial five-hour time line by several hours — a significant decrease. To say that his chronology was "off" is putting it lightly. This decrease is troubling given that the initial time line was given to law enforcement much closer to the events of the case; when Jackson testified at trial, almost five years had transpired since the fire.

viii. Jackson's motivation to lie and/or implicate himself in the arson

Finally, the court will address the issue of Jackson's incentive to cooperate with law enforcement and to implicate himself and Lewis in the arson. As an initial matter, the court notes that the Government has the discretion to give resources and immunity to a cooperating witness, and that the use of such resources does not alone render the witness's testimony incredible or constitutionally inadmissible. *See, e.g.*, *United States v. Leventine*, 277 F.3d 454, 461–62 (4th Cir. 2002) ("[A]s long

- 45 -

as there are adequate safeguards, the potential corruption should not condemn the practice."). Nevertheless, the receipt of such benefits (or the possibility of receiving assistance in a criminal case) is relevant to the issue of credibility. *See United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (noting it is "difficult to imagine a greater motivation to lie than the inducement of a reduced sentence" but that "it is up to the jury to evaluate the credibility of the compensated witness").

While there is no evidence to suggest that Jackson knew or reasonably believed he would receive such benefits prior to speaking with ATF, the court notes that Jackson was connected to the ATF through Paul McKeever, a prisoner and ATF informant, who has received benefits for his cooperation with the Government in past investigations. Further, while there is no direct evidence that the Government was involved in the dismissal of Jackson's multiple state felony charges, and his eventual conviction for a lesser-included misdemeanor, the record shows that government agents were nevertheless present at some of Jackson's key hearings. The benefits received by Jackson as a result of his cooperation, coupled with the timing of his coming forward to law enforcement is yet another factor warranting heightened scrutiny of Jackson's testimony.

The Government asserts that Jackson volunteered information about his role as a lookout for Lewis to law enforcement, that he had no incentive to implicate himself in the arson, and that implicating himself was against his interest. As stated above, Jackson testified that he did receive some benefits from the Government for his aid in the investigation. These benefits included immunity for his testimony at trial, and money for living expenses and housing. The Government argues that it was not involved with the dismissal of Jackson's criminal charges for want of prosecution and offered testimony by the state prosecutor involved in Jackson's state case, who

denied the federal government's involvement in that case. (Tr. 2465–68.) The Government does not

deny that it provided Jackson with money for living and housing, and immunity for his testimony.

It contends, however, that it provided Jackson money because he feared for his safety because he was

assisting the Government. (Tr. 2392, 2426). It further argues that the Government would be paying

for Jackson's housing anyway because "Jackson was likely to live in government housing of some

sort." As for Jackson's immunity, the Government notes that Jackson did not obtain use immunity

until 2008, three years after he spoke with investigators regarding the fire, and thus, was not shielded

from liability when he initially confessed to investigators in 2005. The Government asserts that the

fact that Jackson did not have immunity during his 2005 confession illustrates that Jackson did not

have a reason to fabricate Lewis's and his involvement in the fire. (Mem. in Opp'n. p. 30.)

### c. Conclusion Regarding Jackson's Testimony

Having reviewed Jackson's testimony and Lewis's arguments concerning Jackson's

testimony, the court finds that several factors undermine Jackson's credibility. Given his memory

lapses, his "miscalculations," and his problems with dates, times, and numbers, Jackson presented

an incomplete and nebulous picture of his relationship with Lewis[17], describing two isolated

---

[17]    The court notes that the only (brief) attempt to independently corroborate
Jackson's account of his relationship with Lewis came during the testimony of
Sharese Williams, the mother of victim Shauntavia. It was unsuccessful and
reflective of a recurring theme at trial concerning the nature of the investigation.
The Government questioned Williams concerning a statement she allegedly made
to the Cleveland Police Department in September of 2006 (after Jackson had
already come forward to law enforcement) in which she stated that she knew the
name "Marion Jackson" because "Antun would do drug transactions with that
person over the phone." (Tr. 1117). Williams vehemently denied making that
statement, was angered by its inclusion, and testified that the Cleveland Police
Department fabricated statements. (Tr. 1083, 1118, 1163.) She further testified
on cross that when ATF Agent Gregg took a different statement from her in
September of 2009, she insisted that the interview be recorded for accuracy or

encounters with Lewis that apparently led to a relationship of trust and confidence, and Jackson's eventual alleged involvement in the arson. The absence of corroboration or additional details is significant—none of the records produced at trial placed Lewis on the west side of Cleveland. Moreover, the evidence produced was such as to cause one to question, from a common-sense standpoint, why a young man involved in drug dealing on the east side of Cleveland would want to recruit a man in his 50's, from a different part of the city, with multiple health complications and disorders, and no automobile, as an accomplice for various criminal activities.

Furthermore, Jackson's testimony concerning his participation in the arson was also incomplete. Indeed, Jackson materially altered the time line he had previously provided law enforcement when he first came forward in September of 2005. At that time, Jackson maintained that he was with Lewis continuously from about 9:30 p.m. on May 20th, 2005, until the fire began early in the morning on May 21st, 2005. After Jackson was confronted with Lewis's cell phone records, the entire series of events was truncated to a period of 15 to 20 minutes, in which Jackson claimed that he and Lewis shared a beer somewhere near Superior Avenue and E. 87th Street; walked over to the 1220 House; walked back to Superior Avenue, where Lewis retrieved two gas cans near E. 83rd; walked to and from a gas station blocks away on E. 76th Street and Superior to purchase gas; and walked back up Superior, and turned on 86th and up to the 1220 House, at which point the crime was committed. Not only was the time line drastically truncated, other key details of his account were called into question. Although prior to trial, Jackson had maintained the gas station was on 79th and St. Clair, his trial testimony was that the gas station was located on E. 76th and Superior Avenue, which means that Lewis and Jackson remained on the same avenue throughout, rather than circling

otherwise witnessed by a third party.  (Tr. 1164.)

the neighborhood by walking from Superior Avenue to St. Clair.  This inconsistency was reflective of a larger pattern of "miscalculations," which also included previous inconsistent statements to law enforcement, including statements concerning his interactions (or lack thereof) with Lewis in the county jail.

Further, although Jackson maintained that a party and cook-out of about 20 people was going on in a lot in close proximity to the fire, this was not corroborated.  Thomas, who testified that he was in close proximity to the 1220 House shortly before the fire began, testified that he did not see a party in that lot, and moreover, did not see anyone walking up the 1220 House or standing outside as a lookout.  The Government's argument concerning Thomas's credibility are not convincing—Thomas was familiar with the neighborhood, was a first responder to the fire, and provided a statement to law enforcement shortly after the fire.  The Government notes that the Defense failed to call Thomas's friends who were with him that night to support his testimony; but the Government did not produce any witnesses who were on the block shortly before the fire, and might have seen Lewis and Jackson walking to and from the 1220 House, or the alleged outdoor party.

Lastly, although the Government emphasized that no benefits were promised to Jackson in exchange for his cooperation, the court is mindful of the fact that his cooperation came at a time when he was facing serious criminal charges, and when he was incarcerated with a friend who happened to be a repeat informant who previously received benefits for his cooperation with law enforcement. The timing is very suspect.  The court discusses the testimony of the jailhouse informants next in this Opinion, but notes now that it is concerned that much of the corroboration of Jackson's testimony came by way of suspect jailhouse informant testimony.

When viewing the totality of Jackson's testimony, and the various inconsistencies contained

- 49 -

therein, the court finds that Jackson's credibility was significantly undermined.  However, the court will address the testimony of other key witnesses, and the remaining evidence in order to base its decision on the record as a whole.  *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded.  Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses.")

## 2. The Jailhouse Informants

To corroborate Jackson's account of the arson, the Government introduced the testimony of various jailhouse informants.  As an initial matter, the court notes that jailhouse informants present special credibility problems; courts, scholars and some state legislatures have recognized that they are often unreliable witnesses who stand to benefit from providing testimony, and often present testimony that can readily be fabricated.  *See, e.g.*, *State v. Arroyo*, 973 A.2d 1254, 1259 (Conn. 2009) (holding that "[i]n light of [the] growing recognition of the inherent unreliability of jailhouse informant testimony . . . the trial court should give a special credibility instruction to the jury whenever such testimony is given, *regardless of whether the informant has received an express promise of a benefit*" (emphasis added)); *Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) (noting "numerous scholars and criminal justice experts have found the testimony by 'jail house snitches' to be highly unreliable"); *Dodd v. State*, 993 P.2d 778, 784 (Okla. Crim. App. 2000) (adopting special procedures in relation to use of jailhouse informant testimony, including discovery and special jury instruction); *United States v. Bernal-Obeso*,  989 F.2d 331, 333 (9th Cir. 1993) ("Criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from

manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom."); Peter A. Joy, "*Brady* and Jailhouse Informants: Responding to Injustice," 57 Case W. Res. L. Rev. 619, 625 (2007) (noting false snitch testimony is a "major contributing cause[] to wrongful convictions"); *see also* 725 Ill. Comp. Stat. 5/115-21(c)–(d) (2003) (Illinois statute requiring, in capital cases, special procedures for use of in-custody informant testimony, including discovery and pretrial hearing regarding witness reliability).  Although the court in this case did not instruct the jury regarding these special credibility problems, the court notes that the testimony of the jailhouse informants and the defense's cross-examinations nevertheless presented salient credibility questions for the jury.

As the court previously noted, the jailhouse informants in this case were all connected in some way to repeat jailhouse informant, Paul McKeever.  Therefore, the court begins its assessment of the credibility of the jailhouse informants with Paul McKeever.

### a. Paul McKeever ("McKeever")

McKeever is a recidivist offender who at the time of trial was serving a sentence for gross sexual imposition and two convictions arising out of his failure to register his sex offender status and to report to a parole officer.  (Tr. 1406.)  He has a long history of convictions dating back to 1992, which include multiple theft-related and sex-related offenses.  (Tr. 1407–1412.)  According to McKeever, "I've always done everything wrong in my life and cooperating with law enforcement kind of helps me give back to the society that, you know, I couldn't give when I'm out there." (Tr. 1414.)  He was not provided a wire in this case, but had previously worn a wire in his capacity as an informant.  (Tr. 1550.)  On cross, McKeever admitted to having some "mental" issues (Tr. 1592), and further, to being placed on suicide watch on September 26, 2006.  (Tr. 1598.)

- 51 -

McKeever testified that he met Lewis in May of 2005, and saw him again in May and June of 2006. (Tr. 1413.) McKeever testified that his first encounter with Lewis was in the medical unit of the Cuyahoga County Jail, where they were both locked up in isolation. (Tr. 1417.) Lewis had been locked up in that unit after having beaten up a fellow inmate. (Tr. 1417.) McKeever recalled that while they were isolated in this unit, another inmate recognized Lewis from the streets and asked Lewis about the fire for which he was under investigation; Lewis responded that "they didn't have nothing on him and not to worry about it." (Tr. 1418–19.) He stated that, at the time, he did not know what the conversation was about, but he paid more attention after Lewis added that "the bitch deserved what she got and that they didn't have nothing on him." (Tr. 1420.) McKeever then contacted a law enforcement official with whom he had previously cooperated with in investigations– "[t]o try to give something back, you know." (Tr. 1420–1421.) He admitted to previously receiving a benefit – probation – for providing information in a murder case. (Tr. 1421–1422.) He met with Detective Ray McCarthy from the arson unit of the Cleveland Fire Department in June of 2005 and told him about Lewis's statements. (Tr. 1423–24.) He testified that he did not have an opportunity to interact with Lewis thereafter, but in September 2005, while he was imprisoned in the Cuyahoga County Jail, he encountered Marion Jackson. (Tr. 1424–25.) McKeever testified that he has known Jackson "[t]hroughout my prison sentences" and admitted to being friends with Jackson. (Tr. 1425.)

He testified that while they were both locked up in the medical unit, the "East 87th Street fire came on the news and Pops [Marion Jackson] . . . started watching it real, real closely when it came on." (Tr. 1426.) He added that he looked "worried" and "was acting funny, so he went towards the window. I went over and talked to him a little bit and our conversations led to him saying that he knew who set that fire and he said that he knew the guy who actually did it." (Tr. 1426.) Jackson

- 52 -

told him that it was Lewis who committed the arson, and McKeever testified that he relayed the information to Detective McCarthy.  (Tr. 1426.)  McKeever testified that he asked Jackson how he knew this information, and that Jackson indicated that "he knew the same girl that [Lewis] knew, a girl by the name of Sam."  (Tr. 1428.)  McCarthy instructed McKeever to talk more with Jackson, and McKeever encouraged Jackson to speak with Detective McCarthy, which he agreed to do.  (Tr. 1430–31.)

Sometime thereafter, McKeever was transferred to Grafton Correctional Institution ("Grafton"); he learned from Special Agent Gregg that Lewis would be transferred to Grafton to give McKeever an opportunity to elicit information from Lewis.  (Tr. 1433–1434.)  McKeever claimed that Lewis recognized him and asked him how he was doing; they started talking about women, and McKeever shared pictures with Lewis and they discussed possibly setting up a prostitution ring.  (Tr. 1440–41.)  McKeever raised the subject of the fire, asking about the progress of the investigation; Lewis again responded "they really didn't have nothing on him" and that he wasn't too worried about it.  (Tr. 1442.)  McKeever told Lewis that he knew one of the girls whom Lewis knew–Sam–and that Lewis then showed him a picture of Sam.  (Tr. 1442.)  On the stand, McKeever denied knowing Sam, and testified that he knew of Sam through Jackson, and was just using the name "Sam" to get information from Lewis.  (Tr. 1442–43.)  Lewis told McKeever that "Sam's always been a problem to him . . . but that he wasn't really worried about her, he was only worried about one person," namely Jackson.  (Tr. 1444.)  McKeever testified that he knew then that there was "more to what Pops' involvement was in this fire."  (Tr. 1444.)

McKeever testified that he then contacted Agent Gregg and told him that he should look at Jackson more carefully.  (Tr. 1445.)  McKeever testified that Lewis added that Pops "was the – the

MF'er that was staying across the street." (Tr. 1446.) The conversation made Lewis irritable and so McKeever changed the subject. (Tr. 1447.) McKeever testified that he apologized to Lewis the next day in the dayroom, and that Lewis "mentioned a girl named Nicole." (Tr. 1450.)

McKeever testified that on May 27th, 2006, Lewis came to his cell to talk with McKeever, and to ask if he was serious about getting out and making money together. (Tr. 1458.) McKeever showed Lewis a fake bank statement that he got from the ATF showing that he had $1.9 million in a bank account. (Tr. 1459.) He testified that after he showed Lewis the statement, "his whole demeanor changed" and that he confided in him, telling him that: "he did set the fire, that he had it all planned out. He said that he actually wanted Pops to go in the house and set the fire for him. . . . Pops went to the gas station, got the gas with him, but Pops ended up backing out at the last minute and wouldn't do it." (Tr. 1459–60.) Lewis told him that "the bitch [Jackson] got scared, so he ended up going in there and setting the fire. When he came back out, Pops was gone. He was worried about that." (Tr. 1460.) McKeever testified that he asked Lewis about the children that died in the fire, but Lewis responded that "he did not know that those kids were there . . . he didn't mean to kill them people, that he just wanted to send that bitch a message is what he said." (Tr. 1460.) Lewis told him that he went into the house through the left door of the house carrying gas cans, (Tr. 1472), and "[w]hen he [Lewis] come running out, he had gas cans." (Tr. 1466.) McKeever testified that Lewis eventually revealed that Pops was actually Marion Jackson, and that this shocked McKeever a little bit, "but [he] knew who he was talking about any ways." (Tr. 1462.)

McKeever recalled another interaction with Lewis where Lewis was staring out a window and had a "little tear in his eye;" Lewis revealed that "it was a relative that was burned up in the fire and he took off his shirt and showed [McKeever] the cross and . . . the girl's name that was actually on

the cross that had died [in] that fire." (Tr. 1479.) Lewis admitted that he had been smoking "a lot of water [wet][18] on the street. . . ." (Tr. 1479.)

McKeever testified that Lewis was eventually moved "to the hole," or into a segregation unit, because ATF Agents were concerned about how Lewis had begun acting towards McKeever. (Tr. 1482.) McKeever was also moved into the segregation unit for his own misconduct. (Tr. 1482.) Thus, Lewis and McKeever spent some time in the hole together. (Tr. 1483.) McKeever testified that this was sometime in July of 2006. (Tr. 1483.) He testified that Lewis was two cells down from him, and when Lewis saw McKeever being taken to his cell, Lewis "started yelling my name all night, two or three times he was yelling. . . . He kept making like little threats throughout the night." (Tr. 1484.) Lewis threatened McKeever, telling him that "he could have someone burn [his] family like he did theirs." (Tr. 1485.)

On cross, McKeever admitted to previously receiving benefits for his cooperation and testimony in several cases. (Tr. 1502, 1507–14.) Notably, McKeever testified for the prosecution in another arson case in which four people were killed, *State v. Brown*. (Tr. 1517.) In that case, he claimed that while he was in jail with Brown, Brown told him that he had set the fire at issue, but didn't mean to kill anyone. (Tr. 1517.) He admitted to saying in that case that the defendant set the fire to kill a particular "bitch." (Tr. 1518.) In that case, he had two other jailhouse informants corroborate his testimony. (Tr. 1551.)

McKeever admitted to being in the same jail pod with Jackson for a total period of six weeks - August 11, 2005 to September 30, 2005. (Tr. 1520.) Jackson was "hysterical" at that point in time because of recent events in his life. (Tr. 1521.) He learned that at the time of his arrest, Jackson had

---

[18]        Marijuana laced with either embalming fluid or PCP (phencyclidine).  (Tr. 418.)

just gotten his own place, and that it looked like he might lose it because of his incarceration. (Tr. 1528.) While he was in Cuyahoga County Jail, there were rumors going around concerning Lewis's alleged involvement in the arson, and there was intense media coverage, with people watching news stories. (Tr. 1531.)

He admitted to discussing Sam with Jackson, but claimed that he did not know Sam. (Tr. 1544–45.) When confronted with conviction records showing that he had previously been indicted in a 1992 car theft alongside Sam Collins's then-husband, he agreed that this is an incredible coincidence, but denied knowing Sam. (Tr. 1545–46.)

McKeever was released from incarceration on December 18th, 2008, but within months was rearrested. (Tr. 1601.) Specifically, he did not report to his parole office, did not report a change of address in light of his sex offender status, and was charged with kidnapping. (Tr. 1602–03.) He pled guilty to gross sexual imposition, failing to notify a change of address, and escape. (Tr. 1620.) He also pled guilty to an aggravated theft offense. (Tr. 1624.) He admitted that based on the severity of the offenses, he was looking at over eight years of incarceration. (Tr. 1625.) At sentencing, a state prosecutor spoke on his behalf, and he received a four-year sentence. (Tr. 1628.) He admitted that he could make a motion for judicial release in this latest case. (Tr. 1629.) His latest convictions brings his total count to over 20. (Tr. 1630.)

### b. Daniel Id'Deen ("Id'Deen")

Like McKeever, Id'Deen has a string of convictions dating back to the early 1990s, including, but not limited to, a 1993 conviction for forgery; a 1996 conviction for counterfeiting; 1997 convictions for forgery and receiving stolen property; a 1998 conviction for counterfeit securities; 2000 convictions for fraud; a 2001 conviction for forgery; and 2004 convictions for

engaging in a pattern of corrupt activity, forgery, and identity fraud.  (Tr. 1697–98.)

Id'Deen testified in corroboration of McKeever's testimony that he elicited incriminating statements from Lewis.  Specifically, Id'Deen testified to overhearing a conversation between McKeever and Lewis in which Lewis stated "that Sam was okay, but Pops can hurt me."  (Tr. 1716.)  He also heard "Mr. Lewis say, 'I didn't know the kids was there. It wasn't meant for them. It [was] meant for the bitch Nicole."  (Tr. 1716.)  Id'Deen admitted that these statements "got my attention the most because I just heard about that on the news . . . especially when he said the name Nicole."  (Tr. 1720.)  Id'Deen also recalled Lewis stating that "Pops was waiting, but he didn't go in with him, so Pops stayed across the street. . . .When he came out, Pops was not there across the street."  (Tr. 1724.)  Id'Deen gave his statement to law enforcement on July 18, 2006, regarding the conversations he maintains he overheard in May of 2006.  (Tr. 1760.)

### c. Richard Wheeland ("Wheeland")

Wheeland was called to corroborate certain portions of McKeever's and Id'Deen's testimony, specifically their testimony concerning the events of May 2006 and Lewis's alleged incriminating statements.  (Tr. 1817.)  At the time of trial, Wheeland was serving a sentence for vehicular homicide and assault.  (Tr. 1806.)  At the time of the incriminating statements in question, Wheeland had been McKeever's cellmate for about a month.  (Tr. 1821.)  He testified to a particular incident in which he witnessed Id'Deen, McKeever, and Lewis at a table.  (Tr. 1824.)  They were looking at photographs while he was working on homework.  (Tr. 1826.)  He testified he was about six feet away from them.  (Tr. 1827.)  Wheeland's interest was piqued when the conversation turned to the 1220 House fire.  (Tr. 1829.)  He testified to having overheard a second conversation about a week later.  He said he witnessed McKeever and Lewis having a conversation in the dayroom "looking

- 57 -

suspicious." (Tr. 1835.)  Specifically, Wheeland overheard Lewis saying that he was not worried about Sam, but was worried about Pops. (Tr. 1837.)  Lewis, referring to the fire, stated "It was either that or shoot the bitch."  (Tr. 1839.)  He testified having heard Lewis state that "they owed him or something . . . I'm going to assume money." (Tr. 1839.) When McKeever asked him about the kids, Lewis stated "it wasn't intended for the kids, it was meant for Nicole."  (Tr. 1839.)  Wheeland recalled a separate incident in which he was approached by Lewis and asked whether he had heard a rumor that McKeever had previously worn a wire.  (Tr. 1853.)

On cross, he admitted to being "kind of an outcast" in prison given his studious nature and his involvement in educational programs.  (Tr. 1864.)  He testified that as a person with his background and upbringing "[y]ou can be exploited."  (Tr. 1865.)  He admitted that it is important to know who your cellmate is because that person could be violent or could plant stuff in your cell. (Tr. 1866.)  On cross, he admitted that he can file a motion for judicial release now that the mandatory portion of his sentence is over; he previously had applied in 2009, but had been denied. (Tr. 1888.)

### d. Anthony Collier ("Collier")

Like McKeever, Id'Deen, and Jackson, Collier has an extensive criminal record dating back several years. At the time of his testimony, he was serving a two-year sentence for three counts of robbery. (Tr. 1906.) His criminal record dates back to 1974, and includes multiple convictions for robbery and theft-related offenses.  (Tr. 1906–08.)  During June and July of 2006, he was serving time in Grafton Correctional Institution.  (Tr. 1909.)  On June 29th, 2006, he was placed in the segregation unit, where he said he spent a total of about 19 to 21 days.  (Tr. 1911.) Collier testified that during the time he spent in segregation, he spent about ten days alone with no cellmate.  (Tr.

1915.)

Collier testified that although inmates were essentially isolated when locked up in segregation units, they communicated with each other by yelling out of "air holes" in the cell doors. (Tr. 1914–15.) Collier described the segregation unit as consisting of two levels: a lower level, and an upper level; he was being held in the lower level. (Tr. 1918.) Further, he testified that Lewis was also in segregation during this time, and was being held a few cells down on the same level. (Tr. 1918.) He testified that he could hear Lewis communicating through the airholes with someone on the upper level. (Tr. 1918.) At first, he was not paying attention "but then I slowly started listening and then . . . I heard the guy pretty much just incriminate himself I think pretty much out of fright." (Tr. 1918.) Collier testified that he heard Lewis yelling through the airholes that he was being transferred and that he was sure that someone had snitched on him. (Tr. 1918.) Collier testified Lewis was also talking about the house fire that "about a year before . . . had been pretty big news . . . it was one of the biggest losses of life that had transpired in the City of Cleveland in its history." (Tr. 1919.)

Regarding the allegedly incriminating statements, Collier testified that he heard Lewis "talk about this girl named Nicole" and "heard him threaten a guy named Paul" who was detained on the other side of Collier's cell on the same level. (Tr. 1919.) Regarding Nicole, Collier testified that Lewis yelled to his friend on the upper level that Nicole "got burned but she still looked good." (Tr. 1920.) He also testified that Lewis's friend on the upper level yelled out to Lewis to ask him why he did it, to which Lewis responded that "he was wetted out and that he was on that jealousy shit and that he fucked up." (Tr. 1922.) Lewis yelled that McKeever had better keep his mouth shut or he would be burned up as well, or his family's house would be burned. (Tr. 1923–24.) Collier testified

that after spending ten days alone in the cell, McKeever was moved into his cell, but that McKeever denied being the "Paul" that Lewis had been yelling about and threatening.  (Tr. 1925.)

Collier left segregation on July 19th, 2006.  (Tr. 1927.)  Thereafter, he met with ATF Agent Gregg and provided a statement on August 11, 2006.  (Tr. 1927–28.)  On direct, Collier admitted that after providing a statement, he came up for parole, and that Agent Gregg wrote a letter on his behalf concerning his cooperation on the Lewis case.  (Tr. 1932–33.)  The letter was dated July 30th, 2008, and was sent almost two years after he provided his statement.  (Tr. 1933.)  Collier testified that he ultimately got out on parole in February 2009; but that he got back in trouble in early 2010, and is now currently back in prison.  (Tr. 1934.)

### e. Cyle Watson ("Watson")

Watson has a criminal record dating back to 2005; at the time of trial, he was serving a sentence for violating parole in connection with a prior conviction for rape.  (Tr. 1974–77.)  After serving three years, he was sent back to prison in 2009 for violating parole.  (Tr. 1977.)  Watson's testimony was limited to the period of October 2006, when he was incarcerated in the same facility as Lewis.  (Tr. 1979.)  Watson, a white male, testified that at the time, he was part of the Crips, a mostly African-American gang.  (Tr. 1983, 2008.)  Watson testified that he initiated conversations with Lewis "to brag to him because he's [Lewis] considered a high ranking Crip."  (Tr. 1983.)  He testified that "I was bragging to him about things I had done, shot at people or whatever on the streets, and he's like, you know, you think you shot at people, you think you might have killed people, I know I have. . ."  (Tr. 1984.)  Specifically, Lewis confided: "you know, I killed a bitch. I – I asked what for? And he said she ripped him off with some dope and [Lewis] torched her house. . . . I know that she died and I know there was a bunch of kids, and I don't give a fuck about the bitch,

- 60 -

I care about the kids, I feel bad about the kids." (Tr. 1986.) Further, Lewis told him that "the only person he had to worry about was a guy named Pops." (Tr. 1987.) He testified that after this conversation, he had limited interaction with Lewis. (Tr. 1987.) He testified that some months down the road he saw his "real good friend" Chris Myers talking with Lewis. (Tr. 1988.) Watson provided a statement to ATF Agent Gregg on August 26, 2008. (Tr. 1990.) On cross, he admitted to being housed right next to McKeever in June and part of July of 2008, just prior to providing his statement. (Tr. 1998.) He testified that the interactions with Lewis he described on direct occurred between October and December of 2006. (Tr. 2000.) However, he did not provide a statement to authorities until after he was later incarcerated with McKeever in Belmont. (Tr. 2000.) On redirect, Watson testified that not only did McKeever live next to him, but that Watson also cut his hair. (Tr. 2012.) On re-cross he testified that he didn't come forward to authorities until much later, out of concern for the children that died because it "was a phase of my life I had to go through." (Tr. 2015.) He testified that law enforcement got in touch with him because his friend Chris Myers "floated his name to law enforcement." (Tr. 2017.)

### f. Christopher Myers ("Myers")

Myers is a recidivist offender who has numerous convictions for theft-related offenses. (Tr. 2024.) On July 19, 2006, he received a sentence of four years and three months for his latest conviction. (Tr. 2025.) He testified that sometime in the fall of 2006, he was transferred to Belmont Correctional Institution. (Tr. 2026.) There, he met Lewis in 2007, working out at the pull-up bars. (Tr. 2026.) Myers testified that during this encounter at the pull-up bars, he, Lewis, and another inmate started talking about "snitches," and that Lewis started talking about a man who snitched on him named Pops. (Tr. 2031.) Lewis was "offering a couple stacks to . . . shut old boy [Jackson] up."

- 61 -

(Tr. 2031–32.)  Myers claimed that Lewis then told him about the fire, specifically that "some girl had owed him money and he was going to go take care of it one way or the other and I guess they was supposed to set the mother fucker on fire. . . [and] Pops had bitched out on him."  (Tr. 2033.)  Lewis apparently then stated that "when old boy bitched out that he went in the side door with some gas and did it himself."  (Tr. 2034.)  Myers testified that when Lewis revealed that a couple of kids had died in the fire, "I didn't want nothing to do with it.  I was like, wow."  (Tr. 2035.)  Myers testified that after Lewis revealed this to him, "I told him I was a thief and I got to go.  I go, 'I'm a thief, I'm not a killer.'"  (Tr. 2035.)  He avoided Lewis thereafter.  (Tr. 2037.)  Myers perceived Lewis to be a member of the Crips, based on Lewis's handshakes, and that the Crips is a "multi-race" organization.  (Tr. 2039.)  He testified that both he and Watson were members of Crips' branches.  (Tr. 2040.)

A few months after his conversation with Lewis, he asked Watson for advice.  (Tr. 2042.)  He testified that Watson told him that he should speak to a Sergeant Howell.  (Tr. 2043.)  Myers eventually spoke with ATF Agent Gregg.  (Tr. 2047.)  Myers admitted to having a close relationship with Watson but denied having any friendship with McKeever, stating only that he "knew of him."  (Tr. 2041, 2049.)  On cross, however, he acknowledged that he and McKeever were in the same prison pod at Belmont for a period of time between May and July of 2008, and that he spoke with Agent Gregg regarding Lewis during this time period.  (Tr. 2057–58, 2062–63.)   He provided a statement to Agent Gregg on July 1, 2008.  (Tr. 2048.)  Myers testified that he was motivated to speak to law enforcement because "it was laying heavy on my chest when I heard people talking about some kids getting burned up in a fire and I got a conscience and it was weighing heavy on it so I had to talk to somebody. . . . I got a heart."  (Tr. 2048.)

g. Analysis

Several aspects of the jailhouse informants' testimony call their credibility into serious question.  As an initial matter, the court cannot ignore the fact that each witness was somehow connected to Paul McKeever when he offered a statement to law enforcement.  Paul McKeever either shared a cell or was in the same pod as the jailhouse informants, Daniel Id' Deen, Richard Wheeland, Anthony Collier, Cyle Watson, and Christopher Myers.  (*See* Id'Deen's testimony, Tr. 1760; Wheeland's testimony Tr. 1868, 1980; Collier's testimony, Tr. 1942; Myers's testimony, Tr. 2057–58; and Watson's testimony, Tr. 1995.)  Indeed, Watson, who testified regarding incriminating statements made by Lewis in the fall of 2006, only provided a statement to law enforcement in the Summer of 2008, after having been incarcerated in a cell adjacent to McKeever.  McKeever, in turn, admitted to having a history of cooperating with law enforcement and providing statements, and receiving benefits in some cases.  He admitted to previously cooperating in a different arson case in which he also claimed that the Defendant did not mean to kill some of the victims, and that the fire was meant for a particular "bitch."

The court also notes that some of the informants did receive benefits for their cooperation with the Lewis case.  Specifically, at McKeever's latest sentencing hearing, a state prosecutor spoke on his behalf regarding his cooperation in state and federal cases.  (Tr. 1628.)  When Collier came up for parole in 2008, ATF Agent Gregg wrote a letter on his behalf.  (Tr. 1933.)  Throughout trial, the informants in this case maintained that the Government made no promises to them in exchange for their statements.  Whether explicit promises were made by the Government, however, is in some ways beside the point.  The relevant question for the purposes of assessing credibility is the witness's *motivation*, and the court cannot disregard the fact that some of the Government's key witnesses

provided statements to law enforcement at or around critical junctures in their criminal cases. *See Arroyo*, 973 A.2d at 1260. Further, some of their criminal backgrounds raise questions concerning these witnesses' character for truthfulness.

The court also cannot ignore the similarities in the accounts of the jailhouse informants, most of whom provided a generic account that the fire was meant for a particular woman because of a drug debt, and some of whom testified that Lewis specifically meant to kill a "bitch Nicole." Not only were these accounts uncorroborated by non-informants, they were flatly contradicted by the testimonies of the family members and friends of the victims of the fire. As noted previously, Nicole Bell's testimony, and that of other witnesses, raises serious questions about why Lewis would set the fire in retaliation against her, or any other female residing at the 1220 House, or at the very least claim to have had a conflict with her. Lewis contends that the use of buzz words and "glaring" similarities in the witnesses' testimonies indicate that they all conspired to fabricate their testimonies against Lewis. (Mem. in Supp., p. 71.) Specifically, Lewis notes that almost all of the informants claimed that Lewis stated that he didn't mean to kill kids; that several referenced "Nicole;" all testified regarding "Pops"; and that McKeever, Watson, and Myers discussed a drug debt as Lewis's motive for the crime. (*Id.*) Notably, some of the jailhouse informants admitted to learning about the fire from news stories. (*See, e.g.*, Daniel Id'Deen's testimony, Tr. 1720 (heard name "Nicole" on the news); Anthony Collier's testimony, Tr. 1919 (testifying fire "had been pretty big news" and involved one of the "biggest losses of life that had transpired in the City of Cleveland in its history"). The court cannot disregard this fact in assessing the credibility of these witnesses. Collier's testimony was particularly striking. As a matter of common sense, the court finds it difficult to believe that Lewis was screaming out several key details concerning the fire through "airholes" in

- 64 -

the door of his cell in the segregation unit.

### 3.  Samantha Collins-Taylor and George Hightower, III

#### a. Samantha Collins-Taylor

The Government also called Samantha Collins-Taylor ("Collins"), a former prostitute and crack cocaine addict from the west side of Cleveland, to testify in its case-in-chief.  Collins claimed that she bought drugs from Lewis and allowed Lewis to stay at her house in 2005.  Collins testified that, shortly before the fire, Lewis expressed to her that he was upset about a drug debt and that he would burn those who owed him money.  (Tr. 2206.)  Lewis contends that Collins's testimony is not credible or "competent" to support Lewis's guilty verdict.  (Mem. in Supp. p. 65.)  Lewis enumerates three factors that either contradict or undermine Collins's testimony: (1) Lewis's cell phone records; (2) the Government's own evidence as it relates to Lewis's motive for committing the crime; and (3) Collins's relationship to Paul McKeever, a jailhouse informant, who related to authorities information about Lewis's involvement with the fire.

#### (a) Collins's testimony

Sometime in 2005, Collins, a drug user and prostitute, met Lewis.[19]  (Tr. 2199, 2202.)  She testified that she met him on a street corner on the west side of Cleveland, where she "was out looking for drugs to buy them and he was one of the ones that approached me."  (Tr. 2199.)  Collins testified that her relationship with Lewis developed thereafter and she would allow Lewis to come to her house on West 82nd street to cook crack cocaine, shower, and have sex with girls.  (Tr.

---

[19]  As noted previously, Jackson testified that he met Lewis through Collins.  On cross, he admitted that in his September 2005 statement to ATF Agent Gregg, Jackson indicated that this first encounter with Lewis was in August of 2004.  While Jackson testified that he believed Collins was a prostitute for Lewis, this was not corroborated by Collins.

2200–02.)  She testified that he would be at her house "[q]uite a bit during that time," meaning in the

two months preceding the fire.  (Tr. 2202.)  In exchange, Collins would get crumbs and left-overs of

crack cocaine.  (Tr. 2202.)  Collins stated that at this time, Lewis had at least two cell phones—"[o]ne

would be for drugs. I imagine the other one would be for the girls."  (Tr. 2203.)  Collins would call

Lewis on his cell phone to purchase drugs; at trial, she could not remember his number or her own

cell phone number in 2005.  (Tr. 2218.)

Collins claimed that in May 2005, the month of the fire, Lewis began acting irrational, upset,

and angry, would wave around a gun, and he was also using the drug "wet."[20]  (Tr. 2203-04.)  Collins

stated that Lewis visited her house frequently during that time, and that right before the fire, Lewis

was at her home at least one to two times a day.  (Tr. 2217.)  Lewis related to Collins that he was

upset because people did not pay him back for drugs (Tr. 2204) and that "there was too many to

shoot, so he would burn them all out."  (Tr. 2206.)  She testified that during the conversations

regarding this house, he was hostile, "sweating profusely, he was upset, always waving the gun

around, always cussing, mad." (Tr. 2207.)  She assumed the house was on the east side of Cleveland,

and she testified that Lewis was focused on the house for a "good two weeks, three weeks maybe."

(Tr. 2205.)  Lewis told Collins that he went to the 1220 House three times to retrieve his drug money

---

[20]    The Government suggests that Lewis might have been under the influence of
"wet" when he allegedly set the fire.  (Mem. in Opp'n p. 51.)  However, the court
finds this to be pure speculation.  Jackson testified that he did not know whether
Lewis had smoked wet during their "walk" leading up to the fire.  (Tr. 2447.)
When shown his statement to law enforcement in which there is no indication that
Lewis had smoked wet or marijuana in his presence, Jackson responded "I don't
even know what that [wet] is."  (Tr. 2448.)  The only support for this assertion is
the dubious testimony of certain jailhouse informants, who claim that Lewis
admitted to them that he had been smoking wet on the streets.  The court does not
find that their testimony is competent evidence.

but that people inside would not let him enter.  (Tr. 2231, 2233.)  She testified that about a week before the fire, she "tried to call him and call him" but "there were no answers;" she never heard from him again. (Tr. 2207.)  When Collins heard about the 1220 House fire, she assumed that Lewis "did it."  (Tr. 2207.)  She admitted that she did not go to law enforcement with Lewis's comments, (Tr. 2208) and that law enforcement found her and asked her to give a statement on July 6, 2006.  She testified that law enforcement found her because, according to Special Agent John Gregg, "somebody had pointed me out."  (Tr. 2209.)  Notably, there was no mention of Marion Jackson at all in her testimony.

After she gave her statement,  law enforcement gave her $1,000 for moving expenses because she was "getting threatening phone calls and I was scared."  (Tr. 2212.)  On cross-examination, Collins denied knowing jailhouse informant Paul McKeever, even though in 1992, her then-husband was indicted for stealing a car with jailhouse informant Paul McKeever.  (Tr. 2214.)  On cross, she was also shown Lewis's cell phone records, which showed that during May of 2005, Lewis's calls did not place him anywhere on the west side of Cleveland.  (Tr. 2217.)  She responded that "he had several different phones, maybe it was another phone he used."  (Tr. 2217.)  She admitted not having previously told law enforcement that Lewis carried more than one phone, stating this fact for the first time at trial.  (Tr. 2219.)  She testified that she did not supply her cell number to authorities investigating the fire because she "couldn't remember it." (Tr. 2219.)  She added: "I was on drugs really bad, so I can't give that information." (Tr. 2223.) On redirect, she added: "I can't even barely remember my own address at that time."  (Tr. 2237.)

(b) Lewis's Arguments Concerning Collins's testimony

In his Motion, Lewis challenges the credibility of Collins's testimony.  Specifically, Lewis

attacks Collins's assertions that Lewis was upset about a drug debt owed to him by the residents of 1220 East 87th Street. Lewis first argues that, for the month of May 2005, his cell phone records do not indicate that he made or received calls in the area of Collins's house. He further contends that the records do not contain Collins's phone number, despite her testimony that she called Lewis in May to purchase drugs, and that Lewis frequently spent time at her house in the weeks leading up to the fire. (*See* Tr. 1338–41 (Douglas Smith testified that none of Lewis's calls from May 1 to May 25, 2005 were located on the "west side" of Cleveland.).) The Government responds that Lewis had multiple cell phones at that time and that the cell phone records indicate calls for only one of Lewis's cell phones. (Mem. in Opp'n p. 53.) It further notes that Lewis could have turned off his cell phone while on the westside and thus any calls he received would not be listed on the records. (*Id*. (citing to Douglas Smith's testimony, Tr. 1350).) Second, Lewis contends that Collins's testimony that Lewis went to 1220 House three times to collect his money for a drug debt (from several people) is contradicted by the Government's own evidence. (Mem., p. 63.) Lewis asserts that Capritta Nicole Bell, the surviving victim of the fire and a government witness, testified that Lewis was never violent or threatening towards her. (Tr. 499.) Lewis further asserts that none of the Government's witnesses testified that Lewis was confrontational or aggressive towards residents of the house in the past. (Mem., p. 63 (citing to Moses Marshall's testimony, Tr. 585; Teon Smith's testimony, Tr. 2582; Sharese Williams's testimony, Tr. 1133–36).) The Government replies that Lewis's motive is irrelevant for his arson conviction. (Mem. in Opp'n p. 54.) Third, Lewis argues that Collins had a motive to fabricate incriminating statements allegedly made by Lewis – Collins knew Paul McKeever, a jailhouse informant, and thus, corroborated McKeever's testimony that Lewis committed the arson. In its Opposition, the Government referred to the testimonies of both Collins

and McKeever, who each denied knowing each other.  (Collins's testimony, Tr. 2198; McKeever's testimony, Tr. 1545–46.)

### ii. George Hightower

The Government also called as its witness, George Hightower, III, a resident of 1560 East 86th Street, Cleveland, who had known Lewis for 10 or 15 years.  (Tr. 777, 790.)  Hightower was with Lewis on May 21, 2005, the morning of the fire.  Lewis argues that Hightower's testimony lacks all credibility and is the "epitome of the 'dubious' testimony offered by the [G]overnment." (Mem., p. 67.)

### (a)  Hightower's Testimony

A week before the fire, Lewis lived with Hightower at Hightower's residence, which was located at 1560 East 86th Street, a few blocks south of the 1220 House.  (Tr. 787, 793.)  Prior to living with Hightower, Lewis lived with Sharese Williams.  (Tr. 793.) Hightower described Lewis as being like family to him, specifically referring to him as a "play brother."  (Tr. 790.)  Hightower overheard a conversation Lewis had with his mother regarding Sharese Williams taking his clothes. (Tr. 797.)  Hightower described Lewis as upset by the incident.  (Tr. 796.) Hightower suggested to Lewis that "if I was you, I'd burn the house down."  (Tr. 806.)  The day before the fire, Lewis unsuccessfully attempted to call Sharese Williams.  (Tr. 808.)

The morning of May 21, 2005, around 3:04 a.m., Hightower called Lewis twice, and did not receive a response.  (Tr. 812.)  Shortly after these calls, Lewis drove into Hightower's driveway at a high rate of speed, and told Hightower to come open Hightower's door.  (Tr. 815–16.)  Although Hightower first testified that once Lewis drove into his driveway, Lewis called Hightower, when Hightower was confronted with Lewis's phone records that suggested the opposite, Hightower stated

- 69 -

that he could have called Lewis.  (Tr. 817.)   Hightower went to open the door, and subsequently stepped outside and headed towards Lewis's van.  (Tr. 817–18.) Hightower smelled gas emanating from the van.  (Tr. 819.)  On cross-examination, Hightower stated that Lewis's van was not running properly, and that a week before the fire, he gave Lewis a can of STP gas treatment, which could account for the smell of gas. (Tr. 844.)

Hightower told Lewis to get out of the van.  (Tr. 820.) He and Lewis started to enter into his house when they both heard people next door state that Moses Marshall's house was on fire and they could not locate him.  (Tr. 821.)  Moses Marshall was Medeia Carter's live-in boyfriend at the time.  Hightower's neighbors were relatives of Marshall, including his mother.  (Tr. 822.)  Hightower recalled that Lewis had no apparent reaction  to the information that Marshall's house was on fire. (Tr. 857.)  Believing that the house of Marshall's grandmother was on fire, Hightower told Lewis that the fire must be on Decker Street.  (Tr. 825.)  Lewis responded that the house in question was on 87th Street.  (Tr. 825.)  Subsequently, Hightower observed the neighbors run out of the house, presumably to go look for Moses Marshall.  (Tr. 828.)

Once Lewis and Hightower entered the house, Hightower described Lewis as acting like he had "something on his mind."  (Tr. 829–30.)  Lewis  began making phone calls and eventually found out that his cousin or "little play cousin" died in the fire.  (Tr. 832.)  Hightower stated that Lewis started to cry: "It hit him pretty hard. . . . He fell to the floor, and he was crying."  (Tr. 832.)  Hightower then went to the store and spoke with a person regarding Lewis and the fire; the person's comments made Hightower want to speak with Lewis immediately about the incident. (Tr. 833.)  He testified that when he came back from the store it was no longer dark out, and that he remembered it was in the early morning.  (Tr. 836.) Hightower testified that Lewis had calmed down by the time

he returned home, and he confronted Lewis and told Lewis that people accused him of setting the fire. (Tr. 836–37.) Lewis responded, "You're talking crazy shit, you're talking crazy shit" and proceeded to walk out of Hightower's house. (Tr. 861.)

Hightower stated that on May 22, 2005, the police took him down to the police station for interrogation about the fire. (Tr. 846.) During his interrogation, Hightower was not asked whether he smelled gas in Lewis's van, and did not volunteer this information to law enforcement. (*Id*.) Additionally, Hightower did not tell law enforcement about Lewis correcting Hightower that the fire occurred on 87th Street and not Decker. (Tr. 865.) Hightower testified that he was interviewed by law enforcement 30 or 40 times and was never asked about the gas smell in Lewis's car. (Tr. 850–51.) When confronted with an April 5, 2006 statement he allegedly made regarding the gas smell, Hightower asserted that his April 5 statement had changes made by the ATF that he did not agree with. (Tr. 854.) Hightower admitted that in June of 2010, ATF agents permitted Hightower to engage in a review of his previous reports to law enforcement, and that this review made him tired "because the conversation went like, no, this isn't my statement; no, I didn't say this; no, why is this marked out?" (Tr. 853.) Frustrated, Hightower ended the review and told the agents to take him home. (Tr. 854.) On redirect, Hightower re-emphasized that during his initial interview with law enforcement the day after the fire, he only answered the questions that were asked and only relayed the information he wanted law enforcement to know. (Tr. 867.)

(b) Credibility of Hightower's testimony

Lewis directs this court to several issues that he argues undermines the credibility of Hightower's testimony. Lewis asserts that the emphasis the Government placed on the 3:04 a.m. call in Hightower's testimony is misplaced, given the fact that Lewis's cell phone records indicate that

- 71 -

Hightower called Lewis 32 times that night, including once at 3:20 a.m., when according to Hightower, Lewis was already inside Hightower's home.  (Mem., p. 66 (citing to Ex. 27B).)  The Government replies that the 3:04 a.m. phone call is significant because it corresponds with the discovery of the fire.  (Mem. in Opp'n, p. 49.)  Lewis further  notes that portions of Hightower's testimony — in particular, Hightower's claim that Lewis corrected him by stating the house on fire was on 87th Street —  were not corroborated by Hightower's May 22, 2005 statement to police, but instead appeared in a later statement dated April 5, 2006.  (Mem., p. 67.)  In its Opposition, the Government contends that Hightower explained he did not want to cooperate with the police and that he only answered questions that were asked of him. (Mem. in Opp'n, p. 49.)  The Government further argues that Lewis has offered no reason why Hightower would fabricate this information, in light of their friendship.  (*Id.*)  Finally, the Government notes that Hightower's testimony that he initially thought the fire was on Decker is consistent with other witnesses' testimony that Moses Marshall's family lived on Decker.  (*Id.* at p. 50 (citing to Moses Marshall's testimony, Tr. 542; Stephanie Mitchell's testimony, Tr. 1254).)

### iii. Analysis

There are some inconsistencies in Collins's and Hightower's testimonies that raise serious credibility issues.  Collins's testimony that Lewis visited the 1220 House three times in close proximity to the fire is not corroborated by the two surviving residents of the house, and other relatives of the victims.  Further, Collins's account of Lewis's three visits to the house conflict with other witness testimony indicating Lewis was not in a dispute with the residents of that house shortly before the fire, or that any one in that house purchased drugs from him.  Similar to Jackson, Collins presented a very nebulous account of her relationship with Lewis.  She alleged that Lewis spent a

- 72 -

considerable amount of time in her home in the weeks preceding the fire, yet during the entire month of May, Lewis's phone records did not place him any where on the west side of Cleveland.  Lastly, Collins's connection to McKeever is troublesome.  There is a significant question regarding the truth of Collins's and McKeever's statements that they do not know each other.

Hightower stated that he smelled gas in Lewis's van both at trial and in a 2006 statement to law enforcement.  Hightower did not tell law enforcement about the smell of gas in Lewis's car or Lewis's alleged knowledge of the fire's location when he was initially interviewed by the police the day after the fire in 2005.  Although his 2005 omissions raise questions concerning the veracity of his later statements to law enforcement, it was clear that Hightower was uncooperative throughout the investigation.  His uncooperativeness is further supported by his hostile, offensive behavior at trial, where he was antagonistic to both sides and refused to answer certain questions.

The court finds several of Lewis's critiques regarding the credibility of Collins and Hightower persuasive. However, the court must base its decision on the entire trial record.

d. Conclusion regarding the credibility of the Government's witnesses

As detailed above, the court finds that substantial issues of credibility were raised in regard to several of the Government's key witnesses.  Jackson's testimony revealed inconsistent accounts of the events leading up to the fire, and important facts went uncorroborated by the Government. Jackson presented a very incomplete picture concerning his relationships with Lewis and Collins, and the timing of his cooperation with law enforcement raised questions concerning his motivation.  It is troublesome that the only corroboration of Jackson's account came by way of suspect jailhouse informant testimony.  All of the informants (and alleged accomplice Jackson), moreover, were in some way connected to repeat informant, Paul McKeever, who described himself as Jackson's friend

- 73 -

and who was incarcerated with Jackson during the weeks leading up to Jackson's initial statement to law enforcement.  While Sam Collins was not impeached in all respects, the court is nevertheless troubled by her own connection to Paul McKeever, even though both McKeever and Collins denied knowing each another.  Like Jackson's testimony, Collins's testimony also contained critical pieces of information that could not be corroborated because Collins could not recall her phone number (because she consumed too many drugs during the relevant time period) and was insistent that Lewis had a second phone, which was not recovered by law enforcement and whose number she could not remember.  Especially troubling to the court is these witnesses' collective account of Lewis's motivation for the arson: a drug debt. Although the Government did not have to prove a motive in this case, their statements concerning Lewis's alleged motive was an integral part of the testimony. No one connected to the 1220 House testified that any of the residents used drugs or purchased drugs from Lewis.  While the Government dismisses Lewis's arguments concerning the credibility of Jackson, Collins, and the jailhouse informants as a mere conspiracy theory, (Mem. in Opp'n, p. 52), their testimony presented ample grounds for skepticism.

While Hightower testified that he smelled gas emanating from Lewis's van at around the time of the fire, on cross it was revealed that Lewis's van had a number of mechanical problems and that Hightower had given the van STP gas treatment a few days before the fire.  The portion of his testimony less favorable to Lewis is the testimony concerning Lewis's knowledge of the fire at Medeia's house, particularly Lewis correcting Hightower regarding the location of the fire.  The court addresses this fact later in its Opinion.

Although serious concerns have been raised regarding the credibility of the Government's key witnesses,

- 74 -

> [m]anifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice."

*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992); *see also Washington*, 184 F.3d at 658 ("[O]n a motion for a new trial . . . the court may reweigh the evidence, taking into account the credibility of the witnesses.").  In other words, even if the court, sitting as a "thirteenth juror," gives little to no weight to the testimony of the Government's key witnesses, the court must see whether the Government produced other competent evidence sufficient to support the verdict.  With this inquiry in mind, the court turns to the remaining issues addressed by Lewis in his Motion and in the Government's Opposition. Specifically, the court looks to the remaining evidence in this case and asks whether, based on the record as a whole, the verdict was against the manifest weight of the evidence.

### D. The Remaining Evidence

#### 1. Lewis's Cell Phone Records

In the absence of physical evidence tying Lewis to the arson, Lewis's cell phones and call records were an integral part of the Government's case-in-chief, and as such, raise a number of issues. In its Opposition, the Government argues that based on Lewis's cell phone records and the expert testimony of Doug Smith, Lewis "was in the fire sector just before and just after the fire started."

(Mem. in Opp'n p. 43 (citing Tr. 1322–24).)[21]  Specifically, Lewis phone records showed calls at 2:53 a.m., 2:56 a.m., and 2:57 a.m. that placed him in the "fire sector." (Tr. 1323–24.)  A call at 3:04 a.m., placed him in an adjacent cell phone sector that contains George Hightower's residence.  (Tr. 1324.)  The so-called "fire sector," however, corresponded to a geographic area extending 16 city blocks, east to west.  (Tr. 1333.)  Further, the so-called "fire sector" also happens to correspond to a part of the east side of Cleveland that is familiar to the Defendant, and in close proximity to George Hightower's residence, where the Defendant had been staying prior to the fire, and Lewis's mother's residence.  Smith admitted on cross that while call records may place an individual within a particular coverage sector, the records would not show the person's exact location within that sector.  (Tr. 1332.)  Thus, this evidence is circumstantial evidence that Lewis was in the general vicinity of the 1220 House just before and just after the first 911 call regarding the fire.  It is not, however, "devastating" evidence as the Government argues.[22]

Equally critical to the Government's case-in-chief was Lewis's hypothetical second phone, records of which were never produced at trial.  It was this second phone that allegedly connected Lewis to Jackson, his alleged accomplice, and crack addict and prostitute Sam Collins, to whom Lewis confided that people in a house owed him money for drugs.  Their alleged communications

---

[21]  The first 911 call about the fire came in at 2:55 a.m.  It is unclear at which exact time the fire started.

[22]  While the Defense failed to object to the nature of the Government demonstrative exhibit labeling the cell phone sector in which the 1220 House was located the "fire sector," the court notes that the exhibit was suggestive in nature. The Government notes in its Opposition that "at least one juror noted how crucial this evidence was to the jury's decision." (Mem. in Opp'n p. 43.)  Not only did the exhibit label the cell phone coverage sector in which the 1220 House was located the "fire-sector," the physical exhibit itself contained a depiction of flames that encompassed the so-called "fire-zone."

were not independently corroborated because no records were produced for Lewis's second phone, and further, both Jackson and Collins testified that they could not remember their own cell phone numbers at the time.  The nature of Lewis's relationship with Jackson and Collins were critical issues at trial.  While the court certainly does not rule out the possibility that Lewis possessed multiple phones and that law enforcement could not recover all of them, their absence left the testimony largely uncorroborated.  Call records would have confirmed, at a minimum, that Lewis actually knew both Jackson and Collins.

### 2. Lewis's Alibi and the Investigation of the Arson

Lastly, the court considers the significance of Lewis's initial statements to law enforcement, early on in the course of the fire's investigation, and the nature of the investigation of the arson.  In his Motion, Lewis attacks the Government's investigation of the fire, and argues: (A) that ATF Agent Don Illig's testimony about Lewis's alleged false alibi is disingenuous and; (B) that the testimony of Teon Smith exposes the corrupt nature of the investigation, in particular the conduct of Agent John Gregg.

#### a. Lewis's allegedly false alibi and knowledge of the fire

On May 31, 2005, a few days after the fire, Agent Illig questioned Lewis for approximately 30 minutes regarding his involvement with the fire.  (Tr. 935, 937, 944.)  During closing argument and in opposition to Lewis's Motion, the Government argued that during the May 31, 2005 questioning, Lewis created a false alibi.  The false alibi argument boils down to an alleged statement Lewis made that he was in a particular housing project between 2:30 and 3:00 a.m., and that he made certain calls to Sharese and Sharay Williams during this period.  In this Motion, Lewis contends that his May 31, 2005 statements were true and supported by evidence presented at trial.  In their briefs,

- 77 -

both parties focus on the time line provided by Agent Illig during his testimony.  Agent Illig testified that Lewis described the following sequence of his whereabouts the night of May 20 through the morning of May 21, 2005.

On May 20, Lewis spent most of the day at George Hightower's house.  (Tr. 945.)  At 2:30 a.m., on May 21, Lewis returned to Hightower's house to retrieve a compact disc or CD.  (Tr. 946.) Lewis left Hightower's house and went to "The Browns," a housing project in Cleveland located at East 86th Street and Kenmore, where he listened to music, smoked marijuana, and took a half tablet of ecstasy.  (*Id.*)  While Lewis was listening to music, he received several phone calls from Sharay and Sharese Williams (Tr. 947.)  He stated that he never spoke to Sharay or Sharese when they called, but instead he opened the cell phone and held it up to the music.  (Tr. 947.)  After an unknown amount of time, two vehicles pulled into "The Browns'" parking lot; Lewis stated that he became nervous and decided to leave to go back to Hightower's house.  (Tr. 947.)

Once in Hightower's driveway, Lewis received a call from Hightower to turn down his music and turn off the light in his van.  (Tr. 948.)  Hightower came out of his house, walked toward Lewis's van, and he and Lewis proceeded to talk.  (Tr. 950.)  While outside, Lewis noticed that there were three individuals next door to Hightower's house.  Lewis and Hightower entered into the house; Hightower told Lewis that there had been a fire earlier that morning.  (Tr. 951–52.) Lewis believed that Hightower had the wrong information about whose house was on fire — Lewis corrected Hightower that the house on fire was Medeia Carter's, not the house of Moses Marshall's grandmother.  (Tr. 951–52.)

Approximately 20 minutes later, Lewis called Sharay Williams and learned that Shauntavia died in the fire.  (Tr. 953.)  Lewis remained at Hightower's house for the rest of the morning, but left

- 78 -

for his mother's house mid-morning.  (Tr. 953.)  Lewis got to his mother's house between 7:00 a.m. and 8:00 a.m.  (Tr. 953.)   At some point in the two-day period leading up to the fire, Lewis stopped at a Citgo gas station either at 79th and Superior, or Chester,  and purchased $5.00 worth of gas for his van.  Lewis initially told Illig that he purchased the gas during the late night, early morning, of May 20 through the 21, but later, stated that he could have gotten gas the previous night.  (Tr. 949.)

On cross-examination, Agent Illig testified that during the May 31, 2005 questioning, he took handwritten notes of Lewis's account, and then later, on June 9, 2005, he created a typed report of the interrogation.  (Tr. 1005.)  Agent Illig admitted that there were things in his typed report that were not in his May 31 handwritten notes.  (Tr. 989.)  Specifically, in his subsequent typed report, Agent Illig noted that Lewis stated he went to retrieve a CD from Hightower's house at around 2:30 a.m. (Tr. 996.)  Agent Illig testified that his May 31, 2005 handwritten notes do not contain this time.  (Tr. 996.)  Lewis notes that Agent Illig's handwritten notes contained no time line at all, and that the only time referenced in the notes is "7:00 a.m. to 8:00 a.m.," when Lewis stated he left Hightower's residence for his mother's residence.  (Mem., p. 50.)

 Lewis asserts that his statements to Agent Illig are true and corroborated by the testimonies of Sharay and Sharese Williams and other evidence in the record if one does not utilize the time-line provided by Illig in his testimony.  Both Sharay and Sharese testified to the following,  in pertinent part:  Around 3:32 a.m. on May 21, Sharay Williams called Lewis, but she does not remember talking to him. (Tr. 1208–09, 1241.)  Around 4:02 a.m. on May 21, Sharese Williams called Lewis on his phone (Tr. 1149–50); this phone call lasted 34 seconds. (*See* Ex. 27B, p. 58.)  Around 4:17 a.m on May 21, Sharay Williams called Lewis; this phone call lasted 27 seconds.  (See Ex. 27B, p. 58.) Starting at 4:58 a.m. Sharay Williams called Lewis over a dozen times in an hour (Tr. 1150–51); she

testifies that Lewis never answered his phone.  (Tr. 1243–44.)  At 5:47 a.m., Lewis called Sharay Williams and asked if it is true that Medeia Carter's house was on fire.  (Tr. 1233.)  At 6:04 a.m., Sharay Williams and Lewis spoke over the phone for 24 minutes; she told Lewis that Shauntavia died in the fire.  (Tr. 1236.)  Later that morning, Lewis arrived at Sharese Williams's house.  (Tr. 1114.)

Both parties' briefs focus on two issues regarding the time line from Agent Illig's records: (1) the start time of Lewis's conduct the night of the fire; and (2) Lewis's knowledge of the fire, and specifically the death of Shauntavia, Sharese Williams's daughter.

As stated above, Agent Illig's June 9 typed report described Lewis as arriving at Hightower's house, around 2:30 a.m., to retrieve a CD.  The time "2:30 a.m." was missing from Illig's May 31 handwritten notes.  This discrepancy is indispensable to the Government's argument that Lewis's May 31 account was a "demonstrably false alibi" because Lewis's phone records do not show calls to or from Sharay and Sharese Williams during this time period that place Lewis in the same cell phone sector as "The Browns."  Because of this, the absence of "2:30 a.m." from Agent Illig's handwritten notes and then, its appearance in the typed report must be viewed with some level of concern.  Although the Government acknowledges the importance of the "2:30 a.m." time to support its false-alibi argument (Mem. in Opp'n  p.  45), it does not offer a reasonable explanation for the time's absence in the handwritten notes.

Lewis argues that his May 31, 2005 account and Sharese and Sharay Williams' testimonies of their interactions with Lewis the night and morning of the fire can coexist, if one does not believe Lewis's conduct that night began around 2:30 a.m.  (Mem., p. 55.)  Lewis asserts that his May 2005 statement that he received phone calls from both Sharay and Sharese, without speaking with them is corroborated by both Williams' testimonies that they called Lewis around 3:32, 3:40, and 4:02

- 80 -

a.m., with no response.  (*Id.*)  Douglas Smith, who testified concerning Lewis's phone records, also

testified to the following:

- At 1:00 a.m., Lewis made a call to girlfriend Janine Chisholm that placed him in cell tower sector 257-4, which encompasses the location of the 1220 House.  (Tr. 1346.)
- Lewis's records show calls at 1:38 a.m. and 1:39 a.m. that place Lewis in cell phone sector 58-3, several miles south of the 1220 House, the housing project "The Browns," and Hightower's residence.  (Tr. 1321–22.)  The cell tower for this sector is located at 98th and Union Ave.  (Tr. 1345.)
- Lewis's records show calls at 2:53 a.m., 2:56 a.m., and 2:57 a.m. that place him back in the so-called "fire sector," sector 257-4. (Tr. 1323–24.)  From west to east, this sector extends from approximately East 80th Street to East 96th Street.  (Tr. 1333.)
- Lewis's records contain a series of calls between 3:04 a.m. and 3:32 a.m. that place him in an cell phone sector that encompasses George Hightower's residence.  (Tr. 1324.)
- Beginning at 3:37 a.m. and ending at 3:47 a.m., Lewis's records place him in a nearby cell phone sector that encompasses "The Browns."  (Tr. 1325.)
- The end of the 3:47 a.m. call places Lewis back in the same cell phone sector as George Hightower's residence.  (Tr. 1325.)
- Lewis's records also show calls to Sharese and Sharay Williams at 4:02 a.m. and 4:17 a.m. that place him back in sector 257-3, the same sector as "The Browns." (Tr. 1348.)

    In his Motion, Lewis contends that he was at "The Browns" when he received these phone

calls from Sharay and Sharese, and as presented above, Lewis's cell phone records do place him in

the area of the "The Browns" after 3:00 a..m.  Under this time line, Lewis does not have the

inconsistency explained above because his account of being at "The Browns" is no longer tied to the

2:30 a.m. time, but now the phone calls starting around 3:32 a.m.  (*Id.* at p. 56.)  While Lewis's later

time line is consistent with other evidence presented at trial, which undermines the false alibi

argument, less favorable to him is the fact that the later time-line provides no explanation for his

whereabouts during the time between 1:39 a.m., when his phone records place him several miles

away from the 1220 House, and 2:53 a.m., when the phone records place him in the general vicinity

of 1220 House.

An additional issue brought up in both parties' briefs is the extent of Lewis's knowledge concerning the fire.  Agent Illig testified that Lewis corrected Hightower about the location of the fire, shortly after Lewis entered into Hightower's driveway.  Agent Illig's testimony is corroborated by Hightower's testimony that Lewis informed Hightower, in response to Hightower's neighbors stating that Moses Marshall's house was on fire, that it was Medeia Carter' s house that was on fire, not, as Hightower believed, Moses Marshall's grandmother's house.  (Tr. 825.)  The Government argues that this testimony indicates that  Lewis must have known about the fire prior to his conversation with Hightower, however, it does not convincingly rule out the possibility that Lewis was simply aware of the fact that Marshall had been living at Medeia Carter's house.  Hightower's testimony was that the neighbors were saying that Moses Marshall's house was on fire.  Moses Marshall was Medeia Carter's live-in boyfriend (Tr. 466, 549) and Lewis knew him.  Indeed, Moses Marshall testified at trial and admitted a few weeks before the fire, Lewis had visited the 1220 House while Marshall was there.  (Tr. 596.)

The Government also notes that at 4:50 a.m., Lewis called Myesha Glass, an acquaintance who lived across the street from the 1220 House.  Glass testified that she "barely knew" Lewis, and that she found the call unusual because "he was calling me that time of the morning."  (Tr. 929.) Glass testified that Lewis asked her what she was doing, and that she responded that she was "all sad because Moe['s] house was on fire."  (Tr. 928.)  Glass told Lewis that "Sharese was crying in the street, like she was jumping up and down crying . . . because they was telling her they can't get to her daughter."  (Tr. 928.)  Glass testified that Lewis's response was that Glass was lying. (Tr. 928–29.)  He hung up shortly thereafter, and Glass testified that Lewis gave no indication that he

already knew that the fire had taken place.  (Tr. 929.)  The Government argues that this call "is consistent with the Government's theory that the defendant called someone directly across the street from the fire to get a report about the fire, not to chit chat with a casual acquaintance at 4:50 in the morning." (Mem. in Opp'n p. 42.)  Lewis argues that while he may have been aware of a fire at the 1220 House when he called Myesha, he was not necessarily aware of its consequences, particularly Shauntavia's death.

Regarding the news of Shauntavia's death, there is evidence that suggests Lewis first learned about the death of Shauntavia from his conversation with Sharay Williams just after 6:00 a.m, which would have been after the call with Myesha Glass.  Both Sharay Williams's testimony and Lewis's account to Agent Illig describe Lewis hearing that Shauntavia had died from Sharay.  (*See* Sharay Williams's testimony, Tr. 1235-36.)  Sharay describes Lewis as weeping when she told him the news. (Tr. 1236.)  Further, Hightower testified that after his arrival, Lewis had made a series of phone calls and eventually started crying in his house after receiving news that "one of his cousins or little play cousins was in the fire."  (Tr. 832.)

The foregoing reflects uncertainty regarding the full extent of Lewis's knowledge of the fire and its consequences, in the hours before the call with Sharay at 6:04 a.m.  While he may have known that the 1220 House was on fire before then, that does not necessarily mean that he was also aware of the magnitude of the fire, including the casualties.  At bottom, it is difficult to know, based on the evidence presented at trial, what Lewis knew and what he was thinking in the hours after the fire. "We are left with a case that is full of puzzles." *United States v. Morales*, 902 F.2d 604, 607 (7th Cir. 1990) (reversing district court decision denying motion for new trial), *opinion amended*, 910 F.2d 467 (7th Cir. 1990) (upholding ruling but amending language).

Finally, Lewis presents additional issues regarding Agent Illig, that the court finds less relevant to its inquiry.  Lewis notes that Agent Illig was the only investigator the Government called to testify.  (Mem., p. 47.)  Lewis believes this is important because there were several investigators for this crime – both state and federal – that the Government did not place on the stand.  (*Id.*)  The court takes note of this criticism, but this fact does not discredit Agent Illig's testimony as a witness or undermine the Government's argument as it pertains to Lewis's May 31, 2005 statement.

### b. ATF Agent Gregg and testimony of Teon Smith

Teon Marcel Smith is a friend of Medeia Carter who had been living in her basement, and is one of two survivors of the 1220 House fire.  On the night of the fire, Smith was sleeping in the house's basement, when he awoke to people yelling, "Fire, Fire."  (Tr. 2570.)  Smith walked up from the basement, and attempted to go to the upstairs bedrooms, where Medeia Carter and the children slept.  (Tr. 2571–72.)  He was unsuccessful.  (Tr. 2572.)  On a second attempt to go upstairs, Smith saw Capritta Nicole Bell walking down the stairs with severe burns.  (Tr. 2572.)  Smith grabbed Bell and took her out of the house.  (Tr. 2572.)  Bell suffered extensive injuries from the fire; Smith survived the fire, unscathed.

On June 7, 2005, Smith gave a statement to city law enforcement regarding the fire.  (Tr. 2573–74.)  On June 12, 2005, Smith gave a second statement to Agent John Gregg that implicated Moses Marshall, Medeia Carter's boyfriend at the time of her death, for committing the fire.  (Tr. 2575.)  At trial, Smith testified about the fire and his interview with Agent Gregg.  Smith stated that the eight-hour interview was forced and that Agent Gregg "coerced" him to give those statements.  (Tr. 2576.)  Smith further stated that the statements were not in his handwriting.  (Tr. 2576.)  Smith testified that Agent Gregg threatened him that he could not go home until he implicated "Mo Ellis"

- 84 -

(Moses Marshall) for the crime, and that if he failed to give the statements, the Government would charge him for the arson. (Tr. 2577; *See* Ex. T5.)  Smith stated that he signed the statements so that he could go home. (Tr. 2577.)  Reviewing his second statement on direct examination, Smith denied the truth of the statements. (Tr. 2578–80.) The Government declined to cross-examine Smith. (Tr. 2582.)

Lewis contends that Smith's unrebutted testimony regarding Agent Gregg's conduct warrants a new trial in the interest of justice. (Mem., p. 82.)  Lewis suggests that there are only two ways to rationalize Smith's testimony: (1) that Smith's second statement is accurate, and thus Moses Marshall is responsible for the fire or; (2) that Smith's testimony is accurate, and thus Agent Gregg coerced an individual to fabricate evidence to implicate an innocent man for the crime. (*Id*., p. 80-81.)  In its Opposition, the Government, which did not cross-examine Smith, hypothesizes a third reason for Smith's testimony: (3) Smith "had to explain why he bizarrely claimed that Moses Marshall woke him up, and it sounded better for him if he blamed the agent instead of admitting that he awoke from a drug-induced sleep . . . ."  (Mem. in Opp'n p. 55.)

Lewis also notes that Agent Gregg sought to intimidate Capritta Nicole Bell, the other survivor of the fire, into stating that she owed Lewis money for drugs. (Mem., p. 81.)  On cross-examination, Bell testified that Agents Gregg and Illig confronted Bell with "new information" that suggested she owed Lewis money for drugs. (Tr. 527–28.)  Bell testified that both Agents accused her of owing Lewis for a drug debt and, in response, she contacted the Cleveland detectives to deny their accusations. (Tr. 528.)

The court is troubled by Smith's unrebutted testimony.  Agent Gregg was heavily involved in the investigation, having interviewed and written statements for 13 witnesses called to testify at

- 85 -

trial. Critical to the Government's case-in-chief, Agent Gregg wrote statements for Lewis's alleged accomplice, Marion Jackson, the jailhouse informants, Paul McKeever (Tr. 1760), Daniel Id'Deen (Tr. 1706, 1780), Cyle Watson (Tr. 1989), Christopher Myers (Tr. 2048), Anthony Collier (Tr. 1927, 1930), Richard Wheeland, and the prostitute, Samantha Collins (Tr. 2209). As the court already noted, all of the previously listed witnesses were connected not only by their interactions with Agent Gregg, but also by their relationships with Paul McKeever. At one time, Id'Deen, Watson, Myers, Collier, and Wheeland were either cell mates with McKeever or in the same prison pod as McKeever, prior to giving a statement to Agent Gregg that implicated Lewis. During his testimony, McKeever stated that Agent Gregg asked McKeever to speak with Lewis to see if Lewis related any information to McKeever about the fire. (Tr. 1434–45.) Agent Gregg arranged for Lewis to be transferred to Grafton Correctional Institution, the prison where McKeever was incarcerated. (Tr. 1434–45.) McKeever testified that Agent Gregg deposited money into McKeever's account so McKeever could buy Lewis items as a way of getting close to Lewis. (Tr. 1454.)

Because Agent Gregg did not testify at trial, this court is left to consider the nature of Agent Gregg's conduct only through the testimonies of other witnesses. Even if the court finds Smith's and Bell's testimony credible, which it does, Agent Gregg's tactics with these witnesses do not necessarily lead to the conclusion that Agent Gregg coerced or orchestrated a half dozen prisoners and Lewis's alleged accomplice to implicate *Lewis* for the arson. While the court is very concerned about these accusations against Agent Gregg, these accusations are not evidence that weigh against the verdict. However, the nature of the investigation, as revealed through the testimonies of the witnesses, is a factor the court considers in deciding whether the record permits a confident conclusion. *See Morales*, 902 F.2d at 607.

## IV. SUMMARY AND CONCLUSION

In our criminal justice system, *jurors* are the triers of fact and are charged with the duty of weighing credibility.  *See United States v. Caraway*, 411 F.3d 679, 682 (6th Cir. 2005).  Federal Rule of Criminal Procedure  33, however, grants trial judges limited discretion, upon a motion by the Defendant, to overturn a jury's verdict "if the interest of justice so requires."  This discretion, however, is not to be utilized lightly.  Where the defendant contends that the verdict is against the manifest weight of the evidence, the court can consider the credibility of the witnesses and the weight of the evidence to ensure that there has not been a miscarriage of justice.  *Ashworth*, 836 F.2d at 266.  However, a new trial should be granted only under extraordinary circumstances, such as where the evidence preponderates heavily against the verdict.  *Id.*

In its Opposition, the Government argues that this "was a relatively straightforward case." (Mem. in Opp'n p. 57.)  The court disagrees.  This was not a case that was "solid and consistent." *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985) (denying Rule 33 motion based on manifest weight of the evidence).  Rather, the "government's [key] witnesses had been impeached" and the Government's case-in-chief was "marked by uncertainties and discrepancies."  *Id.*  The most glaring inconsistency in the Government's case-in-chief was the conflict between the testimonies of the relatives and friends of the fire's victims and the testimonies of the jailhouse informants, crack-addict and prostitute Samantha Collins, and alleged accomplice and career criminal Marion Jackson, each of whom presented variations on a similar theme:

- Marion Jackson (alleged accomplice and acquaintance of informant McKeever and prostitute Collins): believed Lewis wanted the fire set "for drugs or something." (Tr. 2272.) Lewis answered phone call shortly before the fire with, "is the bitch Nicole in the house?" (Tr. 2284.)

- Paul McKeever (jailhouse informant): Lewis stated he "wanted to send that bitch a

- 87 -

message" (Tr. 1460) and "mentioned a girl named Nicole." (Tr. 1450.)

- Daniel Id'Deen (jailhouse informant): Lewis stated fire was "meant for the bitch Nicole." (Tr. 1716.)

- Richard Wheelend (jailhouse informant): Lewis stated fire "was meant for Nicole" (Tr. 1839) and it was "either that or shoot the bitch." (Tr. 1839.)

- Anthony Collier (jailhouse informant): Lewis referred to a "girl named Nicole" (Tr. 1919) and the girl "got burned but she still looked good." (Tr. 1920.)

- Cyle Watson (jailhouse informant): Lewis confessed he "killed a bitch . . . she ripped him off with some dope and [Lewis] torched her house." (Tr. 1986.)

- Christopher Myers (jailhouse informant): Lewis confessed "some girl had owed him some money and . . . [Lewis and Jackson] was supposed to set the mother fucker on fire." (Tr. 2033.)

- Samantha Collins (former prostitute and drug user): Lewis was upset because people did not pay him back for drugs and "there was too many to shoot, so he would burn them all out." (Tr. 2206.) Collins denied knowing McKeever despite the fact that her former husband had been indicted for a car theft alongside McKeever. Even though Jackson claimed he met Lewis through Collins, there was no mention of Jackson in Collins's testimony.

The ubiquitous "bitch Nicole" testified at trial. Capritta Nicole Bell is actually a nursing student, and a survivor of the fire who incurred serious burns. She testified that she is not a drug user, did not purchase drugs from Lewis, and was not in any dispute with him. She testified that she was upset when agents approached her and suggested she was linked to the fire and owed Lewis money for drugs. She was not impeached, but rather her statements were corroborated by other friends and relatives of the victims who testified that no one in the 1220 House was a drug user, purchased drugs from Lewis, or was in a dispute with him. Evelyn Martin, the mother of victim and renter of the 1220 House, Medeia Carter, testified that her daughter kept an "immaculate" house and that it was always full of children. (Tr. 182–83.) Indeed, the eight children who died in the fire were at her home having a sleep over. She described Medeia as a kind woman, who took Capritta Nicole

- 88 -

Bell into her house and encouraged her to go to college.  (Tr. 185.)

The friends and relatives of the victims also testified to disconcerting tactics on the part of agents investigating the fire, including coercion and intimidation.  *See Morales*, 902 F.2d at 607 (noting, in reversal of denial of Rule 33 motion, "extraordinarily sloppy" nature of the investigation).  The friends and relatives of the victims have nothing to gain from the trial process but justice and knowledge of the truth; the court has serious doubts concerning the motives of the jailhouse informants, prostitute Collins, and alleged accomplice Jackson, who during the course of the arson investigation, changed his name to Michael Alexander Knight after the fictional crime-fighter, the "Knight Rider."

The Government presented a different motive that also fell flat.  Sharese Williams, mother of child-victim Shauntavia and "play mother" to Lewis, testified that in the week leading up to the fire, she was in a dispute with Lewis because Lewis had skipped court while out on bond in her name.  Lewis, who had been living with Williams, took all of his clothing from her house and moved it to his biological mother's house in order to hide out.  Williams "retained" his clothing from his mother in an attempt to get Lewis to return to her home, at which point she would call the police so that he could be taken into custody to answer to an outstanding warrant.  George Hightower, Lewis's friend, overheard a phone call between Lewis and his biological mother in which Lewis expressed his anger concerning Williams.  Hightower testified that he told Lewis that if he were Lewis, *he (Hightower)* would burn the house down.  Yet, Lewis knew precisely where Williams lived, and it was not at the 1220 House.  Lewis had been living with Williams up until the bond dispute, and had recently helped her move to a new house.  Lewis also knew that his "play-sister" Shauntavia, Sharese's daughter, had been staying at the 1220 House since Sharese had recently moved to a new neighborhood.  Sharay

Williams, Shauntavia's sister, testified that Lewis broke down crying when she shared the news that Shauntavia had perished in the fire.  This was corroborated by Hightower, who was present when Lewis received the call from Sharay.

The Government has consistently argued that it had no obligation to prove a motive in this case.  This is true, but that does not shield testimony from an assessment of its credibility, weight, and competency, especially in a case where there is no physical evidence tying the defendant to the crime.  It certainly does not transform uncorroborated and contradicted speculation into competent and credible evidence.  *See Simms*, 508 F. Supp. at 1207 ("The government's case depends upon . . . uncorroborated testimony that, upon careful scrutiny, is subject to questions of credibility.").

That leaves the testimony of alleged accomplice Marion Jackson and circumstantial evidence regarding Lewis's phone records and Lewis's knowledge of the fire.  As an initial matter, it is difficult to view Jackson's testimony in isolation.  He came forward to law enforcement as an alleged accomplice on September 30, 2005, after having spent approximately six weeks in the same prison pod with acquaintance, repeat informant and career criminal and sex-offender McKeever.  At that time, Jackson was facing serious criminal charges and could not afford to post a $100,000 bond.  In essence, he emerged from the same milieu as the jailhouse informants.  Several aspects of his testimony are deeply troubling, including the following:

- Jackson presented a nebulous and bare bones picture of his relationship with Lewis, yet claimed that Lewis grew to trust him.  Despite claiming to have been the accomplice in the arson and to have had a relationship of trust with Lewis, he bizarrely asked Lewis whether he knew who committed the arson, why this person might have set the fire, and whether Lewis was there when the fire happened when he was wired by ATF agents and sent to jail to visit with Lewis in an attempt to collect incriminating statements.

- Jackson drastically changed his account of the events preceding the fire.  Prior to trial and during direct, he claimed to have been with Lewis starting around 9:30 p.m. until

the arson was committed the following morning sometime after 2:30 a.m.  On cross-examination, after he was confronted with Lewis's unrebutted phone records, the five hours he allegedly spent with Lewis was truncated to a brief encounter consisting of a 15-20 minute "casual walk." While not impossible, it is highly improbable that a man of Jackson's age and with his health complications could engage in the activities Jackson described during that brief period of time (which includes a walk of at least 20 city blocks).  At around the time of the fire, Jackson was approximately 55 years old and suffered from heart problems, breathing problems, diabetes, and bipolar disorder. While Jackson insisted that he was not good with times, dates, and numbers, this discrepancy is well outside a reasonable margin of error.  There is a palpable difference between 5 hours and 20 minutes.

- Prior to trial, Jackson testified that the gas station he and Lewis went to in order to purchase gas to commit the arson was at East 79th and St. Clair, and he gave specific directions which involved Jackson and Lewis circling the neighborhood before they finally arrived at the 1220 House.  Just prior to trial, he learned there was no gas station at that location, and during trial, Jackson testified that the gas station was located on East 76th and Superior.  He described a much simpler path than the one he previously described to law enforcement, and it involved he and Lewis walking back and forth on the *same avenue* rather than circling the neighborhood.

- Jackson testified to a key fact that has gone completely uncorroborated.  Specifically, the alleged party/cook-out of about 20 people near the 1220 House, whose attendants allegedly reacted to the fire.  Bruce Thomas, a first responder to the fire who claimed to be standing at the same exact spot where Jackson claimed he stood as a look out, testified that he did not see a party of about 20 people at the block, did not see any one walking down the street with cans of gas, and did not see anyone emerge from the 1220 House.

- Though Jackson insisted that he never received express promises from the Government, the record reflects that he did receive certain benefits during the course of the fire's investigation, including: the support of ATF agent John Gregg at criminal hearings and thousands of dollars in various forms of assistance.

Ordinarily, an eyewitness account of a crime is compelling and probative evidence of guilt and it can be sufficient to convict, but Jackson's testimony was troubling.  The fact that Lewis was indicted approximately three years after Jackson came forward to law enforcement shows that perhaps even the Government was, at one point, skeptical of Jackson's account.  Of further concern is the fact that the corroboration of his testimony came by way of suspect jailhouse informant

- 91 -

testimony.  The court does not conclude that, categorically, such witnesses are incredible, but in this case red flags abound.  Rather than add corroborative value, the cumulative nature of the jailhouse testimony only served to highlight suspect connections.  The Government downplays the connections that repeat informant Paul McKeever had to all of the informants, but it was clear that McKeever was a prominent figure in this case; all the witnesses who directly implicated Lewis were connected to him.  Indeed, as the Government noted in its closing argument: "if that's the story you accept [that McKeever colluded with other witnesses], acquit the defendant."  (Tr. 3077.)  Moreover, the court cannot disregard the fact that these witnesses all presented a very similar and general account, and that some of them acknowledged having learned of the fire (and certain facts, such as the name "Nicole") through media coverage.[23]

The court's concerns would be assuaged if, aside from Jackson's dubious testimony, there was probative evidence that Lewis committed the arson, but the rest of the evidence is ambiguous circumstantial evidence that leaves much room for reasonable doubt.  Lewis received phone calls just before and after the first 911 call reporting the fire at 2:55 a.m., that place him in the same cell phone tower sector within which the 1220 House is located.  This sector is a geographic area extending approximately 16 city blocks that is familiar to the Defendant and in close proximity to George Hightower's residence, where Lewis had been staying prior to the fire.  Lewis could have been at the 1220 House during this time setting the fire.  But he also could have been just driving through the neighborhood on his way to Hightower's house when he received the calls.  A few days after the fire,

---

[23]     By no means does the court conclude that the Government knowingly presented false testimony or otherwise skirted ethical obligations in using these witnesses. However, the use of these types of witnesses clearly presents a problematic gray area, and moreover, as courts have noted, such witnesses are often quite savvy in their interactions with the system. *Arroyo*, 973 A.2d at 1260.

Lewis smoked marijuana with two women, Charise Frazier and Carmella Smith, and told them he was "fucked up about the fire." Was this a manifestation of guilt or was he upset regarding the loss of life in the fire? Smith testified that Lewis discussed details about the fire, but on cross admitted that it seemed that he was relaying information he heard elsewhere and that there were rumors circulating in the neighborhood. She also testified that agents investigating the fire "could have" intimidated her and told her that they knew she had children. This is a case that often required one to enter the realm of speculation.[24]

Ultimately, the court concludes that it would be a miscarriage of justice for this verdict to stand, as it rests predominantly on the testimonies of witnesses who were impeached, stood to gain from providing testimony, and who collectively presented a narrative that was greatly undermined by competent and unimpeached evidence in the record, namely the testimony of the individuals who were actually connected to the 1220 House, the victims, or lived in the surrounding neighborhood. *See Simms*, 508 F. Supp. at 1207–08 ("[W]here there is even the slightest chance that a miscarriage of justice may have occurred, as is the case here, the Court is obligated in the interest of justice to order a new trial.")

This has not been an easy decision for the court. The court has the utmost respect for our jury system, and does not overturn this jury's verdict lightly. However, the court finds that this is one of those few cases where the integrity of the system is at stake and the court is required to overturn the jury's verdict as being against the manifest weight of the evidence. Here, a conviction for a crime

---

[24]    As an example of the matters of speculation in this case is the question of how Lewis got into the 1220 House when there was testimony that Medeia Carter locked the doors of the home as a matter of habit before going to bed. (Tr. 505,603.)

of this magnitude rests almost exclusively on the word of suspect witnesses, career criminals, and jailhouse informants who can easily insert themselves into the facts of a case given its high-profile nature.  This is a case where the Defendant was at one point facing the death penalty and now a life sentence; the stakes demand some measure of confidence, and the record simply does not provide it. *See Morales*, 902 F.2d at 608 ("When, however, in a case in which a jury has convicted a person of a crime carrying a very long . . . penalty, the complete record, testimonial and physical, does not permit a *confident* conclusion that the defendant is guilty beyond a reasonable doubt, the district judge [may be] obliged to grant a motion for a new trial." (emphasis in original)).

In so ruling, it is important to note that the court does not find that Lewis did not commit the arson or that there was no evidence at all which would support a conviction.  However, this is also a case that was marked by many unresolved questions.  A new trial would provide an incentive for both sides to better develop the facts in this case and present competent evidence to the jury.  As the Seventh Circuit noted in reversing a court's denial of a Rule 33 motion, "[t]he better the lawyers at a [second] trial are . . . the more likely is the trier of fact to find the truth."  *Id.* at 609.  The court is mindful of the expense involved in re-prosecuting a case, but a new trial is "much more likely to render a verdict in which the legal system and the public can have confidence."  *Id.*

- 94 -

For the foregoing reasons, the court hereby grants Lewis's Motion for a New Trial based on the Manifest Weight of the Evidence under Fed. R. Crim. P. 33. (ECF No. 324.)  Because the court grants the above Motion, Lewis's Rule 33 Motion based on newly-discovered evidence of perjury and witness collusion is dismissed as moot. (ECF No. 332.)

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

February 8, 2012